## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| | |
| ALAMEDA RESEARCH LTD. and FTX TRADING LTD., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50444 (JTD) |
| PLATFORM LIFE SCIENCES INC., LUMEN BIOSCIENCE, INC., GREENLIGHT BIOSCIENCES HOLDINGS, PBC, RIBOSCIENCE LLC, GENETIC NETWORKS LLC, 4J THERAPEUTICS INC., LATONA BIOSCIENCES GROUP, FTX FOUNDATION, SAMUEL BANKMAN-FRIED, ROSS RHEINGANS-YOO, and NICHOLAS BECKSTEAD, | |
| Defendants. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT PLATFORM LIFE SCIENCES, INC.'S
MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION**

---

[1]       The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

# TABLE OF CONTENTS

**Page(s)**

PRELIMINARY STATEMENT ...................................................................................................1

STATEMENT OF FACTS ..........................................................................................................3

      A.    The Parties ...................................................................................................3

      B.    PLS Has Extensive Contacts With the United States ...............................4

      C.    In Connection with Latona's Investment, PLS Incorporated a Delaware Entity, Employed U.S. Legal Counsel, Agreed to U.S. Forum and U.S. Choice of Law Clauses, and Invoked the Benefits and Protections of U.S. Law....................9

      D.    The Fraudulent Transfers to PLS Originated from Plaintiffs' U.S. Bank Accounts and, at PLS's Direction, Were Transmitted Through a U.S. Correspondent Bank.....................................................................................12

ARGUMENT ...............................................................................................................................15

I.      LEGAL STANDARD.......................................................................................15

II.     PLS IS SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES ........18

      A.    This Court Has General Personal Jurisdiction Over PLS .....................18

      B.    This Court Also Has Specific Personal Jurisdiction Over PLS ............22

      C.    PLS Has Sufficient Minimum Contacts with the United States Such That Exercising Personal Jurisdiction Over PLS Will Not Offend Due Process..........25

III.    SHOULD THE COURT FIND PLAINTIFFS HAVE NOT MADE A PRIMA FACIE SHOWING OF PERSONAL JURISCITION OVER PLS, PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY.......................................................27

CONCLUSION.............................................................................................................................28

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*3G Licensing, S.A.* v. *Lenovo Grp. Ltd.*,
    2019 WL 3974539 (D. Del. Aug. 22, 2019) ............................................................................28

*Alicea* v. *LT's Benjamin Recs.*,
    762 F. Supp. 2d 299 (D. Mass. 2010) ....................................................................................20

*In re Arcapita Bank B.S.C.(C)*,
    640 B.R. 604 (S.D.N.Y. 2022)..........................................................................................2, 23

*Arlington Indus., Inc.* v. *Elec. Custom Distributors, Inc.*,
    817 F. Supp. 2d 473 (M.D. Pa. 2011) ....................................................................................19

*Arpaio* v. *Dupre*,
    527 F. App'x 108 (3d Cir. 2013) ....................................................................................16, 18

*Asahi Metal Indus. Co.* v. *Superior Court*,
    480 U.S. 102 (1987)................................................................................................................27

*In re Asbestos Litig.*,
    2016 WL 7404547 (Del. Super. Oct. 17, 2016)......................................................................17

*In re AstroPower Liquidating Tr.*,
    335 B.R. 309 (Bankr. D. Del. 2005) .......................................................................................17

*Atchley* v. *AstraZeneca UK Ltd.*,
    22 F.4th 204 (D.C. Cir. 2022) ................................................................................................20

*In re Bernard L. Madoff Investment Securities LLC*,
    440 B.R. 274 (Bankr. S.D.N.Y. 2010).....................................................................................26

*BNSF Ry. Co.* v. *Tyrrell*,
    581 U.S. 402 (2017)................................................................................................................17

*In re Plassein Int'l Corp.*,
    352 B.R. 36 (Bankr. D. Del. 2006) .........................................................................................17

*Budget Blinds, Inc.* v. *White*,
    536 F.3d 244 (3d Cir. 2008)....................................................................................................20

*Burger King Corp.* v. *Rudzewicz*,
    471 U.S. 462 (1985)..............................................................................17, 18, 20, 25, 26

*Cacchillo* v. *Insmed Inc.*,
    833 F. Supp. 2d 218 (N.D.N.Y. 2011) ...................................................................19

*In re Chocolate Confectionary Antitrust Litig.*,
    602 F. Supp. 2d 538 (M.D. Pa. 2009) ...............................................................27, 28

*In re DBSI, Inc.*,
    451 B.R. 373 (Bankr. D. Del. 2011) .....................................................................26

*In re DBSI, Inc.*
    467 B.R. 309 (Bankr. D. Del. 2012) .....................................................................25

*Dorsey* v. *Am. Golf Corp.*,
    98 F.Supp.2d 812 (E.D. Mich. 2000) ...................................................................19

*Douglass* v. *Nippon Yusen Kabushiki Kaisha*,
    46 F.4th 226 (5th Cir. 2022) ................................................................................22

*In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*,
    735 F. Supp. 2d 277 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012) ............18

*Fid. Nat'l Info. Servs.* v. *Plano Encryption Techs., LLC*,
    2016 WL 1650763 (D. Del. Aug. 25, 2016) .........................................................28

*Finjan LLC* v. *Trustwave Holdings, Inc.*,
    2021 WL 5051147 (D. Del. Oct. 29, 2021) ..........................................................15

*Forest Labs. Inc.* v. *Cobalt Labs. Inc.*,
    2009 WL 605745 (D. Del. Mar. 9, 2009) .............................................................19

*Foster-Gwin* v. *Fallwell*,
    2001 WL 1382069 (N.D. Cal. Nov. 5, 2001) .......................................................19

*Functional Pathways of Tennessee, LLC* v. *Wilson Senior Care, Inc.*,
    866 F. Supp. 2d 918 (E.D. Tenn. 2012) ...............................................................19

*Godo Kaisha IP Bridge 1* v. *TCL Commun. Tech. Holdings Ltd.*,
    2016 WL 4413140 (D. Del. Aug. 17, 2016) .........................................................28

*Hanson* v. *Denckla*,
    357 U.S. 235 (1958).............................................................................................18

*Harris* v. *Harris*,
    289 A.3d 277 (Del. Ch. 2023)..............................................................................24

*Helicopteros Nacionales de Colombia, S.A.* v. *Hall*,
    466 U.S. 408 (1984).............................................................................................16

*IM2 Merchandising & Mfg, Inv.* v. *Tirex Corp.*,
2000 WL 1664168 (Del. Ch. Nov. 2, 2000) .......................................................................17

*International Shoe Co.* v. *Washington*,
326 U.S. 310 (1945) .........................................................................................................18

*Ipoint Ventures, LLC* v. *Pequot Cap. Mgmt., Inc.*,
2005 WL 1828586 (D.N.J. July 29, 2005) ...................................................................19, 21

*Licci* v. *Lebanese Canadian Bank, SAL*,
732 F.3d 161 (2d Cir. 2013) ..............................................................................................23

*Lionti* v. *Dipna, Inc.*,
2017 WL 2779576 (E.D. Pa. June 27, 2017) .......................................................................28

*Marshall* v. *I-Flow, LLC*,
856 F. Supp. 2d 104 (D.D.C. 2012) ....................................................................................20

*McGee* v. *Int'l Life Ins. Co.*,
355 U.S. 220 (1957) .........................................................................................................18

*Mellon Bank PSFS, Nat'l Ass'n* v. *Farino*,
960 F.2d 1217 (3d Cir. 1992) ............................................................................................16

*Metcalfe* v. *Renaissance Marine, Inc.*,
566 F.3d 324 (3d Cir. 2009) .........................................................................................15, 27

*Miller Yacht Sales, Inc.* v. *Smith*,
384 F.3d 93 (3d Cir. 2004) ................................................................................................15

*Pieczenik* v. *Dolan*,
2003 WL 23095553 (S.D.N.Y. Dec. 30, 2003) ....................................................................20

*In re Pursuit Capital Mgmt., LLC*,
595 B.R. 631 (Bankr. D. Del. 2018) .................................................................16, 19, 20, 22

*Registered Agents, Ltd.* v. *Registered Agent, Inc.*,
880 F. Supp. 2d 541 (D. Del. 2012) ...................................................................................27

*Sanitec Indus., Inc.* v. *Sanitec Worldwide, Ltd.*,
376 F. Supp. 2d 571 (D. Del. 2005) ...................................................................................16

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*,
2022 WL 17726520 (Bankr. S.D.N.Y. Dec. 15, 2022) ..........................................................23

*Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec., LLC*,
460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011) .........................................................................24

*Silver* v. *Countrywide Realty, Inc.*,
    39 F.R.D. 596 (S.D.N.Y. 1966) ...................................................................................19, 22

*In re Sledziejowski*,
    2016 WL 6155929 (Bankr. S.D.N.Y. Oct. 21, 2016) ...........................................................20

*Surgical Laser Techs., Inc.* v. *C.R. Bard, Inc.*,
    921 F. Supp. 281 (E.D. Pa. 1996) ....................................................................................19

*In re Tandycrafts, Inc.*,
    317 B.R. 287, 289 (Bankr. D. Del. 2004) ...........................................................................16

*Toys "R" Us, Inc.* v. *Step Two, S.A.*,
    318 F.3d 446 (3rd Cir. 2003) .....................................................................................15, 27

*Tristrata Tech., Inc.* v. *Emulgen Labs., Inc.*,
    537 F. Supp. 2d 635 (D. Del. 2008) ...................................................................................26

*In re UD Dissolution Corp.*,
    629 B.R. 11 (Bankr. D. Del. 2021) ...............................................................................26, 27

*United States SEC* v. *Carrillo*,
    115 F.3d 1540 (11th Cir. 1997) .......................................................................................19

*In re Uni-Marts, LLC*,
    405 B.R. 113 (Bankr. D. Del. 2009) ..................................................................................17

*In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*,
    2017 WL 66281 (N.D. Cal. Jan. 4, 2017) ...........................................................................20

*Wells Fargo Bank, N.A.* v. *RLJ Lodging Tr.*,
    2013 WL 5753805 (N.D. Ill. Oct. 23, 2013) ........................................................................20

*World-Wide Volkswagen Corp.* v. *Woodson*,
    444 U.S. 286 (1980) ............................................................................................18, 22, 25

Plaintiffs Alameda Research Ltd. and FTX Trading Ltd. ("Plaintiffs") respectfully submit this brief in opposition to the motion of Defendant Platform Life Sciences, Inc. ("PLS") to dismiss the Complaint under Fed. R. Civ. P. Rule 12(b)(2) [Adv. D.I. 35] ("PLS Mot.").  In connection with their brief, Plaintiffs submit the concurrently filed Declaration of Matthew McGuire and the exhibits attached thereto (the "McGuire Decl.").

## PRELIMINARY STATEMENT

PLS cannot escape this Court's exercise of personal jurisdiction over it by omitting crucial facts about its extensive connections with the United States and by asserting incorrectly that none of the fraudulent transfers at issue had any connection to the U.S.  Without the benefit of jurisdictional discovery, Plaintiffs have made a *prima facie* showing, based on competent evidence, that PLS is subject to both general and specific jurisdiction in the U.S.

Seeking to avoid general jurisdiction, PLS falsely asserts that "PLS [ ] has no business activities directed to . . . the United States."  PLS Mot. ¶ 33.  PLS, however, omits myriad facts showing that it maintains continuous and systematic contacts with the U.S.  PLS's high-level decision-making is directed from the U.S. because five out of the six-members of PLS's Leadership Team and two of the three members of its board of directors reside and work in the U.S.  Indeed, until May 2023, the then-CEO of PLS lived in and worked from the U.S.  In addition, 43% of PLS's employees reside and work in the U.S., and PLS actively solicits employees to work in the U.S.  As a for-profit corporation that offers clinical trial services, PLS boasts access to 83 clinical trial sites in the U.S. and more "experts and access sites" in the U.S. than in the rest of the world combined.  To promote its business objectives, PLS employees regularly publish articles in U.S.-medical journals and attend conferences in the U.S., and PLS's current CEO traveled from Canada to the U.S. to accept an award from a U.S.-based

organization in May 2022.  When the Court considers the totality of the circumstances of PLS's

extensive contacts with the U.S.—all of which Plaintiffs established without the benefit of

jurisdictional discovery—there can be no doubt that PLS is "essentially at home" in the U.S. and

should reasonably anticipate being haled into Court here.

      Seeking to avoid specific jurisdiction, PLS again resorts to misrepresentations.

      *First*, PLS falsely asserts that "[a]ll funding [with respect to the fraudulent

transfers] flowed between non-U.S. banks" and "[n]o part of the transactions underlying the

allegations . . . have a connection to the United States."  PLS Mot. ¶ 17.  But Plaintiffs have

demonstrated, through wire instructions provided by PLS to Plaintiffs and Plaintiffs' bank

records, that each of the fraudulent transfers in U.S. Dollars was in fact sent from a Plaintiff's

U.S. bank account and, at PLS's instruction, was transmitted through Wells Fargo in New York

as U.S. correspondent bank, before arriving in PLS's bank account at the Canadian Imperial

Bank of Commerce ("CIBC").  PLS's choice to route the transfers through a U.S. correspondent

bank is sufficient to confer specific jurisdiction.  *See In re Arcapita Bank B.S.C.(C)*, 640 B.R.

604, 617 (S.D.N.Y. 2022) (affirming the lower court's finding of specific personal jurisdiction

over foreign defendant based on its "use of New York correspondent accounts because [the

foreign defendant] purposefully availed itself of carrying on activities in New York by using

those accounts to effectuate" the transfers).

      *Second*, PLS also twists the facts in asserting that "PLS Delaware was

incorporated for the sole and exclusive purpose of processing payroll[ ] and providing benefits"

to PLS employees who work in the United States.  PLS Mot. ¶ 8.  The contemporaneous

evidence demonstrates that only days after Ross Rheingans-Yoo, who held himself out as the

Executive Director of Latona, asked whether Latona should require PLS to incorporate in

Delaware and received a revised draft term sheet for Latona's investment in PLS that defined PLS as a "*to be* incorporated company in a jurisdiction mutually agreeable to [PLS] and [Latona]," PLS incorporated an entity in Delaware with exactly the same name as PLS.  The Chief Strategist (and now CEO) of PLS, Ed Mills, informed Rheingans-Yoo that PLS had incorporated in Delaware and asked how to proceed.  PLS's assertion that the Delaware entity was created solely to pay U.S. employees is at odds with that history, and is not credible given that PLS managed to pay its U.S. employees before it formed the Delaware entity.

       *Third*, PLS purposefully availed itself of the United States in connection with the agreements governing Latona's investment in PLS at issue in the Complaint.  Using U.S. counsel to negotiate the agreements, PLS agreed to U.S. forum selection and U.S. choice of law clauses and invoked the benefits and protections of U.S. securities and tax laws.  That same U.S. counsel incorporated the Delaware entity.

       Because PLS has extensive contacts with the United States, and because PLS purposefully availed itself of the United States in connection with the fraudulent transfers that Plaintiffs seek to avoid, its motion to dismiss for lack of personal jurisdiction pursuant to Rule 12(b)(2) should be denied.

### STATEMENT OF FACTS

**A.    The Parties**

       Defendant PLS is a for-profit corporation incorporated in British Columbia, Canada, Compl. ¶ 21[2], that sells different types of clinical trial services based on the amount clients are willing to pay:  a bronze tier package for basic services, a silver tier package for

---

[2]      Cites to "Compl." shall refer to the complaint filed in *Alameda Research et al.* v. *Platform Life Sciences, Inc. et al.*  Adv. Pro. No. 23-50444-JTD, ECF No. 1 (the "Complaint").  Capitalized terms used in this memorandum shall have the same meaning as those used in the Complaint.

intermediate services, and a gold tier package for premium services.  McGuire Decl. Ex. 1 at 10-11.  PLS incorporated a Delaware entity with the exact same name as PLS on March 31, 2022 in connection with the Latona investment in PLS that is at issue in this action.  Mills Decl. Ex. 2.

Defendant Latona is purportedly a non-profit company incorporated in the Bahamas and affiliated with the FTX Group that arranged for Plaintiffs to make three fraudulent transfers totaling $53.25 million from Plaintiffs' U.S. bank accounts to PLS in connection with Latona's investment in PLS.  Compl. ¶¶ 16, 56–72.  Defendant Ross Rheingans-Yoo, a U.S. citizen who currently resides in the U.S., held himself out as the Executive Director of Latona and continues to serve as member of PLS's Board of Directors.  Compl. ¶¶ 19, 67; McGuire Decl. Ex. 2.

### B.    PLS Has Extensive Contacts With the United States

#### 1.    *Virtually All of PLS's Leadership Team and the Majority of its Current Directors Reside and Work in the United States*

PLS is managed almost entirely by U.S. citizens who live and work in the U.S.  In fact, five members of the six-person PLS Leadership Team are located and reside in the U.S.  Ed Mills, PLS's current CEO, is the only member of PLS's Leadership Team who is not based in the U.S.  McGuire Decl. Ex. 4 at 4-6.  The five members of PLS's current Leadership Team who live and work in the U.S. are as follows:

- Dr. Mark Dybul serves as PLS's Executive Chairperson.  McGuire Decl. Ex. 5.  Dybul resides and works in the Washington, D.C. metropolitan area.  PLS's website indicates that Dybul is a Professor at Georgetown Medical School in Washington, D.C. (*Id.*), which is consistent with property records indicating that Dybul has owned a single-family home in Chestertown, Maryland since 2006.  McGuire Decl. Ex. 6.

- Bob Battista has served as PLS's Chief Commercial and Strategy Officer since in or about March 2023.  McGuire Decl. Ex. 7 at 2.  Battista's LinkedIn Profile indicates that he is based in Santa Monica, California.  *Id.*

- Twanna Davis is currently PLS's Head of Clinical Trial Solutions, and prior to June 2023, she served as PLS's Chief Clinical Operations Officer. McGuire Decl. Ex. 4 at 6; Ex. 8. According to her LinkedIn profile, Davis is based in North Carolina. McGuire Decl. Ex. 8. Property records confirm that she has owned and resided in a single-family residence in Mebane, North Carolina since March 2017. McGuire Decl. Ex. 9.

- Katie Winter is PLS's Vice President of Product Lifecycle Innovations. McGuire Decl. Ex. 4. Winter's LinkedIn profile indicates that she is based in Ashland, Massachusetts. McGuire Decl. Ex. 10. Property records show that Winter owns a condominium in Ashland, Massachusetts. *See* McGuire Decl. Ex. 11.

- Melissa Bomben is currently the Chief Operating Officer of PLS, and has been employed by PLS since April 2023. McGuire Decl. Ex. 12. Bomben's LinkedIn profile states she is based in Blaine, Washington (*id.*), and property records show that she has co-owned a single-family residence in Blaine, Washington since October 2021.[3] *Id.*; McGuire Decl. Ex. 13.

In fact, the only member of PLS's Leadership Team who is a Canadian resident is Mills, who is currently PLS's CEO and previously served as its Chief Strategist at the time of the fraudulent transfers at issue.[4] Mills himself has extensive connections with the U.S. As indicated in his declaration submitted in support of PLS's Motion ("Mills Decl.") [Adv. D.I. 36], while employed by PLS, Mills simultaneously serves as a senior scientist at Stanford University's School of Medicine in Palo Alto, California, and also worked for Cytel, Inc., a Massachusetts-based company, until August 2022. Mills Decl. ¶ 1; McGuire Decl. Ex. 15 While employed by PLS, Mills has authored at least six articles published in U.S. medical journals—which are featured prominently on PLS's website (McGuire Decl. Ex. 16)—and has

---

[3]     Plaintiffs acknowledge that, due to the proximity of Blaine, Washington, to the Canadian border, Bomben may at times work in PLS's office in Vancouver and, like other U.S.-based PLS employees, work remotely from her home in Washington at other times.

[4]     The Complaint mistakenly alleges that Mills was PLS' CEO at the time of the fraudulent transfers (Compl. ¶ 60), but it appears that Michael Zimmerman, who resided and worked in California, was PLS's CEO at the time of the fraudulent transfers. *See* McGuire Decl. Ex. 1 at 12-13; Ex.14.

co-authored multiple articles with academics affiliated with U.S. medical and educational institutions.  *See, e.g.*, McGuire Decl. Exs. 17–21.

In addition to virtually all of PLS's Leadership Team being based in the United States, two of the three current members of PLS's Board of Directors (McGuire Decl. Ex. 2) are U.S. citizens who reside and work in the United States.  Michael Zimmerman, who was the CEO of PLS at the time the fraudulent transfers were made, has served as a Director of PLS since June 2022.  *Id*.  According to Zimmerman's LinkedIn profile, he has been based in the San Francisco Bay Area for the entirety of his tenure at PLS.  McGuire Decl. Ex. 22; *see also* McGuire Decl. Exs. 2, 23.  Rheingans-Yoo has served as a Director of PLS since Latona's investment.  McGuire Decl. Exs. 2, 24.  Rheingans-Yoo is a U.S. citizen who resides in Orono, Maine.  McGuire Decl. Exs. 25–28.  Mills is the third director of PLS.  McGuire Decl. Ex. 2.  Thus, the majority of the Board of Directors is U.S.-based, and they attend PLS board meetings and make high-level business decisions on behalf of PLS remotely in the U.S.  *See* McGuire Decl. Exs. 29–31.

2.      *43% of PLS's Employees Reside and Work in from the U.S.*

According to PLS's LinkedIn page, PLS currently has 30 total employees, 13 of whom work in the U.S.  McGuire Decl. Ex. 32.  Thus, approximately 43% of PLS's total employees reside and work in the U.S.  In addition to the five members of PLS's Leadership Team who live in the U.S. discussed above, PLS's U.S.-based employees include, among others, its Executive Director of its Project Management Office (Jessica Ladwig), Operational Strategy Director (Ali LeFebre), Director of Finance (Inna Roitman), Senior Vice President of Global Partnerships & Innovation (Amy Ghelardi), Vice President of Marketing (Lauren Panco), and Vice President of Innovation Partnerships (Dallas Hodgson).  *Id*.; McGuire Decl. Exs. 32–35.

Moreover, PLS actively targets the U.S. labor market in recruiting employees.  In a recent PLS LinkedIn post soliciting candidates for employment, PLS posted that it was hiring a Senior Director of Business Development in Boston, Massachusetts.  McGuire Decl. Ex. 36 PLS's website recently advertised job openings for a "Clinical Project Manager" in "Remote USA" and a "Clinical Team Manager" in "Remote USA or Canada."  McGuire Decl. Ex. 37. PLS's job postings note that "many team members [ ] work in their own remote locations in Canada and the USA."  McGuire Decl. Ex. 38 at 2.

    3.    *PLS Has 83 Clinical Trial Sites in the United States and Dozens of "Experts and Site Access" in the United States*

PLS states that its "primary focus is the development of an international network of clinical trial sites in Canada, Brazil, Pakistan, Rwanda and South Africa," PLS Mot. ¶ 6, but it omits the fact that it has 83 clinical trial sites in the U.S.  In a June 1, 2023 presentation deck that appears to have been prepared for investors, PLS boasted that it "is building capacity and increasing access to clinical trial sites worldwide," including 83 clinical trial sites in the U.S., as well as trial sites run by Rhode Island-based CVS Health, which owns thousands of pharmacies through which it recruits participants for clinical trials in the U.S.  McGuire Decl. Ex. 3 at 5, Ex. 39.  That same presentation deck states that PLS "deliver[s] innovation amplified by global partnership and collaboration," including through PLS's "[e]xperts and site access" in the U.S., which it lists as including:  University of Pittsburgh; University of Kansas; University of Minnesota; University of Maryland; Columbia University; Stanford University; John Hopkins University; Brigham & Women's Hospital (Boston); University of North Carolina; University of Washington; National Institutes of Health; Bill & Melinda Gates Foundation; University of Virginia; University of Colorado; Centers for Disease Control & Prevention; Emory University; Boston University; Harvard University; University of California at San Francisco; Tufts

University; National Institute of Allergy & Infectious Diseases (USA); National Cancer Institute (USA); and UNICEF (USA). McGuire Decl. Ex. 3 at 6.[5]  In fact, the PLS presentation lists far more experts and site access in the U.S.—including several government agencies—than in the rest of the world combined.  *Id.*

> 4.    *PLS Employees Promote PLS's Business Objectives By Attending Conferences in the United States, Publishing in U.S. Medical Journals, and Accepting Awards in the United States*

PLS relies on the presence of its employees in the U.S. to advance its business objectives.  PLS's U.S.-based employees regularly attend conferences in the U.S. on behalf of PLS.  For example, on October 19, 2022, PLS's U.S.-based CEO Zimmerman spoke at a data management meeting for the Veeva Summit in Boston (McGuire Decl. Ex. 14); in January 2023, Erica Figueroa, PLS's California-based Vice President of Global Business Development, attended J.P. Morgan's Health Conference in San Francisco (McGuire Decl. Ex. 40); in March 2023; Figueroa attended the Outsourcing in Clinical Trials West Coast 2023 Conference in San Francisco (McGuire Decl. Ex. 41); in June 2023, Winter and Battista, who are both based in the U.S., attended the biotechnology convention BIO 2023 in Boston (McGuire Decl. Ex. 42); and in June 2023, Winter attended a clinical trial design meeting hosted by the Drug Information Association in Boston (McGuire Decl. Ex. 43).  On April 19, 2022, Dybul, PLS's U.S.-based Executive Chair, testified before the Foreign Relations Committee of the United States Senate. McGuire Decl. Ex. 44 at 18.

In 2022 (not May 2023, as claimed in the Mills Decl. ¶ 5 and PLS Mot. at ¶ 6), the Illinois-based Society for Clinical Trials awarded PLS the David Sackett Trial of the Year Award for the TOGETHER Trial.  *See* Mills Decl. ¶ 5; McGuire Decl. Ex. 47.  PLS proudly

---

[5]        By contrast, PLS lists only seven "experts and access sites" in Canada.  (*Id*.)

touts its receipt of David Sackett Award for Trial of the Year on its website and on the cover

page of the June 2023 PLS investor presentation.  McGuire Decl. Exs. 3, 45.  Because of the

great importance to PLS's business of receiving this award, Mills himself travelled to San Diego,

California, to attend the Society for Clinical Trials dinner and to accept the award on behalf of

PLS.  McGuire Decl. Exs. 46–47.

     *5.    PLS Receives Funding from and Partners with U.S. Entities*

PLS's most-advertised achievement to date—the TOGETHER Trial for which it

received the 2022 David Sackett Trial of the Year Award—received extensive funding from U.S.

institutions (McGuire Decl. Ex. 48), including Fast Grants (a George Mason University project

whose funding comes from various U.S. individuals and charities) (McGuire Decl. Ex. 49), the

Rainwater Charitable Foundation (McGuire Decl. Ex. 50) (a private charitable foundation based

in Texas), and the Bill & Melinda Gates Foundation (a private charitable foundation based in

Seattle) (McGuire Decl. Ex. 51).

PLS also partnered with GreenLight Biosciences, a U.S. life sciences company

headquartered in Medford, Massachusetts, to support a clinical trial project in Rwanda.  McGuire

Decl. Ex. 52.

    **C.    In Connection with Latona's Investment, PLS Incorporated a Delaware Entity, Employed U.S. Legal Counsel, Agreed to U.S. Forum and U.S. Choice of Law Clauses, and Invoked the Benefits and Protections of U.S. Law**

     *1.    PLS Delaware Was Incorporated In Connection with Latona's Investment*

While PLS asserts that "PLS Delaware was incorporated for the sole and

exclusive purpose of processing payroll[ ] and providing benefits" to PLS employees who work

in the United States, PLS Mot. ¶ 8, the contemporaneous evidence shows that the Delaware

entity was incorporated in connection with Latona's investment in PLS.  In late March of 2022,

Rheingans-Yoo decided that Latona would invest in PLS.  On March 25, 2022, Rheingans-Yoo

sent comments on a draft term sheet for Latona's $50 million investment and asked whether Latona should "require that they [PLS] incorporate in Delaware"  McGuire Decl. Ex. 53.  On March 28, 2022, Rheingans-Yoo received a revised version of the term sheet that defined PLS as a "to-be-incorporated company in a jurisdiction mutually agreeable to the Company and the Investor."  *Id.*

Three days later, on March 31, 2022, PLS incorporated "Platform Life Sciences, Inc." in Delaware.  Mills Decl. Ex. 2.  The U.S.-based law firm of Pearl Cohen Zedek Latzer Baratz, LLP—which represented PLS in negotiating the investment agreements with Latona—is listed as the "incorporator" of the Delaware entity, *id.* ¶ 5, which strongly suggests that incorporation of the Delaware entity was, in fact, connected to Latona's investment in PLS.  On April 4, 2022, Mills sent Rheingans-Yoo an email with the subject line "Delaware Inc." and wrote:  "We have now incorporated in Delaware and have all of the necessary registrations.  Could you advise on how to proceed?"  McGuire Decl. Ex. 54.  Thereafter, the parties began discussing and drafting the formal investment agreements.

2.  *PLS Agreed to a New York Forum and New York Choice of Law for Disputes Relating to the Services Agreement With Latona, and Availed Itself of the Benefits and Protections of U.S. Securities and Tax Laws*

The Services Agreement between PLS and Latona—pursuant to which Latona invested $15 million in PLS for future services—contained a dispute resolution provision that required any disputes between the parties relating to the agreement be resolved through arbitration to be "held in New York, New York" and "applying New York law."  McGuire Decl. Ex. 55 § 8.7.  Thus, PLS explicitly consented to jurisdiction in the U.S. in connection with the Services Agreement.

Moreover, PLS used U.S. counsel at Pearl Cohen Zedek Latzer Baratz, LLP in New York—the same law firm that PLS used to incorporate the Delaware entity—to negotiate and draft the investment agreements that PLS characterizes as being between non-U.S. entities and relating to non-U.S. subject matter.  McGuire Decl. Ex. 56.  Moreover, the Simple Agreement for Future Equity ("SAFE")—the agreement pursuant to which Latona invested $35 million in PLS—is replete with references to the U.S. Securities Act of 1933 and the U.S. Tax Code.  For example, the SAFE provides:

- "THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES OF AMERICA SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), OR UNDER THE SECURITIES LAWS OF CERTAIN STATES OR OTHER JURISDICTIONS ("**APPLICABLE SECURITIES LAWS**").  THESE SECURITIES MAY NOT BE OFFERED, SOLD, OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND UNDER APPLICABLE SECURITIES LAWS PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM."  McGuire Decl. Ex. 57 at 1 (emphasis in original)).

- The SAFE requires the investor to represent that "The Investor is an accredited investor as such term is defined in:  (x) if the investor is resident in the United States, Rule 501 of Regulation D under the Securities Act. . . ."  *Id.* § 4(b).

- "The parties acknowledge and agree that for United States federal and state income tax purposes, this Safe is, and at all times has been, intended to be characterized as 'stock,' and more particularly as 'common stock' for purposes of Sections 304, 305, 306, 354, 368, 1036 and 1202 of the Internal Revenue Code of 1986, as amended.  Accordingly, the parties agree to treat this Safe consistent with the foregoing intend for all United States federal and state income tax purposes (including, without limitation, on their respective tax returns or other informational statements)."  *Id.* § 7(h).

The SAFE also contemplates that PLS might in the future conduct an "initial listing of its Common Shares (other than Common Shares not eligible for resale under Rule 144 under the Securities Act) on a national securities exchange in the United States by means of an

effective registration statement on Form F-1 or Form S-1 filed by the Company with the United

States Securities and Exchange Commission that registers the Company's existing Capital Shares

for resale. . ." *Id.* p. 3 (Direct Listing).

Thus, in connection with Latona's investments in PLS, PLS consented to

jurisdiction in the U.S., agreed that its contractual obligations would be governed by New York

law, and purposefully availed itself of the benefits and protections of the U.S. securities and U.S.

tax laws.[6]

> ### D.     The Fraudulent Transfers to PLS Originated from Plaintiffs' U.S. Bank Accounts and, at PLS's Direction, Were Transmitted Through a U.S. Correspondent Bank

PLS asserts that "[a]ll funding flowed between non-U.S. banks" and that "[n]o

part of the transactions underlying the allegations in the Complaint . . . have a connection to the

United States."  PLS Mot. ¶ 17.  In making such misleading assertions, PLS omits the wire

instructions it sent to Plaintiffs directing that the funds be wired through Wells Fargo in the

United States as correspondent bank.  PLS also incorrectly asserts—apparently based solely on

the street addresses for Plaintiffs listed on PLS's bank records for the transfers—that the bank

accounts from which Plaintiffs wired the funds were located outside of the United States.  PLS

Mot. ¶¶ 11, 14, 16, 17.  In fact, as shown below, Plaintiffs wired the funds from their U.S. bank

accounts.

---

[6]     Because the SAFE and Services Agreement were both part of a single $50 million investment by Latona, the provision of the SAFE providing for the application of British Columbia law and jurisdiction in the Courts of Vancouver (McGuire Decl. Ex. 57 § 7(f)) must be considered together with the New York forum selection and New York choice of law provisions of the Services Agreement.  *See* McGuire Decl. Ex. 55 § 8.7.

      *1.     The $35 million transfer from Alameda to PLS*

      On May 20, 2022, Latona agreed to invest $35 million in PLS, and PLS and Latona executed the SAFE on May 23, 2022 memorializing that investment.  McGuire Decl. Exs. 24, 57.  On May 15, 2022, Zimmerman, the then-CEO of PLS based in California, emailed Rheingans-Yoo and an FTX Group employee providing wire transfer information for PLS. McGuire Decl. Ex. 58.  The wire instructions directed that the $35 million be wired to PLS's CIBC account through "Wells Fargo Bank, N.A. 375 Park Avenue, New York, NY" as the "Bank US Correspondent."  *Id.*

      Although Mills was copied on Zimmerman's email with the wire instructions (*id.*)—and thus knew that the funds were transmitted through a U.S. correspondent bank—Mills omits any reference to the wire instructions from his sworn declaration, and PLS incorrectly asserts that "[a]ll funding flowed between non-U.S. banks," and "[n]o part of the transactions underlying the allegations in the Complaint against PLS Canada have a connection to the U.S." PLS Mot. ¶ 17.

      On May 26, 2022, Alameda wired $35 million to PLS from its U.S.-based Silvergate bank account ending in #4464 (McGuire Decl. Ex. 61; *see id.* Exs. 59, 60 at 3 (showing Silvergate is based in La Jolla, California)), not from a "non-U.S. bank account" as PLS asserts.  PLS Mot. ¶ 14; Mills Decl. ¶ 13.  The funds were transmitted through Wells Fargo as U.S. correspondent bank before arriving in PLS's CIBC account.  *See* McGuire Decl. Ex. 58.

      *2.     The $15 million transfer from Alameda to PLS*

      On or about May 20, 2022, PLS and Latona had reached an agreement in principle for Latona to transfer $15 million to PLS, ostensibly in exchange for future clinical trial services to be provided to an as-yet unidentified third party.  McGuire Decl. Ex. 24.  On June 7,

2022, PLS and Latona entered into a Services Agreement memorializing that investment.

McGuire Decl. Ex. 55.  On June 13, 2022, Zimmerman emailed the FTX employee who was to

transfer the funds that PLS had signed a service agreement for $15,000,000 and that he

"believe[d] the next step [would be] to wire the funds to Platform Life Sciences bank account."

McGuire Decl. Ex. 62.  On June 18, 2022, Zimmerman provided the FTX employee the same

wire instructions that PLS had provided previously for the $35 million transfer.  *Id.*  On June 21,

2022, Alameda, at Rheingans-Yoo's direction, wired $15 million to PLS pursuant to the same

wire instructions.  Once again, $15 million was transferred from Alameda's bank account ending

in #4464 at Silvergate Bank in the U.S. (McGuire Decl. Ex. 63; *see id.* 59-60 (Silvergate is

located in La Jolla, California)), and not from a "non-U.S. bank account" as PLS asserts.  PLS

Mot. ¶ 16; Mills Decl. ¶ 15.  And once again, the funds were transmitted (at PLS's direction)

through Wells Fargo as U.S. correspondent bank before arriving in PLS's CIBC account.

> 3.    *The $3.25 million transfer from FTX Trading to PLS*

On January 29, 2022—prior to Latona's incorporation and its $50 million

investment in PLS—Rheingans-Yoo emailed Mills indicating that the FTX Foundation, the

philanthropic arm of the FTX Group, had approved making a "philanthropic gift for $3,250,000"

to PLS.  Compl. ¶ 62.

On January 31, 2022, Mills sent an invoice addressed to FTX Trading for $3.25

million and included wiring instructions for PLS.  McGuire Decl. Ex. 64.  As with the other

transfers, the wire instructions directed FTX Trading to send the funds to PLS's CIBC account

through "Wells Fargo Bank, N.A. 375 Park Avenue, New York, NY" as "Bank US

Correspondent."  *Id.*  On February 3, 2022, Mills emailed an FTX Group employee requesting

that she inform Mills when the wire transfer had been completed because "sometimes these

[transfers] get stuck in the US/Can banking system." McGuire Decl. Ex. 65. Mills' sworn

declaration again omits the wire instructions for this transfer and the fact that the transfer, at

PLS's instruction, was transmitted through Wells Fargo as U.S. correspondent bank.

        On February 4, 2022, Plaintiff FTX Trading wired USD $3.25 million to PLS

from FTX Trading's its U.S.-based Signature bank account ending in #9018 (McGuire Decl.

Ex. 66)—and not a "non-U.S. bank account" as PLS contends (PLS Mot. ¶ 11; Mills Decl.

¶ 10)—and, as with the other transfers, the funds were transmitted through Wells Fargo, as U.S.

correspondent bank, before arriving in PLS's CIBC account.

## ARGUMENT

### I.    LEGAL STANDARD

        In deciding a motion to dismiss for lack of personal jurisdiction, courts generally

defer to a plaintiff's allegations. *See, e.g.*, *Toys "R" Us, Inc.* v. *Step Two, S.A.*, 318 F.3d 446,

457 (3d Cir. 2003) ("It is well established that in deciding a motion to dismiss for lack of

jurisdiction, a court is required to accept the plaintiff's allegations as true, and is to construe

disputed facts in favor of the plaintiff."). Once the defendant raises the question of personal

jurisdiction, plaintiff bears the burden of establishing the court's jurisdiction over the defendant.

*Miller Yacht Sales, Inc.* v. *Smith,* 384 F.3d 93, 97 (3d Cir. 2004). Absent jurisdictional discovery

or an evidentiary hearing, plaintiff need only make a *prima facie* showing that personal

jurisdiction exists over the defendant. *See Metcalfe* v. *Renaissance Marine, Inc.*, 566 F.3d 324,

330 (3d Cir. 2009) ("If the district court does not hold an evidentiary hearing, 'the plaintiff[s]

need only establish a *prima facie* case of personal jurisdiction'"); *Finjan LLC* v. *Trustwave*

*Holdings, Inc.*, 2021 WL 5051147, at *4 (D. Del. Oct. 29, 2021) ("[t]o survive a motion to

dismiss in the absence of jurisdictional discovery, plaintiffs need only make a *prima facie* showing of jurisdiction").

A plaintiff may meet this burden by "establishing with reasonable particularity sufficient contacts between the defendant and the forum." *Mellon Bank PSFS, Nat'l Ass'n* v. *Farino*, 960 F.2d 1217, 1223 (3d Cir. 1992); *see also In re Pursuit Capital Mgmt., LLC*, 595 B.R. 631, 646 (Bankr. D. Del. 2018) (quoting *Provident Nat'l Bank* v. *Cal. Fed. Sav. & Loan Ass'n*, 819 F.2d 434, 437 (3d Cir. 1987)) (holding that a plaintiff may make a *prima facie* showing by "establishing with reasonable particularity sufficient contacts between the defendant and the forum state to support jurisdiction"). The parties agree that in bankruptcy cases, the relevant forum for purposes of personal jurisdiction is the United States in general, not the state in which the bankruptcy court sits. PLS Mot. at ¶ 21. *See also In re Tandycrafts, Inc.*, 317 B.R. 287, 289 (Bankr. D. Del. 2004); Fed. R. Bankr. P. 7004. Plaintiff "must sustain [its] burden of proof . . . through sworn affidavits or other competent evidence." *Sanitec Indus., Inc.* v. *Sanitec Worldwide, Ltd.*, 376 F. Supp. 2d 571, 573 (D. Del. 2005) (citing *Time Share Vacation Club* v. *Atlantic Resorts, Ltd.*, 735 F.2d 61, 67 n.9 (3d Cir. 1984)).

Personal jurisdiction can be either general or specific. The inquiry into general personal jurisdiction is fact-specific. *See*, *e.g.*, *Arpaio* v. *Dupre*, 527 F. App'x 108, 113 (3d Cir. 2013) ("[G]eneral jurisdiction exists when a defendant has maintained systematic and continuous contacts with the forum state. . . . This is a fact-specific inquiry" (citations omitted)). A court may exercise general jurisdiction over a nonresident defendant where the defendant's activities within the forum are of such a continuous and systematic, though limited, nature that the defendant could reasonably anticipate being subject to jurisdiction there even if the litigation does not arise from or relate to those activities. *See Helicopteros Nacionales de Colombia, S.A.*

-16-

v. *Hall*, 466 U.S. 408, 415–16 (1984) (citing *Perkins* v. *Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952)). Corporate defendants are subject to general jurisdiction in U.S. courts where their connections are "'so continuous and systematic' as to render [the corporation] essentially at home in [the United States]." *BNSF Ry. Co.* v. *Tyrrell*, 581 U.S. 402, 413 (2017) (citing *Daimler AG* v. *Bauman*, 571 U.S. 117, 127 (2014)). A corporation that is "neither incorporated nor headquartered in [the forum] may yet be 'at home' [t]here" depending on whether the operations in the forum are "so substantial and of such a nature as to render the corporation at home in that [forum]." *In re Asbestos Litig.*, 2016 WL 7404547, at *4 (Del. Super. Oct. 17, 2016) (citing *Daimler AG*, 571 U.S. at 139 n.19).[7]

A court may exercise specific personal jurisdiction over a nonresident defendant who purposefully avails itself of the relevant forum. *See Burger King Corp.* v. *Rudzewicz*, 471 U.S. 462, 472 (1985) (holding that specific personal jurisdiction exists where a foreign defendant "purposefully direct[s] his activities at residents of the forum," and the underlying cause of action "arise[s] out of or relate[s] to those activities."); *In re Uni-Marts, LLC*, 405 B.R. 113, 122 (Bankr. D. Del. 2009) (quoting *Max Daetwyler Corp.* v. *Meyer*, 762 F.2d 290, 293 (3d Cir.1985)) (requiring "that certain minimum contacts exist between the non-resident defendant and the forum"). Purposeful "minimum contacts" are the "constitutional touchstone" of the due process analysis. *Burger King*, 471 U.S. at 474. The requirement of "minimum contacts" ensures that non-residents have fair warning that they may be subject to litigation in the forum,

---

[7]    Although PLS refers to the Delaware long-arm statute and devotes an entire page of its brief to discussing *IM2 Merchandising & Mfg, Inv.* v. *Tirex Corp.*, 2000 WL 1664168 (Del. Ch. Nov. 2, 2000), which was decided under it (PLS Mot. at ¶ 21 & fn. 11, ¶ 30), the Delaware long-arm statute is "irrelevant in the bankruptcy context." *In re Plassein Int'l Corp.*, 352 B.R. 36, 38 (Bankr. D. Del. 2006). Because the bankruptcy rules provide the statutory basis for personal jurisdiction, "the Court need not look to the Delaware long-arm statute, or the case law interpreting it, to determine whether it has personal jurisdiction." *In re AstroPower Liquidating Tr.*, 335 B.R. 309, 317 (Bankr. D. Del. 2005).

*id*. at 472—which in a bankruptcy case is minimum contacts with the U.S.  Therefore, a court has jurisdiction when "the defendant's conduct and connection with the forum [ ] are such that he should reasonably anticipate being haled into court there."  *World-Wide Volkswagen Corp.* v. *Woodson*, 444 U.S. 286, 297 (1980); *see also International Shoe Co.* v. *Washington*, 326 U.S. 310, 316 (1945) ("due process requires only that . . . [the defendant] have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'").  For purposes of specific personal jurisdiction, the defendant's activity need not have taken place within the forum, *Burger King*, 471 U.S. at 476, and a single transaction with the forum will suffice, *see McGee* v. *Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957), so long as there is "some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum . . .  thus invoking the benefits and protections of its laws."  *Hanson* v. *Denckla*, 357 U.S. 235, 253 (1958).

## II.      PLS IS SUBJECT TO PERSONAL JURISDICTION IN THE UNITED STATES

On the extensive factual record they have marshaled—even without the benefit of jurisdictional discovery—Plaintiffs have satisfied their burden of establishing a *prima facie* showing that PLS is subject to jurisdiction in the U.S.

### A.      This Court Has General Personal Jurisdiction Over PLS

General jurisdiction is a "fact-specific" inquiry and a court must examine the totality of the defendant's contacts with the forum taken together, not in isolation, in deciding whether it can exercise jurisdiction over the defendant.  *Arpaio*, 527 F. App'x at 113 (stating general jurisdiction is a "fact-specific" inquiry);  *In re Enter. Rent-A-Car Wage & Hour Emp. Pracs. Litig.*, 735 F. Supp. 2d 277, 315 (W.D. Pa. 2010), *aff'd*, 683 F.3d 462 (3d Cir. 2012) ("The court must collectively look at all defendant['s] [ ] contacts.  Often the evidence offered by

a plaintiff when viewed in isolation is not sufficient to confer general jurisdiction over a

corporation, but if viewed in conjunction with all the evidence presented it may be sufficient");

*see also Forest Labs. Inc.* v. *Cobalt Labs. Inc.*, 2009 WL 605745, at *8 (D. Del. Mar. 9, 2009)

(considering the defendant's contacts with the forum collectively).

      In determining whether this Court has general personal jurisdiction over PLS,

factors relevant to whether the totality of the circumstances make PLS at home in the U.S.

include:  (i) whether high-level decision-making by PLS management and its board of directors

took place in the U.S.[8]; (ii) the presence of numerous PLS's employees in the U.S.[9]; (iii) whether

PLS operates in the U.S. by providing clinical trial services[10]; (iv) whether PLS employees

publish journal articles or attend conferences in the U.S.[11]; (v) whether PLS employees travel to

---

[8]    *See In re Pursuit Capital Mgmt., LLC, LLC*, 595 B.R. at 649–50 (finding personal jurisdiction over Cayman corporation based, in part, on the fact two of the three board members of Cayman entity were Connecticut residents); *Silver* v. *Countrywide Realty, Inc.*, 39 F.R.D. 596, 599 (S.D.N.Y. 1966) (finding that because the majority of the board of directors and executives of the foreign entity and the CEO of the parent company resided in New York, the "affairs of [foreign entity] are in large part directed and managed from New York, so that it is doing business and amenable to suit in New York").

[9]    *See Functional Pathways of Tennessee, LLC* v. *Wilson Senior Care, Inc.*, 866 F. Supp. 2d 918, 928–29 (E.D. Tenn. 2012) (finding personal jurisdiction over an entity that was not incorporated in and did not have its principal place of business in Tennessee, based, in part, on defendant having "numerous employees" working in Tennessee"); *Dorsey* v. *Am. Golf Corp.*, 98 F. Supp. 2d 812, 815 (E.D. Mich. 2000) (finding general jurisdiction over a defendant corporation that, among other things, maintained employees in Michigan).

[10]    *See Cacchillo* v. *Insmed Inc.*, 833 F. Supp. 2d 218, 228 (N.D.N.Y. 2011) (finding general personal jurisdiction where plaintiff had shown, in part, that defendant pharmaceutical research company had engaged in clinical trials in New York through New York research institutes with some degree of continuity); *Surgical Laser Techs., Inc.* v. *C.R. Bard, Inc*., 921 F. Supp. 281, 284 (E.D. Pa. 1996) (considering clinical trial locations in general jurisdiction analysis).

[11]    *See United States SEC* v. *Carrillo*, 115 F.3d 1540, 1545 (11th Cir. 1997) (finding that the articles published by defendant were "reasonably calculated to reach the forum," and thus constituted the purposeful availment of the privileges of doing business in the forum); *Foster-Gwin* v. *Fallwell*, 2001 WL 1382069, at *3 (N.D. Cal. Nov. 5, 2001) (noting defendant publishing articles in magazine likely circulated in forum state is a "fact[ ] supporting jurisdiction"); *Ipoint Ventures, LLC* v. *Pequot Cap. Mgmt., Inc.*, 2005 WL 1828586, at *10 (D.N.J. July 29, 2005) (holding defendant subject to general jurisdiction where defendant's agents served as speakers and panelists and conferences in the forum); *Arlington Indus., Inc.* v. *Elec. Custom Distribs., Inc.*, 817 F. Supp. 2d 473, 478 (M.D. Pa. 2011) (citing *Autogenomics, Inc.* v. *Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1014–18 (Fed. Cir. 2009)) (noting that the fact that defendant participated in three scientific conferences in California weighed in favor of general jurisdiction).

the U.S. to accept awards[12]; (vi) whether PLS receives funding from or partners with U.S.

entities[13]; (vii) whether PLS has agreed to U.S. forum selection or U.S. choice of law[14]; and

(viii) whether PLS purposefully avails itself of the benefits and protections of U.S. laws.[15]

      As Plaintiffs have demonstrated in the Statement of Facts and in the McGuire

Declaration, PLS has an extensive presence in the U.S. Because five out of the six members of

PLS's Leadership Team and two of its three directors are located and work in the U.S. (*see supra*

p. 4–6), the high-level decision-making of PLS occurs in the U.S. In addition, 43% of PLS's

current employees live and work in the U.S., and PLS actively solicits job applications for

remote jobs from U.S. residents. McGuire Decl. Exs. 32, 36–38. Importantly, Zimmerman, who

served as CEO of PLS at the time the fraudulent transfers were made,[16] lived and worked in the

---

[12]   *See Alicea* v. *LT's Benjamin Recs.*, 762 F. Supp. 2d 299, 308–09 (D. Mass. 2010) (considering defendant's travel to Massachusetts to accept award in personal jurisdiction analysis); *Pieczenik* v. *Dolan*, 2003 WL 23095553, at *3 (S.D.N.Y. Dec. 30, 2003) (considering defendant's travel to New York to accept award in the general jurisdiction analysis).

[13]   *See In re Pursuit Capital Mgmt., LLC*, 595 B.R. at 648 (finding general jurisdiction based, in part, on fact that "Defendants should not be surprised to find themselves in a United States court because they had United States based investors"); *Wells Fargo Bank, N.A.* v. *RLJ Lodging Tr.*, 2013 WL 5753805, at *7 (N.D. Ill. Oct. 23, 2013) ("finding general jurisdiction based, in part, on fact "shares of stock [were] held by Illinois investors"); *Marshall* v. *I-Flow, LLC*, 856 F. Supp. 2d 104, 108 (D.D.C. 2012) (finding personal jurisdiction, in part, based on the fact that Defendant "has established and benefits from a partnership with the George Washington University Hospital," and has obtained "expert medical consulting services of prominent Washington, D.C. medical facilities and physicians").

[14]   *See Budget Blinds, Inc.* v. *White*, 536 F.3d 244, 261 (3d Cir. 2008) ("[A] choice-of-law provision 'standing alone would be insufficient to confer jurisdiction,' but combined with other factors, it may reinforce a party's 'deliberate affiliation with the forum State and the reasonable foreseeability of possible litigation there'" (citing *Burger King*, 471 U.S. at 482)); *In re Sledziejowski*, 2016 WL 6155929 at *6 (Bankr. S.D.N.Y. Oct. 21, 2016) ("While not determinative, the choice of law is relevant to the question of whether the Movants could foresee any dispute regarding the transactions in question would be litigated in the United States").

[15]   *See Atchley* v. *AstraZeneca UK Ltd.*, 22 F.4th 204, 235 (D.C. Cir. 2022) (finding specific jurisdiction over the foreign defendants businesses, which "benefited from the protections of U.S. food and drug law, customs and export law, and intellectual property regime"); *In re Volkswagen "Clean Diesel" Mktg., Sales Pracs., & Prod. Liab. Litig.*, 2017 WL 66281, at *22 (N.D. Cal. Jan. 4, 2017) (noting personal jurisdiction over defendant was appropriate where the defendant availed himself of U.S. benefits by "taking advantage of the [capital] markets available here").

[16]   Zimmerman was listed as PLS's CEO in a March 2022 Investment Proposal (*see* McGuire Decl. Ex. 1) and an October 2022 LinkedIn Post (*see* McGuire Decl. Ex. 14); PLS's website currently lists Mills as the company's CEO. *See* McGuire Decl. Ex. 4.

United States while CEO.  PLS boasts to investors that it operates 83 clinical trial sites in

addition to CVS Pharmacy clinical trial sites in the U.S., and has more "[e]xperts and site

access" in the United States than in all the other countries in the world combined—crucial facts

PLS omits from its brief.  McGuire Decl. Ex. 3 at 5-6.  PLS employees also regularly attend

conferences in the U.S. (McGuire Decl. Exs. 14, 40–43), publish articles in U.S. medical journals

(McGuire Decl. Ex. 16–21), and one even testified before a United States Senate committee

(McGuire Decl. Ex. 44).  Mills travelled to the United States to accept the David Sackett Award

for Trial of the Year on behalf of PLS (McGuire Decl. Exs. 46-47), and PLS's Together Trial

received significant funding from U.S. organizations McGuire Decl. Exs. 48 – 51.  Finally, PLS

agreed to U.S. forum selection and U.S. choice of law clauses in the Services Agreement with

Latona, and purposefully availed itself of the benefits and protections of the U.S. securities laws

and U.S. tax code in the SAFE.  McGuire Decl. Ex. 55 §8.7; Ex. 57.

      Even if none of these contacts individually were sufficient to provide a basis for

this Court to exercise general jurisdiction over PLS, when these numerous contacts are

considered in their totality, they paint an unmistakable picture of a company that is at home in

the U.S. and subject to general jurisdiction here.  Indeed, courts have exercised general

jurisdiction over companies with many fewer contacts with the forum than PLS has.  *See*, *e.g.*,

*Ipoint Ventures, LLC* v. *Pequot Cap. Mgmt., Inc.*, 2005 WL 1828586, at *10 (D.N.J. July 29,

2005) (finding company subject to general jurisdiction based on "investments in the forum,

speaking at conferences in the forum and taking specific actions in the forum geared at

encouraging further investment here," which taken together amounted to "'continuous and

systematic activities' in [the forum]").

-21-

PLS's reliance on *Douglass* v. *Nippon Yusen Kabushiki Kaisha,* 46 F.4th 226, 243 (5th Cir. 2022), is misplaced.  The *Douglass* court determined that it did not have general jurisdiction over Nippon, a corporation headquartered in Japan, because (i) "all of [Nippon's] high-level decision-making [took] place in Japan"; (ii) Nippon's U.S. employees represented "less than 1.5 percent" of its total employees; and (iii) the U.S. "represent[ed] just six to eight percent" of Nippon's provision of services worldwide.  *Douglass*, 46 F.4th at 243.  The sum of these factors led the court to conclude that "the United States is hardly the 'center of [Nippon's] activities,' or a 'surrogate for [Nippon's] place of incorporation or head office"—Nippon's contacts with the United States "comprise only a minor portion of its worldwide contacts."  *Id.* In PLS's case, by contrast, virtually all of its Leadership Team reside and work in the United States, its CEO resided and worked in the U.S. until approximately May 2023, and two-thirds of its Board of Directors reside and work in the U.S., such that PLS is managed in the U.S.  *See supra* p. 19, n.8 (citing *In re Pursuit Capital Mgmt., LLC*, 595 B.R. at 649–50; *Silver*, 39 F.R.D. at 599).  Moreover, 43% of PLS's employees reside and work in the United States, and PLS touts that it has more experts and site access in the U.S. than in the rest of the world combined.

**B.    This Court Also Has Specific Personal Jurisdiction Over PLS**

This Court also has specific personal jurisdiction over PLS, because PLS purposefully availed itself of the United States in connection with Latona's investment in PLS and the three fraudulent transfers that the Complaint seeks to avoid, such that PLS "should reasonably anticipate being haled into court there."  *World-Wide Volkswagen*, 444 U.S. at 295.

It is well-established that a court can exercise specific personal jurisdiction over a foreign defendant based solely "on [defendant's] use of [U.S.] correspondent accounts because [the foreign defendant] purposefully availed itself of carrying on activities in [the United States]

by using those accounts to effectuate" the transfers. *In re Arcapita*, 640 B.R. at 617; *see also Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec. LLC*, 2022 WL 17726520, at \*4 (Bankr. S.D.N.Y. Dec. 15, 2022) (same); *Licci* v. *Lebanese Canadian Bank, SAL*, 732 F.3d 161, 170–71 (2d Cir. 2013) (concluding that "the selection and repeated use of [the forum's] banking system, as an instrument for accomplishing the alleged wrongs for which the plaintiffs seek redress, constitutes 'purposeful[ ] avail[ment] . . . of the privilege of doing business in [the forum]'"). As detailed above in the Statement of Facts, the evidence conclusively demonstrates that each of the three U.S. Dollar fraudulent transfers originated from a Plaintiff's U.S. bank account (not "non-U.S. bank accounts" as PLS contends), then, at PLS's direction, was transmitted through Wells Fargo as U.S. correspondent bank (a fact PLS conveniently omits), before arriving in PLS's CIBC account in Canada. PLS's assertions that "[a]ll funding flowed between non-U.S. banks" and "[n]o part of the transactions underlying the allegations in the Complaint against [PLS] have a connection to the United States" (PLS Mot. ¶ 17) cannot be reconciled with PLS's own wire instructions, which demonstrate that PLS chose to purposefully avail itself of the benefits of the U.S. banking system by directing that the transfers occur in U.S. Dollars and be transmitted to Wells Fargo as U.S. correspondent bank. *See* McGuire Decl. Exs. 58, 62, 64. PLS "could have avoided the United States entirely by routing the [transfers] through correspondent accounts anywhere [else] in the world." *In re Arcapita*, 640 B.R. at 618. Because it routed the three transfers totaling \$53.25 million through a U.S. correspondent bank, however, PLS is subject to specific jurisdiction in this Court.

In addition to the use of a U.S. correspondent bank, PLS purposefully availed itself of the U.S. in other ways in connection with Latona's investment in PLS that subject PLS to specific jurisdiction in this Court.

*First*, PLS agreed to a New York forum selection clause and a New York choice of law provision in the $15 million Services Agreement with Latona, thereby invoking the benefits and protections of New York law and agreeing to resolve disputes arising out of the agreement in New York.  A choice of law clause is a "significant factor in a personal jurisdiction analysis because the parties, by so choosing, invoke the benefits and protections of New York law." *Sec. Inv. Prot. Corp.* v. *Bernard L. Madoff Inv. Sec., LLC*, 460 B.R. 106, 117 (Bankr. S.D.N.Y. 2011), *aff'd*, 474 B.R. 76 (S.D.N.Y. 2012).  *See also* cases cited *supra* p. 20 n. 14. Because PLS agreed to a New York forum and to New York law in connection with a portion of Latona's investment, PLS reasonably foresaw the possibility of litigation in the United States in connection with the $15 million transfer (which was part of a $50 million total investment).

*Second*, PLS's incorporation of a Delaware entity in connection with Latona's investments in PLS is another factor relevant to the Court's exercise of specific jurisdiction over PLS.  *See Harris* v. *Harris*, 289 A.3d 277, 305-06 (Del. Ch. 2023) (explaining that specific jurisdiction is satisfied when a party's "purposeful activity in Delaware," such as incorporating a subsidiary, is "part of a larger wrongful scheme").  Contrary to PLS's assertion that the Delaware entity was incorporated "for the *sole and exclusive purpose* of processing payroll, and providing benefits to, the employees of PLS Canada that work remotely from the U.S.," (PLS Mot. ¶ 8 (emphasis added)), Plaintiffs have submitted contemporaneous evidence showing that PLS incorporated the Delaware entity in connection with Latona's investment in PLS.  Specifically, only days after Rheingans-Yoo asked whether Latona should require PLS to incorporate in Delaware and received a revised draft term sheet for Latona's investment in PLS that defined PLS as a "*to be incorporated company* in a jurisdiction mutually agreeable to [PLS] and [Latona]," PLS incorporated an entity in Delaware with exactly the same name as PLS.

McGuire Decl. Exs. 53, 54; Mills Decl. Ex. 2 ¶ 5.  Four days later, Mills wrote an email to
Rheingans-Yoo with the subject line "Delaware Inc" that said "We have now incorporated in
Delaware and have all of the necessary registrations.  Could you advise on how to proceed?"
McGuire Decl. Ex. 54.  In any event, PLS's self-serving assertion that the Delaware entity was
incorporated "for the sole and exclusive purpose of processing payroll" for U.S.-based
employees (PLS Mot. ¶ 8) strains credulity, given that PLS had employed and managed to pay
its U.S.-based employees for more than a year before the Delaware entity was incorporated.

### C.    PLS Has Sufficient Minimum Contacts with the United States Such That Exercising Personal Jurisdiction Over PLS Will Not Offend Due Process

As demonstrated above, PLS has far more than the requisite minimum contacts
with the United States such that exercising jurisdiction over PLS will not offend due process.
PLS's contacts with the U.S. in their totality are such that PLS "should reasonably anticipate
being haled into court there."  *World-Wide Volkswagen*, 444 U.S. at 297.

In evaluating whether the assertion of personal jurisdiction comports with "fair
play and substantial justice," courts consider:  (1) "the burden on the defendant," (2) "the forum
State's interest in adjudicating the dispute," (3) "the plaintiff's interest in obtaining convenient
and effective relief," (4) "the interstate judicial system's interest in obtaining the most efficient
resolution of controversies," and (5) the "shared interest of the several States in furthering
fundamental substantive social policies."  *Burger King,* 471 U.S. at 477.  All of these factors
strongly support the exercise of jurisdiction in this case.

*First*, the Court's exercise of jurisdiction over PLS—whose Leadership Team,
directors and employees live and work in the U.S. to advance PLS's business interests—would
not make it "so gravely difficult and inconvenient that [PLS] is at a severe disadvantage in
comparison to [Plaintiffs]," which have filed for Chapter 11 in this Court.  *In re DBSI, Inc.*, 467

B.R. 309, 315 (Bankr. D. Del. 2012) (quoting *Burger King*, 471 U.S. at 478).  Indeed, PLS

"already ha[s] counsel [in Delaware] . . . and travel to this forum from Canada is not

inconvenient," as evidenced by Mills' willingness to travel to the U.S. to accept an award on

behalf of PLS.  *In re UD Dissolution Corp.*, 629 B.R. 11, 28 (Bankr. D. Del. 2021).

   *Second*, the U.S. has a strong interest in applying the provisions of its bankruptcy

laws, especially in a high-profile case such as this in which FTX customers lost large sums of

money due to the malfeasance of the FTX Insiders.  *See, e.g.*, *In re Bernard L. Madoff Inv. Sec.

LLC*, 440 B.R. 274, 281 (Bankr. S.D.N.Y. 2010).  Here, Plaintiffs' claims against PLS arise

under the fraudulent transfer provisions of the U.S. Bankruptcy Code.  (Compl. Counts 1–5.)

   *Third*, Plaintiffs also have an interest in litigating in the U.S. to obtain the most

convenient and effective relief.  There are six life sciences defendants in this action (Compl.

¶¶ 21–26), and requiring PLS to litigate in this Court is the most efficient and convenient way to

resolve the action.  *See Tristrata Tech., Inc.* v. *Emulgen Labs., Inc.*, 537 F. Supp. 2d 635, 642 (D.

Del. 2008) ("the judicial system's interest in the efficient resolution of [Plaintiff's] claims against

[Defendant] and its co-defendants in a single action before this Court beg the Court's conclusion

that the assertion of personal jurisdiction over [Defendant] will comport with fair play and

substantial justice"); *In re DBSI, Inc.*, 451 B.R. 373, 378 (Bankr. D. Del. 2011) (finding that,

even if litigating in the forum would impose a burden on the foreign defendant, it would avoid

the expense of "duplicative litigation [that] would be borne by the creditors for whose benefit the

fraudulent transfers actions are meant to serve").  By contrast, requiring Plaintiffs to litigate the

same issues simultaneously in Canada and in this Court, as PLS seeks to do, would needlessly

waste the resources of the Debtors and their creditors.

*Finally*, the judicial systems of the U.S. and Canada are rooted in similar common law traditions, which ensure that the procedural and substantive interests of both nations are not offended.  *See In re UD Dissolution Corp.*, 629 B.R. at 28.

In short, PLS has sufficient minimum contacts with the U.S., and the interests of the Plaintiffs and the forum in exercising jurisdiction over this suit outweigh any potential burden on PLS.  *See Asahi Metal Indus. Co.* v. *Superior Ct.*, 480 U.S. 102, 114 (1987) ("When minimum contacts have been established, often the interests of the plaintiff and the forum in the exercise of jurisdiction will justify even [ ] serious burdens placed on [foreign] defendant[s]").

## III.   SHOULD THE COURT FIND PLAINTIFFS HAVE NOT MADE A *PRIMA FACIE* SHOWING OF PERSONAL JURISCITION OVER PLS, PLAINTIFFS ARE ENTITLED TO JURISDICTIONAL DISCOVERY

Should the Court find that Plaintiffs have not met their burden to make a *prima facie* showing of personal jurisdiction over PLS, the Court should permit Plaintiffs to take jurisdictional discovery of PLS and the Delaware entity.

PLS acknowledges that "[a]s a general matter, jurisdictional discovery should be allowed unless the plaintiff's claim of personal jurisdiction is 'clearly frivolous.'"  PLS Mot. ¶ 35 (collecting cases).  *See also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d 538, 572 (M.D. Pa. 2009) (courts should "generally permit jurisdictional discovery prior to dismissing a defendant for lack of personal jurisdiction"); *Registered Agents, Ltd.* v. *Registered Agent, Inc.*, 880 F. Supp. 2d 541, 548 (D. Del. 2012) ("jurisdictional discovery is particularly appropriate where the defendant is a corporation" (citing *Metcalfe*, 566 F.3d at 336)).  Where, as here, "plaintiff[s] present[ ] factual allegations that suggest with reasonable particularity the possible existence of the requisite contacts between the party and the forum state, the plaintiff[s'] right to conduct jurisdictional discovery should be sustained."  *Toys "R" Us, Inc.*, 318 F.3d at

456.  In deciding whether plaintiffs are entitled to jurisdictional discovery, any factual disputes "between the plaintiff and defendant must be resolved in favor of the plaintiff." *Godo Kaisha IP Bridge 1* v. *TCL Commun. Tech. Holdings Ltd.,* 2016 WL 4413140, at *4 (D. Del. Aug. 17, 2016), *report and recommendation adopted*, 2016 WL 5723653 (D. Del. Sept. 29, 2016); *see also In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 556 (stating that the court must "construe disputed facts in favor of plaintiff" in granting jurisdictional discovery).

Here, Plaintiffs have established jurisdictional facts through competent evidence, consisting of, among other things, (i) admissions on PLS's website, its LinkedIn page and PLS's investor presentation deck; (ii) PLS's wire instructions and Plaintiffs' bank records concerning the fraudulent transfers; and (iii) contemporaneous communications relating to the incorporation of the Delaware entity..  Because Plaintiffs' showing that PLS is subject to personal jurisdiction is far from "clearly frivolous," Plaintiffs would be entitled to jurisdictional discovery.[17]

## CONCLUSION

For the foregoing reasons, the Court should deny PLS's  motion to dismiss for lack of personal jurisdiction.  If the Court finds that Plaintiffs have not met their burden of establishing a *prima facie* showing of personal jurisdiction over PLS, Plaintiffs request jurisdictional discovery.

---

[17]    The cases PLS cites (PLS Mot. at ¶¶ 20, 39, 40) for the proposition that Plaintiffs should not be entitled to jurisdictional discovery are easily distinguishable.  Unlike those cases, Plaintiffs here have presented competent evidence of the existence of requisite contacts between PLS and the U.S., and have not just relied on bare allegations in the pleadings.  *See 3G Licensing, S.A.* v. *Lenovo Grp. Ltd.*, 2019 WL 3974539 at *3, *8–9 (D. Del. Aug. 22, 2019) (denying jurisdictional discovery where plaintiff "under[took] a 'fishing expedition based only upon bare allegations, under the guise of jurisdictional discovery'"); *Fid. Nat'l Info. Servs.* v. *Plano Encryption Techs., LLC*, 2016 WL 1650763, *5 (D. Del. Aug. 25, 2016) (denying jurisdictional discovery where plaintiff merely "recit[ed] the factors relevant" to the theory of jurisdiction and "then stat[ing] that 'on information and belief' the factors are not at play here"); *Lionti* v. *Dipna, Inc.*, 2017 WL 2779576, at *1 (E.D. Pa. June 27, 2017) (denying jurisdictional discovery where plaintiffs "rel[ied] on the bare pleadings alone in order to withstand [the] defendant's . . . motion"); *cf. In re Chocolate Confectionary Antitrust Litig.*, 602 F. Supp. 2d at 573 (granting jurisdictional discovery despite plaintiff presenting only "faint silhouettes of [ ] in-forum contacts" without "substantive proof").

-28-

Dated: September 29, 2023
     Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail: landis@lrclaw.com
     mcguire@lrclaw.com
     brown@lrclaw.com
     pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**

Steven L. Holley (admitted *pro hac vice*)
Andrew G. Dietderich (admitted *pro hac vice*)
James L. Bromley (admitted *pro hac vice*)
Stephanie G. Wheeler (*admitted pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail: holleys@sullcrom.com
     dietdericha@sullcrom.com
     bromleyj@sullcrom.com
     wheelers@sullcrom.com
     gluecksteinb@sullcrom.com
     dunnec@sullcrom.com

*Counsel for the Debtors*
*and Debtors-in-Possession*