**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD. et al.,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| ALAMEDA RESEARCH LTD. and FTX TRADING LTD., | Adv. Proc. Case No. 23-50444 (JTD) |
| Plaintiffs, | |
| vs. | |
| PLATFORM LIFE SCIENCES, INC., LUMEN BIOSCIENCE, INC., GREENLIGHT BIOSCIENCES HOLDINGS, PBC, RIBOSCIENCE LLC, GENETIC NETWORKS LLC, 4J THERAPEUTICS INC., LATONA BIOSCIENCES GROUP, FTX FOUNDATION, SAMUEL BANKMAN-FRIED, ROSS RHEINGANS-YOO, and NICHOLAS BECKSTEAD, | |
| Defendants. | |

**Hearing Date: October 19, 2023 at 10:00 A.M. (ET)**
**Objections Due: September 29, 2023 at 4:00 P.M. (ET)**
**Reply Deadline: October 6, 2023 at 4:00 P.M. (ET)**

**REPLY OF PLATFORM LIFE SCIENCES, INC., A CANADIAN CORPORATION, TO PLAINTIFFS' OPPOSITION TO MOTION TO DISMISS COMPLAINT FOR LACK OF PERSONAL JURISDICTION PURSUANT TO RULE 12(B)(2)**

Platform Life Sciences Inc., a Canadian corporation with its principal place of business in

British Columbia, Canada ("PLS Canada"), hereby submits this Reply to the *Opposition to*

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063 respectively. A complete list of the Debtors and the last four digits of their federal tax identification numbers may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

*Defendant Platform Life Sciences Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction* (the "Opposition") filed by Plaintiffs Alameda Research Ltd., a British Virgin Islands company ("Alameda") and FTX Trading Ltd., a corporation registered in Antigua and Barbuda ("FTX Trading" and, together with Alameda, the "Plaintiffs"). In support, PLS Canada submits the concurrently filed Supplemental Declaration of Dr. Edward J. Mills, the Chief Executive Officer of PLS Canada (the "Supplemental Mills Declaration").

## I.

## PRELIMINARY STATEMENT

1.      The Plaintiffs' attempts to paint PLS Canada as something it is not to support jurisdiction over this Canadian company is unsupportable, based on minutiae and misleading. It is beyond question that this is a dispute involving non-U.S. entities on both sides. PLS Canada, on the one hand, and the non-U.S. Plaintiffs and the Plaintiffs' non-debtor, non-U.S. affiliate, Latona Biosciences Group ("Latona"), on the other. The Plaintiffs' claims against PLS Canada related to the funding provided to this Canadian company to its bank in Canada they now seek to claw-back did not arise from business activities directed to the U.S. and, therefore, specific jurisdiction over PLS Canada is not proper. Moreover, contrary to the Plaintiffs' assertions that PLS Canada operates 83 clinical trial sites in the U.S., including in collaboration with CVS, it does not.[2] PLS Canada operates no clinical trial sites, and has no business operations, in the U.S. It develops and operates clinical trial sites in developing and underrepresented non-U.S. nations.

---

[2] This allegation is based on a draft powerpoint created internally at PLS Canada which reflects PLS Canada's existing business and ideas for future business, including its hopes for future expansion into the U.S., and what it hoped might be a project with CVS that never made it past the initial idea stage (Plaintiffs Ex. 3 (pp. 5-6) (draft powerpoint); Plaintiffs Ex. 39 (CVS press release making no mention of PLS Canada)). In fact, CVS ceased their clinical trial program earlier this year. https://www.fiercehealthcare.com/retail/cvs-closing-down-clinical-trials-business-after-2-years, a print out of which is attached to the Supplemental Mills Declaration as Ex. B. PLS Canada has never had a business affiliation with CVS, or the potential "experts and access sites" in the U.S. identified in the draft presentation. Supplemental Mills Declaration, ¶ 6.

PLS Canada has remote employees in the U.S. that work on these projects – they do not direct their business activities at projects in the U.S. and PLS Canada's leadership and decisionmaking is in Canada, not in the U.S. PLS Canada is incorporated, headquartered and does business, in Canada. In the Third Circuit, it is "incredibly difficult" to establish general jurisdiction over a foreign corporation that is not incorporated or doing business in the U.S. *Malik v. Cabot Oil & Gas Corp.*, 710 Fed. Appx. 561, 563 (3rd Cir. 2017). PLS Canada's contacts with the U.S. are insufficient to consider PLS Canada "at home" in the U.S. for purposes of exercising general jurisdiction.

## III.

## ARGUMENT

### A. This is a Dispute Regarding Transactions Between Non-U.S. Entities and a Tenuous Connection to U.S. Bank Accounts Does Not Create Specific Jurisdiction Over PLS Canada

2. In their Opposition, the Plaintiffs completely fail to address the most fundamental undisputed facts relevant to this Court's determination as to whether it is proper to exercise personal jurisdiction over PLS Canada. ***This is a dispute regarding transactions between non-U.S. entities***. PLS Canada is incorporated in Canada and its headquarters and principal place of business is in Canada. Latona, the counter-party to the SAFE and Services Agreement and the Plaintiffs' non-debtor affiliate, is a company organized under the laws of the Bahamas. Plaintiff Alameda is a British Virgin Islands company. Plaintiff FTX Trading is a corporation registered in Antigua and Barbuda. Nothing in the Opposition addresses – or can alter – these critical undisputed facts.

3. The Plaintiffs attempt to create a specific personal jurisdiction theory based on the underlying transfers having a tenuous connection to U.S. bank accounts. Contrary to the Plaintiffs'

assertions, however, this tenuous connection does not provide a basis for the exercise of specific jurisdiction over PLS Canada.

4.    As a preliminary matter, the fact that the funds received by PLS Canada originated from what appear to be U.S.-based banks is a "fortuitous contact between Defendants and the United States, which cannot constitute a basis for the exercise of personal jurisdiction" as the "receipt of a wire transfer is an inherently passive action." *Gargano v. Cayman Nat'l Corp.*, 2010 U.S. Dist. LEXIS 53774, *18-20 (D. Mass. June 2, 2010).[3] As set forth by the court in *Gargano*,

> "[T]he fact that Defendants received money from Plaintiff's United States bank account is not purposeful availment of an opportunity to act in the United States. The receipt of a wire transfer is an inherently passive action. For Defendants purposes, it did not matter where the money came from or how it got to them. Plaintiff sought to purchase an annuity from CLICO, a Trinidadian insurance company, using Defendants as a broker. In order to do so, he needed to provide Defendants with the money for the transaction. And he happened to be holding those funds in a United States bank account at the time. It would have been equally acceptable to Defendants, if Plaintiff had transferred the necessary funds by physically walking into the Cayman National Bank and handing a teller cash or a paper check. Under such circumstances, no one could reasonably argue that Defendants had intentionally directed their conduct toward the United States, just because the money was at one time housed in a United States account. Cast in this light, it is clear that Defendants receipt of the funds by means of a wire transfer that originated in the United States is fortuitous contact between Defendants and the United States, which cannot constitute a basis for the exercise of personal jurisdiction."

5.    Moreover, even assuming that the funds were routed through CIBC's U.S. correspondent bank, Wells Fargo, this is insufficient to establish personal jurisdiction over PLS Canada. *Canadian Group Underwriters Ins. Co. v. M/V "Arctic Trader",* 1998 U.S. Dist. LEXIS 16293, *13 (S.D.N.Y. Oct. 15, 1998) ("The Court finds that these contacts are insufficient to

---

[3] Based on the information reflected on the CIBC statements of the incoming wires (Exs. 4, 7 and 10 to the Mills Declaration), PLS Canada believed that the funds originated from non-U.S. bank accounts. The Plaintiffs have provided information that appears to show that the funds originated from U.S. bank accounts (Plaintiffs Exs. 61, 63 & 66). Regardless, the origination of the funds from the U.S. "cannot constitute a basis for the exercise of personal jurisdiction" over PLS Canada.

assert personal jurisdiction over Defendants. The New York bank was used only as a conduit into Defendant's account with a London bank: Defendants do not maintain an account in New York, and they had no part in selecting this bank as the intermediary."). Likewise, PLS Canada had no control over the utilization by CIBC of the Wells Fargo account, which according to its website, CIBC apparently utilizes as a matter of procedure for all funds transferred in U.S. Dollars.[4] Merely "cutting and pasting" wire transfer instructions[5] that reference the correspondent bank that CIBC internally uses as a conduit to process funds sent in U.S. Dollars is insufficient to establish jurisdiction over PLS Canada as the recipient of the funds. PLS Canada had no hand in directing the process by which funds flowed into its Canadian bank.[6]

6.     The cases cited by Plaintiffs for the proposition that the transfer of funds through a U.S. correspondent bank is sufficient to create personal jurisdiction over PLS Canada are not applicable to the circumstances here. This line of cases deals with personal jurisdiction over **defendant foreign banks** that process funds through their U.S. correspondent banks, purposely availing themselves of the U.S. banking system. *See e.g.*, *Bahr. Islamic Bank, BisB v. Arcapita Bank B.S.C.(C) (In re Arcapita Bank B.S.C.(C)),* 640 B.R. 604, 613, 617-18 (S.D.N.Y. 2022) (personal jurisdiction found over defendant BisB Bahrain Islamic Bank because the foreign bank deliberately directed plaintiff to send millions of dollars through its U.S. correspondent banks); *Licci v. Lebanese Canadian Bank*, 732 F.3d 161, 169-71 (2nd Cir. 2013) (personal jurisdiction found over defendant Lebanese Canadian Bank based on allegations that the foreign bank violated various statutory duties by using its U.S. correspondent account to funnel money to terrorist

---

[4] *See* https://www.cibc.com/en/personal-banking/ways-to-bank/sending-receiving-wire-transfers.html, a print out of which is attached to the Supplemental Mills Declaration as Ex. A.

[5] Plaintiffs Exs. 58, 62 & 64.

[6] Supplemental Mills Declaration, ¶ 4.

groups); *Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 2022 Bankr. LEXIS 3550, *7-12 (Bankr. S.D.N.Y. Dec. 15, 2022) (personal jurisdiction found over defendant Bank Julius Baer & Co. Ltd. because, among other things, the foreign bank designated U.S. correspondent banks to receive funds).

7.      Finding personal jurisdiction over a ***foreign defendant bank*** utilizing the U.S. banking system to receive funds is wholly distinguishable from personal jurisdiction over the foreign recipient of funds that has no control over the process utilized by their foreign bank. In this case, PLS Canada received the funds in its bank in Canada, CIBC.[7] The conduit through which it may have flowed was a matter internal to CIBC, over which PLS Canada had no control.[8] PLS Canada, therefore, cannot be said to have "purposefully availed" itself of the U.S. banking system. Here, PLS Canada neither chose to use a U.S. bank, nor did it receive funds at a U.S. bank. PLS Canada is therefore not subject to personal jurisdiction in this Court based on CIBC having a process by which funds momentarily flowed through a U.S. correspondent bank of its choosing.

**B.      Neither the Provisions of the Services Agreement Nor the SAFE Provides for Specific Jurisdiction Over PLS Canada**

8.      The Plaintiffs assert that specific jurisdiction over PLS Canada can be based on an arbitration provision in the Services Agreement which provides for a New York arbitration applying New York law. Contrary to the Plaintiffs' statements, however, the Services Agreement does not contain a consent to jurisdiction in New York. In fact, the Services Agreement provides

---

[7] Exs. 3, 6 and 9 to the Mills Declaration.

[8] Even assuming that PLS Canada may have had knowledge that there would be a correspondent bank involved, as the Plaintiffs assert (Plaintiffs Ex. 65), this does not change the fact that PLS Canada lacked the requisite control over the process.

that any judgment "may be entered in any court having jurisdiction thereof," without any reference to a particular jurisdiction.  In this regard, Section 8.7 of the Services Agreement provides:[9]

> The Parties shall attempt to resolve any dispute, controversy or claim arising out of or relating to this Agreement (each, a "**Dispute**") by good faith negotiations and consultation between or among themselves. In the event that such Dispute is not resolved on an informal basis within ninety (90) calendar the parties will submit the Dispute to mediation by a neutral mediator having at least ten (10) years' experience.  The Parties covenant that they will use commercially reasonable efforts in participating in the mediation. The Parties agree that the mediator's fees and expenses and the costs incidental to the mediation will be shared equally between the Parties. If the Parties cannot resolve the Dispute within ninety (90) calendar days of the Mediation, the Parties may (as their sole recourse) initiate confidential arbitration to resolve the Dispute ("**Arbitration**").  Such Arbitration shall be: (i) held in New York, New York; (ii) conducted by a single arbitrator applying New York law; (iii) administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules.  Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.

9.      An arbitration provision does not constitute broad consent to personal jurisdiction by PLS Canada for all disputes arising out of the Services Agreement.  *See e.g., Foster v. Device*, 2012 U.S. Dist. LEXIS 175560, *17 (N.D. Cal. Nov. 21, 2012) ("[T]he court declines to find that Defendant consented to the personal jurisdiction of this Court for all causes of action relating to the Agreement simply because the Agreement includes a clause requiring the parties to arbitrate disputes in San Francisco.  On its face, the arbitration clause says nothing about either party consenting to the personal jurisdiction in California.  Without more, the court will not read the agreement to say more than it explicitly states.").  The Plaintiffs themselves acknowledge that a choice of law provision, standing alone, is insufficient to confer jurisdiction.[10]

10.     Moreover, notwithstanding the Plaintiffs' attempt to dismiss the consent to jurisdiction provisions of the SAFE in a footnote as somehow being tied to, and subject to the

---

[9] Mills Declaration, Ex. 8 (Services Agreement).

[10]Opposition at 20, n.14 (citing cases).

provisions of, the Services Agreement,[11] Paragraph 7(f) of the SAFE specifically provides for exclusive jurisdiction over matters related to the SAFE in Canada, with a Canada choice of law provision, as follows:[12]

> *The parties agree that this Safe (and all the rights and obligations hereunder) shall be governed by the laws of the Province of British Columbia and the federal laws of Canada applicable therein. Each party hereby submits to the exclusive jurisdiction of the Courts of Vancouver, British Columbia.*

11.     There is no basis for the Plaintiffs' assertion – especially in light of the Complaint, which clearly separates the fraudulent transfer claims into separate transactions governed by separate agreements[13] – that the provisions of the Services Agreement should somehow "trump" the more express Canadian jurisdictional provisions of the SAFE. *See e.g., Taylor v. Trevino*, 569 F. Supp. 3d 414, 428 (N.D. Tex. 2021) (each alleged fraudulent transfer is viewed and analyzed individually). Even if the separate transactions were viewed as a single transaction as the Plaintiffs posit, there is no reason that the more specific jurisdictional language of the SAFE in favor of Canada would not control over the Services Agreement.

12.     Moreover, contrary to the Plaintiffs' assertions, the references in the SAFE to U.S. securities and tax law does not mean that PLS Canada has availed itself of U.S. laws.[14] Rather,

---

[11] Opposition at 12, n.6.

[12] Mills Declaration, Ex. 5 (SAFE), at ¶ 7(f) (emphasis added).

[13] Complaint, ¶¶ 12, 65-71, 115, 120, 127, 133.

[14] The cases cited by Plaintiffs are inapposite, and deal with situations where a defendant actually operated in the U.S. and availed itself of the protections of the U.S. laws, not where various laws might at some point become applicable. Opposition at 20, n.15. *Atchley v. Astrazeneca UK Ltd.*, 22 F.4th 204, 233-35 (finding specific jurisdiction over six foreign suppliers that reached into the United States to contract with an affiliated U.S. manufacturer to be the manufacturer's exclusive agent in Iraq, finding that "the foreign defendants' ability to complete their sales of the U.S. manufacturers' products in Iraq thus depended on their forum contacts. The U.S. and foreign defendants' cooperative business model benefitted from the protections of U.S. law. Domestic contract law would have likely governed interactions between the foreign suppliers and their U.S. manufacturers, and their businesses benefited from the protections of U.S. food and drug law, customs and export law, and intellectual property regime."); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 U.S. Dist. LEXIS 1109, *801, 819, 865 (N.D. Cal. Jan. 4, 2017) (denying *forum non conveniens* request by Volkswagen in connection with a securities fraud class action asserting claims under U.S. securities laws based on Volkswagen's sale and alleged fraud related to its issuance of

these provisions are included to reflect the intent of the parties with respect to the provisions of the SAFE in the event that such law might be applicable in connection with a future liquidity event under Canadian or U.S. law.[15] Tellingly, the Plaintiffs have omitted in the Opposition the references in the SAFE to non-U.S. and, specifically Canadian, securities laws. These references in the SAFE include the following:

> THIS INSTRUMENT AND ANY SECURITIES ISSUABLE PURSUANT HERETO HAVE NOT BEEN REGISTERED UNDER THE UNITED STATES OF AMERICA SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), *OR UNDER THE SECURITIES LAWS OF CERTAIN STATES OR OTHER JURISDICTIONS ("APPLICABLE SECURITIES LAWS")*. THESE SECURITIES MAY NOT BE OFFERED, SOLD OR OTHERWISE TRANSFERRED, PLEDGED OR HYPOTHECATED EXCEPT AS PERMITTED IN THIS SAFE AND *UNDER APPLICABLE SECURITIES LAWS* PURSUANT TO AN EFFECTIVE REGISTRATION STATEMENT OR AN EXEMPTION THEREFROM.

> UNLESS PERMITTED UNDER *APPLICABLE SECURITIES LAWS*, THE HOLDER OF THIS SECURITY MUST NOT TRADE THE SECURITY BEFORE THE DATE THAT IS 4 MONTHS AND A DAY AFTER THE LATER OF (I) THE DATE OF ISSUANCE OF THIS SECURITY OR (II) THE DATE THE ISSUER BECAME A REPORTING ISSUER IN ANY PROVINCE OR TERRITORY.[16]

> [*The Company qualifies as a "private issuer", as such term is defined in Ontario pursuant to Section 73.4 of the Securities Act (Ontario) and elsewhere in Canada under National Instrument 45-106 – Prospectus Exemptions, and is not a reporting issuer, as such term is defined in the Securities Act (Ontario).*[1]]
> [1]NTD: to be reviewed and (if needed) adjusted by company's CA counsel.[17]

> *The Investor is an accredited investor as such term is defined in*: (x) if the investor is resident in the United States, Rule 501 of Regulation D under the

---

American Depository Receipts (ADRs) (U.S. dollar denominated form of equity ownership in a non-U.S. company) that were sponsored by J.P Morgan and traded in the U.S. over-the-counter market).

[15] Mills Declaration, Ex. 5 (SAFE), at 3 (defining "Liquidity Event" as a "Change of Control, a Direct Listing or an Initial Public Offering."). The Plaintiffs point to the definition of "Direct Listing" as referencing U.S. securities law (Opposition at 11-12), but fail to reference the definition of "Initial Public Offering" which deals with the listing of shares, not under U.S. law, but on "any securities exchange." *See also* Complaint, ¶ 66 (describing the future events: "Under the SAFE Agreement, Latona received the right to certain of PLS' capital shares in the event of certain 'triggering' events, namely, (1) equity financing, (2) a liquidity event, or (3) a dissolution event.").

[16] Mills Declaration, Ex. 5 (SAFE), at 1 (emphasis added).

[17] Mills Declaration, Ex. 5 (SAFE), at 5 (Section 3(f)) (brackets and NTD in executed version) (emphasis added).

Securities Act, and/or *(y) under applicable Canadian securities laws*, shall provide evidence of the same if requested by the Company, and acknowledges and agrees that if not an accredited investor at the time of an Equity Financing, the Company may void this Safe and return the Purchase Amount. The Investor has been advised that this Safe and the underlying securities have not been registered under the Securities Act, *or any state, federal or provincial securities laws* and, therefore, cannot be resold unless they are covered by a *prospectus filed under applicable Canadian securities laws*, registered under the Securities Act and applicable state securities laws or unless an exemption from such registration requirements is available.[18]

The Investor understands that the Company may be required to provide any one or more of the *Canadian securities regulators* or other regulatory agencies with the name, residential address, telephone number and e-mail address of such Investor as well as information regarding the number, aggregate purchase price and type of securities purchased under this Safe and the Investor hereby consents to and authorizes the foregoing use and disclosure of such information.[19]

13.     To correct the Plaintiffs' assertion that PLS Canada utilized only U.S. counsel in connection with the Services Agreement and the SAFE, PLS Canada also utilized the services of Canadian counsel at Goodmans LLP, one of Canada's leading law firms.[20]

14.     In sum, the Services Agreement did not contain an express consent to jurisdiction in the U.S. and the SAFE provides for exclusive jurisdiction in Canada – and there are no other provisions of the SAFE by which PLS Canada purposely availed itself of the U.S laws such that PLS Canada has subjected itself to the specific jurisdiction of this Court. In any event, as Plaintiffs acknowledge, a choice of law provision is insufficient on its own to establish specific jurisdiction.[21] *Budget Blinds, Inc. v. White*, 536 F.3d 244, 261 (3rd Cir. 2008).

---

[18] Mills Declaration, Ex. 5 (SAFE), at 5 (Section 4(b)) (emphasis added). The Plaintiffs omitted all but the first clause of this Section 4(b) (Opposition at 11).

[19] Mills Declaration, Ex. 5 (SAFE), at 5-6 (Section 4(c)) (emphasis added).

[20] Supplemental Mills Declaration, ¶ 5.

[21] Opposition at 20, n.14.

C.     **The Incorporation of PLS Delaware at the Time of the Underlying Transactions Does Not Provide Grounds to Exercise Specific Jurisdiction Over PLS Canada**

15.     The Plaintiffs assert that specific jurisdiction over PLS Canada should be based on the incorporation of PLS Delaware at the same time as the underlying transactions. To correct the Plaintiffs' assertion, the incorporation of PLS Delaware does not mean that PLS Canada has an office or principal place of business in the U.S. As set forth in the Supplemental Mills Declaration,[22] PLS Delaware was formed in March 2022, around the same time as the transactions and it was incorporated at Latona's request. PLS Delaware is used for the sole and exclusive purpose of processing payroll and providing benefits to PLS Canada's U.S. employees. PLS Delaware has never been utilized as anything other than a payroll processing entity and had no involvement with the transactions at issue. The agreements were between PLS Canada and non-U.S. Plaintiffs and Latona; PLS Delaware was not a party to these agreements. PLS Delaware no offices, no business operations and generates no revenues. PLS Delaware has never functioned as an operating entity. There can be no dispute as to these facts and Plaintiffs' arguments in this regard are undermined by their own actions: The Plaintiffs themselves have stated that they assert no claims against PLS Delaware in this action.[23] Therefore, jurisdiction over PLS Canada based on the timing or circumstances of the incorporation of PLS Delaware, which has never in actuality operated as anything other than a payroll entity, is not warranted.

---

[22] Supplemental Mills Declaration ¶ 7.

[23] *See Plaintiffs' Response to Platform Life Sciences, Inc.'s Motion to Dismiss for Failure to State a Claim* [Dkt. 43] ("Because Plaintiffs did not assert any claims against PLS Delaware in the Complaint, PLS Delaware's motion to dismiss for failure to state a claim is moot.").

**D.    The Exercise of General Jurisdiction Over PLS Canada, a Canadian Corporation Not Doing Business in the U.S., is Not Appropriate**

16.    A corporation is generally "at home" in the "paradigm all-purpose forums" of its "place of incorporation and principal place of business." Corporations are usually only subject to general jurisdiction in the forum where they are incorporated or have their principal place of business. *Claridge Assocs., LLC v. Schepis (In re Pursuit Capital Mgmt., LLC)*, 595 B.R. 631, 647 (Bankr. Del. 2018). Consequently, "it is incredibly difficult to establish general jurisdiction over a corporation in a forum *other* than the place of incorporation or principal place of business." *Malik v. Cabot Oil & Gas Corp.*, 710 Fed. Appx. 561, 563 (3rd Cir. 2017). PLS Canada is incorporated in Canada and has its headquarters and principal place of business in Canada. It has no business office in the U.S. The Plaintiffs have made no allegations to the contrary, nor could they.

17.    Importantly, ***PLS Canada has conducted no clinical trials in the United States***. Contrary to the Plaintiffs' assertions that PLS Canada operates 83 clinical trial sites in the U.S., including in collaboration with CVS, it does not.[24]   PLS Canada operates no clinical trial sites, and has no business operations, in the U.S. Rather, PLS Canada conducts, or is putting the infrastructure in to conduct, clinical trials in developing nations, including expanding on McMaster University's TOGETHER Trial in Brazil and expansion of this initial trial to Rwanda, South Africa, Pakistan, the Bahamas and Canada.[25]   Thus, the cases cited by the Plaintiffs to support

---

[24] *See* fn 2, *supra*. The "evidence" the Plaintiffs point to in support of PLS Canada conducting clinical trials in the U.S. is based on a draft powerpoint created internally at PLS Canada which reflects PLS Canada's ideas for future business development. PLS Canada has never had a business affiliation with CVS, or the potential "experts and access sites" in the U.S. identified in the draft presentation. Supplemental Mills Declaration, ¶ 6.

[25] As discussed in further detail below, PLS Canada did not conduct the initial TOGETHER Trial. It was conducted by McMaster University, as a research project led by Dr. Mills and his colleague, Dr. Gilmar Reis, as McMaster University researchers. The funding for the initial TOGETHER Trial was to McMaster University, not PLS Canada. The funding later received by PLS Canada from Latona/Plaintiffs was to expand clinical sites capable of conducting clinical trials. Supplemental Mills Declaration, ¶¶ 18-20.

general jurisdiction based on the conduct of clinical trials in the U.S. are inapplicable here.[26] While PLS Canada might aspire to one day be in a position to expand its business more globally, including into the U.S. at some point in the future, it has not done so. PLS Canada's business, from the outset, has been to develop clinical trial sites in developing countries. It does not operate clinical trial sites, or conduct business operations, in the U.S. *See Aritomo v. Rhee*, 2022 U.S. Dist. LEXIS 211799, *19 (S.D.N.Y. Nov. 22, 2022) (finding no general jurisdiction in New York over an Austrian corporation based on documents, including a business plan, referring to future plans and hopes to expand from Vienna worldwide, including into the New York market); *DEB USA, Inc. v. CWGC LA Inc.,* 2017 U.S. Dist. LEXIS 20027, *14-15 (W.D.N.C. Feb. 13, 2017) (court found that personal jurisdiction based on "future plans" was lacking).

18. The Plaintiffs focus on PLS Canada's employees working remotely – employees that work for the Canadian company and whose business activities are directed, not to the U.S., but to the development of clinical trial sites in underrepresented countries, which PLS is, along with its partners in these countries, currently in the process of establishing, in Brazil, Rwanda, South Africa, Pakistan, the Bahamas and Canada. Contrary to the Plaintiffs' assertions, in light of the circumstances, the exercise of general jurisdiction over PLS Canada is not appropriate.

19. The Plaintiff cite to *Pursuit Capital* and *Silver v. Countrywide Realty, Inc.,* 39 F.R.D. 596, 599 (S.D.N.Y. 1966) for the proposition that this Court should exercise general jurisdiction over PLS Canada based on the location of its leadership (including management and

---

[26] *Cacchillo v. Insmed Inc.,* 833 F. Supp. 2d 218, 228 (N.D.N.Y. 2011) (allegations that defendant pharmaceutical research company tested the commercial viability of its only product primarily though New York research institutes using New York residents); *Surgical Laser Techs. v. C.R. Bard, Inc.,* 921 F. Supp. 281, 284 (E.D. Pa. 1996) (finding no general jurisdiction over defendant in Pennsylvania, notwithstanding allegations that defendant supplied a laser system for use in clinical trial in the forum).

board members) working remotely for the Canadian company from the U.S.[27]  In addition to being incorrect about the primary location of PLS Canada's leadership and decisionmaking (which is in Canada), the Plaintiffs fail to mention a critical distinction.  In both of these decisions, unlike in this case, the defendant corporation was alleged to have a principal place of business in the U.S.  *See Pursuit Capital*, 595 B.R. at 649 (allegations that each ***foreign corporate defendant maintained its principal office in Connecticut***, at the same address of the two individual defendants who were the alter-egos of, and completely controlled, the foreign corporate entities from Connecticut); *Silver*, 39 F.R.D. at 599 (foreign corporation's business was in the hands of companies having their ***principal places of business in New York***).  Here, unlike in the decisions cited by the Plaintiffs, PLS Canada does not have a principal place of business in the U.S.  Moreover, contrary to the Plaintiffs' assertions, PLS Canada does not have its leadership or decisionmaking been in the U.S.

20.    Dr. Mills (the founding member of PLS Canada, a member of the board, the current CEO (since May 2023) and former Chief Scientific Officer) lives and works for PLS Canada in Canada.  Since its founding in Canada in February 2021, Dr. Mills has served the primary leadership role in the company.[28]

21.    Contrary to the Plaintiffs' assertions, Mr. Michael Zimmerman (a prior member of the board and the CEO of PLS Canada), lived and worked for PLS Canada in Canada during his tenure with PLS Canada until his departure from the company in May 2023.[29]

---

[27] Opposition, p. 19, n.8.  As set forth in the Mills Declaration (¶ 7), PLS Canada set forth that it has remote employees working in the U.S.  This fact was disclosed and is not in dispute.

[28] Supplemental Mills Declaration, ¶ ¶ 8, 15.

[29] Supplemental Mills Declaration, ¶ 9.  Attached as Ex. C to the Supplemental Mills Declaration are rental contracts for Mr. Zimmerman's residence in Vancouver, Canada for the period from July 4, 2022 to October 13, 2022 and December 1, 2022 to May 31, 2023 (redacted).  Prior to that time, Mr. Zimmerman was in Canada on a regular basis, residing at the Granville Island Hotel in Vancouver, close to the PLS Canada headquarters.  *See* Ex. C.

22.     Dr. Mark Dybul (who has served as the executive chairman since 2022) is a world renowned scientist and professor at Georgetown University and is located the U.S.[30]   Dr. Dybul has virtually attended PLS Canada board meetings from both the U.S. and abroad.  He is not a member of management or an employee of PLS Canada.[31]

23.     The Plaintiffs' assertions with respect to Mr. Rheingens-Yoo are also incorrrect. Mr. Rheingens-Yoo was not involved in the transactions at issue here on behalf of PLS Canada (rather, he acted on behalf of the counter-parties, Latona and FTX Foundation).  Pursuant to the terms of the transactions, Mr. Rheingens-Yoo has served on the board of PLS Canada from June 6, 2022, but has not been an active participant in board activities or decisionmaking (he attended 2 of the 3 board meetings held during the period following his appointment to the board). Moreover, until July 2023, Mr. Rheingens-Yoo resided in the Bahamas and then Hong Kong, and he attended both of the PLS Canada board meetings virtually from abroad, not the U.S.[32]

24.     The Plaintiffs are incorrect when they assert that the leadership of PLS Canada is in the U.S.  To the contrary, PLS Canada's leadership team, headed by Dr. Mills and Mr. Zimmerman (until his departure in May 2023), has been based in Canada, and includes Chief Operating Officer Dr. Jamie Forrest and CFO Chris Clarke; both of whom are Canadian citizens and residents.[33]

25.     The information relied on by the Plaintiffs with respect to the assertions regarding the location of leadership is not accurate.  First, the "Our Team" tab reflected on PLS Canada's

---

[30] Plaintiffs Ex. 5 (Dr. Mark Dybul's bio from the PLS Canada website).

[31] Supplemental Mills Declaration, ¶ 10.

[32] Supplemental Mills Declaration, ¶ 11.

[33] Supplemental Mills Declaration, ¶ 12.  *See also* Plaintiffs Ex. 1 at 12-13 (Investment Proposal to FTX Foundation dated March 28, 2022) setting forth that the key personnel of PLS Canada was comprised of Dr. Mills, Dr. Forrest and Mr. Zimmerman.

website print-out is not, as the Plaintiffs claim, entitled "PLS Leadership Team."[34]  In addition, the website print-out referred to by the Plaintiffs reflects out-of-date information (for example, Melissa Bomben is no longer with the company), and it is otherwise not reflective of the actual leadership of the company (for example, Bob Battista, Twanna Davis and Katie Winter do not hold executive leadership positions with the company).[35]  Thus, PLS Canada's board, decisionmaking and leadership cannot be said to be in the U.S for jurisdictional purposes.

26.     As set forth in the Motion, PLS Canada utilizes remote employees that are based in the U.S.  Contrary to the Plaintiffs' assertions, however, these remote employees are not in leadership or management roles with the company.  In addition, the cases cited by the Plaintiffs for the more general proposition that the presence of employees working remotely from the U.S. is grounds to assert general jurisdiction over PLS Canada are distinguishable.[36]  For example, in *Functional Pathways of Tenn., LLC v. Wilson Senior Care, Inc.*, 866 F. Supp. 2d 918, 929 (E.D. Tenn. 2012), the court found jurisdiction over a South Carolina corporation proper in Tennessee because ***the corporation had provided therapy services at a healthcare facility in Tennessee***, pursuant to a contractual agreement with the facility, through its employees working at the facility and thus was physically present and conducting business in Tennessee.  Similarly, in *Dorsey v. American Golf Corp.,* 98 F. Supp. 2d 812, 815 (E.D. Mich. 2000), a California defendant corporation that operated and managed golf and tennis clubs was subject to general jurisdiction in Michigan, because it ***managed seven golf courses in Michigan*** pursuant to management agreements, it maintained employees in Michigan, and was the managing partner of a Michigan corporation.  Unlike in the cases cited by Plaintiffs, here, there is no principal office or location

---

[34] Plaintiffs Ex. 4 (print-out of PLS Canada's website referencing "Our Team").

[35] Supplemental Mills Declaration, ¶ 13.

[36] Opposition, p. 19, n.9.

where the PLS Canada remote employees work from in the U.S., nor do they provide services to an entity located in the U.S. – they provide services solely to PLS Canada in aid of the development of clinical trial sites in underrepresented non-U.S. nations. The remote employees could perform their employment functions for PLS Canada from any location; some just happen to live, and work from, various cities and states in the United States.[37]

27. Further, the Plaintiffs' assertion with respect to Dr. Mills' ties to the U.S. are incorrect. Dr. Mills is PLS Canada's founder and CEO and holds the primary management and leadership role at PLS Canada. Dr. Mills is the spokesperson for PLS Canada in connection with this matter and it would be highly disruptive to impose jurisdiction over PLS Canada, compelling it, through its CEO, to litigate in this Court. Contrary to Plaintiffs' assertions, Dr. Mills' ties to the U.S. are not extensive. Dr. Mills lives and works in Vancouver, Canada. For over 16 years, he has been a professor at McMaster University in Ontario and is also a professor at the University of Rwanda. In 2021, he founded PLS Canada in Vancouver. Dr. Mills has not to date been active as a senior scientist with Virx@Stanford (which is a global pandemic response initiative made up of academics from all over the world, it is not a position at Stanford University in Palo Alto, California), but any work related to this initiative would be done from Canada, in coordination with PLS Canada's clinical trial site partners in Brazil and other developing nations. Dr. Mills also worked at the Vancouver office of Cytel Canada, after Cytel, Inc. (which, according to its website, has operations across North America, Europe, Asia and India) acquired the Vancouver company he co-founded, MTEK Sciences, in 2019.[38]

---

[37] Supplemental Mills Declaration, ¶ 14.

[38] Supplemental Mills Declaration, ¶ 15. *See also* https://www.cytel.com/about-us/ (Cytel, Inc.'s locations), a print out of which is attached to the Supplemental Mills Declaration as Ex. D; https://www.labmanager.com/cytel-acquires-mtek-sciences-further-expanding-its-advanced-real-world-analytics-capabilities-578 (Cytel, Inc.'s acquisition of MTEK Sciences in 2019), a print out of which is attached to the Supplemental Mills Declaration as Ex. E.

28.     The Plaintiffs' assertions that PLS Canada publishes in U.S. medical journals is incorrect and improperly merges the academic work of scientists with company business activities.[39] Dr. Mills, along with his academic co-author researchers, has published articles in the New England Journal of Medicine (and these publications are generally searchable via PubMed).[40] Contrary to the Plaintiffs' assertion, the Lancet is a British journal.   These are worldwide publications available to the global medical community.[41]   The publication of scientific articles by academics on issues of global health which reach the scientific community worldwide, co-authored in collaboration with both non-U.S. and U.S.-based research professionals, which appear in mainstream, globally-respected medical journals (even if published by U.S. publishers) with the aim of reaching the global medical community, or the attendance at medical-related conferences held in the U.S., cannot be the standard for general jurisdiction or each and every foreign corporation in the medical field would automatically be subject to jurisdiction in the U.S. as it sought to provide information, and stay current and relevant, in the developing field of global medical research and topics.  *See e.g., Clark v. Noyes*, 871 S.W.2d 508, 519 (Tex. App. 1994) (declining to exercise general jurisdiction over defendant based on the submission of articles to

---

[39] Plaintiffs Ex. 16 (list of publications from PLS Canada's website); Plaintiffs Exs. 17-21 (publications co-authored by Dr. Mills and various U.S. and non-U.S. academics).  These medical journals target a global, not specifically U.S., audience.

[40] https://pubmed.ncbi.nlm.nih.gov/about/ ("PubMed is a free resource supporting the search and retrieval of biomedical and life sciences literature with the aim of improving health–both globally and personally."), a print out of which is attached to the Supplemental Mills Declaration as Ex. H.

[41] https://www.nejm.org/about-nejm/about-nejm ("The *New England Journal of Medicine* (NEJM) is recognized as the world's leading medical journal and website. Published continuously for over 200 years, NEJM delivers high-quality, peer-reviewed research and interactive clinical content to physicians, educators, researchers, and the global medical community."), a print out of which is attached to the Supplemental Mills Declaration as Ex. F.

https://www.thelancet.com/about-us ("The Lancet journals are both a destination for publication and a platform to advance the global impact of research. The Lancet Group cares that your work is highly visible to a global network of researchers, clinicians, industry professionals, policy makers, media outlets, patients, and the wider public, and we work with you and your affiliated institutions to maximise the impact of your research on the world. … Lancet journals have extensive global reach with more than 36.8 million annual visits and 98.8 million downloaded articles across TheLancet.com and ScienceDirect."), a print out of which is attached to the Supplemental Mills Declaration as Ex. G.

professional medical journals circulated and attendance at medical conferences in the forum); *Foster-Gwin, Inc. v. Fallwell*, 2001 U.S. Dist. LEXIS 18151, *1 (N.D. Cal. Nov. 5, 2011) (denying jurisdiction in California over an antiques dealer and appraiser based on facts that he owned three non-operative websites and he occasional published articles in a magazine that was probably circulated in California); *Arlington Indus. v. Elec. Custom Distribs.*, 817 F. Supp. 2d 473, 478 (M.D. Pa. 2011) (citing *Autogenomics, Inc. v. Oxford Gene Tech. Ltd.*, 566 F.3d 1012, 1014-18 (Fed. Cir. 2009) (denying jurisdiction notwithstanding numerous factors weighing in favor of general jurisdiction, including participation at scientific conferences).

29. Contrary to the Plaintiffs' intimations, Dr. Mills does not exclusively publish in U.S. medical journals.[42] The cases cited by the Plaintiffs are factually distinguishable and do not

---

[42] Supplemental Mills Declaration ¶ 17. A list of publications authored by Dr. Mills and others in non-U.S. journals (*i.e.*, not the New England Journal of Medicine which, as discussed, is a world renowned medical journal that has a worldwide reach) from May 2022 to the present includes:

1. Nachega JB, Nsanzimana S, Rawat A, Wilson LA, Rosenthal PJ, Siedner MJ, et al. Advancing detection and response capacities for emerging and re-emerging pathogens in Africa. Lancet Infect Dis. 2023;23(5):e185-e9.

2. Smith ER, Oakley E, Grandner GW, Ferguson K, Farooq F, Afshar Y, et al. Adverse maternal, fetal, and newborn outcomes among pregnant women with SARS-CoV-2 infection: an individual participant data meta-analysis. BMJ Glob Health. 2023;8(1).

3. Sam-Agudu NA, Quakyi NK, Masekela R, Zumla A, Nachega JB. Children and adolescents in African countries should also be vaccinated for COVID-19. BMJ Glob Health. 2022;7(2).

4. Reis G, Dos Santos Moreira-Silva EA, Silva DCM, Thabane L, Milagres AC, Ferreira TS, et al. Effect of early treatment with fluvoxamine on risk of emergency care and hospitalisation among patients with COVID-19: the TOGETHER randomised, platform clinical trial. Lancet Glob Health. 2022;10(1):e42-e51.

5. Reis G, Dos Santos Moreira Silva EA, Medeiros Silva DC, Thabane L, Cruz Milagres A, Ferreira TS, et al. Effect of early treatment with metformin on risk of emergency care and hospitalization among patients with COVID-19: The TOGETHER randomized platform clinical trial. Lancet Reg Health Am. 2022;6:100142.

6. Petersen E, Ntoumi F, Hui DS, Abubakar A, Kramer LD, Obiero C, et al. Emergence of new SARS-CoV-2 Variant of Concern Omicron (B.1.1.529) - highlights Africa's research capabilities, but exposes major knowledge gaps, inequities of vaccine distribution, inadequacies in global COVID-19 response and control efforts. Int J Infect Dis. 2022;114:268-72.

7. Nsanzimana S, Mills EJ. Estimating HIV incidence in sub-Saharan Africa. Lancet HIV. 2023;10(3):e146-e8.

8. Mills EJ, Reis G. Evaluating COVID-19 vaccines in the real world. Lancet. 2022;399(10331):1205-6.

9. Nachega JB, Musoke P, Kilmarx PH, Gandhi M, Grinsztejn B, Pozniak A, et al. Global HIV control: is the glass half empty or half full? Lancet HIV. 2023;10(9):e617-e22.

support the publication of medical research articles by academics as sufficient to exercise of general jurisdiction over PLS Canada.[43]

30. The Plaintiffs are also incorrect in their assertion that Dr. Mills traveled to the U.S. in May 2022 on behalf of PLS Canada. To clarify, Dr. Mills traveled to the U.S. to receive an award in the U.S. from the Society of Clinical Trials, an international professional organization,[44] for McMaster University's work on the TOGETHER Trial which was conducted in Brazil commencing in June 2020. As a research professor at McMaster University, Dr. Mills was one of the lead researchers (along with his colleague, Dr. Gilmar Reis) on the initial TOGETHER Trial (which commenced prior to the formation of PLS Canada).[45] Dr. Mills' travel to the U.S. to accept

---

10. Thorlund K, Smith D, Linsell C, White N, Butler C, Boulware D, et al. The importance of appropriate selection of clinical endpoints in outpatient COVID-19 clinical trials. Commun Med (Lond). 2023;3(1):53.

11. Jhuti D, Rawat A, Guo CM, Wilson LA, Mills EJ, Forrest JI. Interferon Treatments for SARS-CoV-2: Challenges and Opportunities. Infect Dis Ther. 2022;11(3):953-72.

12. Nachega JB, Scarsi KK, Gandhi M, Scott RK, Mofenson LM, Archary M, et al. Long-acting antiretrovirals and HIV treatment adherence. Lancet HIV. 2023;10(5):e332-e42.

13. Bepouka B, Situakibanza H, Sangare M, Mandina M, Mayasi N, Longokolo M, et al. Mortality associated with COVID-19 and hypertension in sub-Saharan Africa. A systematic review and meta-analysis. J Clin Hypertens (Greenwich). 2022;24(2):99-105.

14. Peer N, Nguyen KA, Hill J, Sumner AE, Cikomola JC, Nachega JB, et al. Prevalence and influences of diabetes and prediabetes among adults living with HIV in Africa: a systematic review and meta-analysis. J Int AIDS Soc. 2023;26(3):e26059.

[43] *United States SEC v. Carrillo*, 115 F.3d 1540, 1541, 1545 (11th Cir. 1997) (action by the Securities & Exchange Committee against Costa Rican company and its Costa Rican principals asserting that defendants fraudulently offered and sold unregistered securities to U.S. residents to finance operations, and finding personal jurisdiction based mailing of investment-related materials to U.S. residents, funding flowing into bank account at a branch located in Miami which the company maintained for the convenience of the U.S. investors, and numerous advertisements and articles related to the challenged investments directed to U.S. investors placed in a Costa Rican airline magazine and American Airlines complimentary magazine, American Way); *Ipoint Ventures, LLC v. Pequot Capital Mgmt.*, 2005 U.S. Dist. LEXIS 16039, *29-30 (D.N.J. July 27, 2005) (finding general jurisdiction over venture capital firm in New Jersey based on defendant belonging to several trade organizations targeting New Jersey businesses, its agents speaking at conferences in New Jersey to discuss venture capital investment in New Jersey, aggressively pursuing development of investment opportunities in New Jersey and entering into agreements with ties to New Jersey).

[44] Plaintiffs Ex. 47 (Society for Clinical Trials' press release dated 2-May-2022: "TOGETHER trial named David Sackett Trial of the Year.").

[45] Supplemental Mills Declaration ¶ 18. *See also* https://brighterworld.mcmaster.ca/articles/mcmaster-researchers-leading-international-study-to-test-three-widely-available-drugs-for-early-covid-19-treatment, a print out of which is attached to the Supplemental Mills Declaration as Ex. I.

this award on behalf of McMaster University cannot form the basis for personal jurisdiction over PLS Canada. *Alicea v. LT's Benjamin Records*, 762 F. Supp. 2d 299, 308-09 (D. Mass. 2010) (declining to exercise personal jurisdiction over defendant based on travel to Harvard to accept an award unrelated to the claims at issue).

31.     The Plaintiffs are also incorrect in their assertion that PLS Canada is funded by U.S. entities. Funding for the initial TOGETHER Trial (sponsored by the Bill & Melinda Gates Foundation, FastGrants and Rainwater Charitable Foundation), does not establish the requisite connections for general jurisdiction over PLS Canada as the funding was provided to McMaster University, not to PLS Canada.[46]  The funding that PLS Canada received was for the ***expansion*** of the initial TOGETHER Trial in Brazil and into Canada other non-U.S. developing nations (Rwanda, South Africa and the Bahamas). This funding for the development of non-U.S. clinical trial sites that is being undertaken by PLS Canada came from non-U.S. companies, Latona/Plaintiffs.[47]  Moreover, the partnership with GreenLight Biosciences is to provide support for their clinical trial in Rwanda.[48]  The cases cited by the Plaintiffs are distinguishable and inapplicable[49] and, in the case of *Pursuit Capital*, 595 B.R. at 647-48, does not stand for the proposition for which it is cited.[50]

---

[46] Supplemental Mills Declaration, ¶ 19.

[47] Supplemental Mills Declaration, ¶ 20.

[48] Supplemental Mills Declaration, ¶ 21. *See also* Plaintiffs Ex. 52 (PLS Canada's press release dated 02 Feb, 2023: "Rwanda FDA approves Platform Life Sciences and GreenLight Biosciences to launch a Phase I clinical trial in Rwanda for mRNA COVID-19 vaccine").

[49] *See Wells Fargo Bank, N.A. v. RLJ Lodging Trust*, 2013 U.S. Dist. LEXIS 152098, *23 (N.D. Ill. Oct. 23, 2013) (finding general jurisdiction in Illinois over a Maryland real estate investment trust based on the trust's contacts with Illinois to solicit business and keep investors apprised of the trust's activities through the visits by trust officers to Illinois and conference calls, combined with revenue derived from Illinois and shares of stock held by Illinois investors).

[50] The Plaintiffs' cite to *Pursuit Capital* for the proposition that the court found general jurisdiction based, in part, on the fact that "Defendants should not be surprised to find themselves in a United States court because they had United States based investors," was not the court's holding, but was the plaintiffs' argument at the hearing in that case. The court's finding of personal jurisdiction in *Pursuit Capital* was based on allegations in the complaint that each Cayman

32.    *Ipoint Ventures, LLC v. Pequot Capital Mgmt.* – which the Plaintiffs cite for the proposition that a company was even held subject to general jurisdiction based on "investments in the forum, speaking at conferences in the forum and taking specific actions in the forum geared at encouraging further investment here"[51] – does not provide the basis for general jurisdiction over PLS Canada and, in fact, highlights the very difference between the cases finding general jurisdiction and this case.  *Ipoint Ventures* dealt with a capital management company that was involved with activities directed at seeking venture capital investments **in the forum** (*i.e.,* investment opportunities in New Jersey-based businesses).  Here, the activities, conferences, publications and other activities of PLS Canada's employees are not directed at seeking investments **in the U.S**.  Rather, they are directed at the development of non-U.S. clinical trial sites (in Brazil, Rwanda, South Africa, Pakistan, the Bahamas and Canada) by a company doing business **in Canada**.

E.    **The Plaintiffs are Not Entitled to Jurisdictional Discovery**

33.    The evidence in this case demonstrates that the Plaintiffs cannot establish a *prima facie* case for personal jurisdiction over PLS Canada.  This a dispute involving non-U.S. entities on both sides – PLS Canada, as the alleged transferee, and the non-U.S. Plaintiffs (British Virgin Islands and Antigua and Barbuda corporations), as the alleged transferors.  Latona, the counterparty to the funding agreements, is a company organized in the Bahamas.  The Plaintiffs' claims against PLS Canada seeking to claw-back the funding provided to this Canadian company

---

defendant maintained its principal office in Connecticut and that the individual principals and board members who were in complete control and were alter-egos of the Cayman entities were Connecticut residents, providing sufficient allegations to support that Connecticut was where all decisions were made.  *Id.* at 649-50.  In any event, the decision does not provide support for the Plaintiffs' argument as the sponsorship by U.S. entities to fund the TOGETHER Trial was not provided to PLS Canada.

[51] Opposition at 19, n.11 and 21.

did not arise from business activities directed to the U.S. PLS Canada is incorporated, headquartered and does business, in Canada. PLS Canada operates no clinical trial sites, and has no business operations, in the U.S. Its business is to develop and operate clinical trial sites in developing and underrepresented non-U.S. nations. PLS Canada's remote employees in the U.S. do not direct their business activities at projects in the U.S., and PLS Canada's leadership and decisionmaking is not in the U.S.

34.     The standard in the Third Circuit is clear – where a plaintiff has failed to make a *prima facie* showing of personal jurisdiction, a grant of jurisdictional discovery is not appropriate. *3G Licensing, S.A. v. Lenovo Grp. Ltd.,* 2019 U.S. Dist. LEXIS 143453, *8-9, *23-24 (D. Del. Aug. 22, 2019) ("[C]an a plaintiff be entitled to jurisdictional discovery if it has not made out a *prima facie* showing of personal jurisdiction? It appears that, pursuant to Third Circuit case law, the answer is 'no.' Indeed, the Third Circuit has repeatedly indicated that if a plaintiff fails to make out a *prima facie* showing, a grant of jurisdictional discovery would not be appropriate."). The Third Circuit has described a *prima facie* showing as one that demonstrates "with reasonable particularity sufficient contacts between the defendant and the forum state." *Id*. at *6, 23. The Plaintiffs have not, and cannot, make this requisite showing here and the grant of jurisdictional discovery is therefore not appropriate.

### III.

### CONLCUSION

35.     Even accepting all of the Plaintiffs' unrebutted jurisdictional allegations as true, the Plaintiffs have failed to show sufficient grounds for this Court's exercise of either specific or general jurisdiction over PLS Canada and the Motion should be granted.

Dated:   October 6, 2023                PACHULSKI STANG ZIEHL & JONES LLP

*/s/ James E. O'Neill*
James E. O'Neill (DE Bar No. 4042)
Alan J. Kornfeld (CA Bar No. 130063*) (admitted pro hac)*
Debra I. Grassgreen (CA Bar No. 169978) *(admitted pro hac)*
Tavi C. Flanagan (CA Bar No. 169156) *(admitted pro hac)*
919 N. Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899-8705 (Courier 19801)
Telephone: (302) 652-4100
Facsimile: (302) 652-4400
Email:  joneill@pszjlaw.com
        akornfeld@pszjlaw.com
        dgrassgreen@pszjlaw.com
        tflanagan@pszjlaw.com

*Counsel to Defendant Platform Life Sciences, Inc.,*
*a Canadian corporation*