| | |
|---|---|
| 1 | UNITED STATES BANKRUPTCY COURT |
| | DISTRICT OF DELAWARE |
| 2 | |
| 3 | IN RE:                    . Chapter 11 |
| | . Case No. 22-11068 (JTD) |
| 4 | FTX TRADING LTD., *et al.,*    . |
| | . (Jointly Administered) |
| 5 | . |
| | Debtors.            . |
| 6 | . . . . . . . . . . . . . . . |
| | . |
| 7 | ALAMEDA RESEARCH LLC, FTX    . |
| | TRADING LTD., WEST REALM    . |
| 8 | SHIRES, INC., AND WEST    . |
| | REALMSHIRES SERVICES INC., . |
| 9 | (D/B/A FTX, US),          . |
| | . |
| 10 | Plaintiffs,      . Adv. Proc. No. 23-50419 (JTD) |
| | . |
| 11 | v.            . |
| | . |
| 12 | DANIEL FRIEDBERG,          . |
| | . |
| 13 | Defendant.        . |
| | . . . . . . . . . . . . . . . |
| 14 | . |
| | ALAMEDA RESEARCH LTD., AND . |
| 15 | FTX TRADING LTD.,          . |
| | . |
| 16 | Plaintiffs,        . |
| | . |
| 17 | -against-      . Adv. Proc. No. 23-50444 (JTD) |
| | . |
| 18 | PLATFORM LIFE SCIENCES INC.,. |
| | LUMEN BIOSCIENCE, INC.,    . |
| 19 | GREENLIGHT BIOSCIENCES    . |
| | HOLDINGS, PBC, RIBOSCIENCE . |
| 20 | LLC, GENETIC NETWORKS LLC, . |
| | 4J THERAPEUTICS INC.,      . |
| 21 | LATONA BIOSCIENCES GROUP,  . |
| | FTX FOUNDATION, SAMUEL    . |
| 22 | BANKMAN-FRIED, ROSS        . |
| | RHEINGANS-YOO, AND NICHOLAS . Courtroom No. 5 |
| 23 | BECKSTEAD,              . 824 North Market Street |
| | . Wilmington, Delaware 19801 |
| 24 | Defendants.        . |
| | . Tuesday, October 24, 2023 |
| 25 | . . . . . . . . . . . . . . . 10:00 a.m. |

<pre>
 1                      TRANSCRIPT OF HEARING
            BEFORE THE HONORABLE JOHN T. DORSEY
 2               UNITED STATES BANKRUPTCY JUDGE

 3
     APPEARANCES:
 4
     For the Debtors:         Adam Landis, Esquire
 5                            Kimberly Brown, Esquire
                              LANDIS RATH & COBB LLP
 6                            919 Market Street, Suite 1800
                              Wilmington, Delaware 19801
 7
                              Andrew Dietderich, Esquire
 8                            Brian Glueckstein, Esquire
                              SULLIVAN & CROMWELL LLP
 9                            125 Broad Street
                              New York, New York 10004
10
     For the U.S. Trustee:    Juliet Sarkessian, Esquire
11                            Jonathan Lipshie, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
12                            844 King Street, Suite 2207
                              Lockbox 35
13                            Wilmington, Delaware 19801

14

15   (APPEARANCES CONTINUED)

16   Audio Operator:          Jermaine Cooper, ECRO

17   Transcription Company:   Reliable
                              The Nemours Building
18                            1007 N. Orange Street, Suite 110
                              Wilmington, Delaware 19801
19                            Telephone: (302)654-8080
                              Email:  gmatthews@reliable-co.com
20
     Proceedings recorded by electronic sound recording,
21   transcript produced by transcription service.

22

23

24

25
</pre>

1   APPEARANCES (CONTINUED):

2   For Bloomberg L.P.:        KatieLynn Townsend, Esquire
                               REPORTERS COMMITTEE FOR
3                                FREEDOM OF THE PRESS
                               1156 15th Street NW
4                              Suite 1020
                               Washington, DC 20005
5
    For the Official
6   Committee of Unsecured
    Creditors:                 Robert Poppiti, Jr., Esquire
7                              YOUNG CONAWAY STARGATT & TAYLOR LLP
                               One Rodney Square
8                              1000 North King Street
                               Wilmington, Delaware 19801
9
    For the Ad Hoc
10  Committee:                 Matthew Harvey, Esquire
                               MORRIS NICHOLS ARSHT & TUNNELL LLP
11                             1201 North Market Street
                               Suite 1600
12                             Wilmington, Delaware 19801

13  For Emergent Fidelity
    Technologies:              Matthew Ziegler, Esquire
14                             MORGAN LEWIS & BOCKIUS LLP
                               101 Park Avenue
15                             New York, New York 10178

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2    MOTION:                                              PAGE

3    Agenda
4    Item 11:  Second Joint Motion of the Debtors and       21
               The Official Committee of Unsecured
5              Creditors for an Order Authorizing
               The Movants to Redact or Withhold
6              Certain Confidential Information of
               Customers [D.I. 2508; Filed 9/13/23]
7
               Court's Ruling:                              58
8
9    Agenda
     Item 12:  Debtors' Motion for Entry of an Order        61
10             (I) Granting Leave from Local Rule
               3007-1(f) to Permit the Filing of
11             Substantive Omnibus Objections and (II)
               Granting Related Relief
12             [D.I. 2646; Filed 9/19/23]

13             Court's Ruling:                              83

14

15   WITNESSES CALLED
     BY THE DEBTORS:                                        PAGE

16
          KEVIN COFSKY
17        Direct examination by Mr. Glueckstein             22
          Cross-examination by Ms. Townsend                 27
18        Cross-examination by Ms. Sarkessian               38

19

20

21

22

23

24

25

1    (Proceedings commence at 10:02 a.m.)

2    (Call to order of the Court)

3         THE COURT:  Good morning, everyone.  Thank you.

4    Please be seated.

5         Mr. Landis.

6         MR. LANDIS:  Good morning, Your Honor.  And my it

7    please the Court, Adam Landis from Landis, Rath & Cobb on

8    behalf of FTX Trading Limited and its affiliated debtors.

9         We are here on what started out as a rather

10   extensive agenda, but now has been narrowed down to just two

11   matters going forward.

12        We appreciate Your Honor's entry of orders in

13   connection with Items Numbers 7, 8, 9, and 10.  So those

14   matters need not go forward.

15        We only have two matters that will proceed today.

16   The first is Item Number 11, which is the second joint motion

17   of the debtors and the committee of unsecured creditors for

18   an order authorizing the redaction or withholding of certain

19   confidential information.  That will be handled by Mr.

20   Glueckstein of Sullivan & Cromwell.

21        The second is Item Number 12, which is the debtors'

22   motion for entry of an order granting leave from Local Rule

23   3007-1(f) in connection with substantive claim objections.

24   That will be handled by Ms. Brown of my office.

25        But before we get to those matters, Mr. Dietderich

1  of Sullivan & Cromwell has an update for the Court --

2          THE COURT:  Okay.

3          MR. LANDIS:  -- so I'll yield --

4          THE COURT:  Thank you.

5          MR. LANDIS:  -- the podium to him.

6          MR. DIETDERICH:  Thank you.  Thank you, Mr. Landis.

7          Good morning, Your Honor.  Your Honor, we, believe

8  it or not, are approaching the first anniversary of the case

9  and --

10         THE COURT:  I do believe.

11         MR. DIETDERICH:  Exactly.

12     (Laughter)

13         MR. DIETDERICH:  Exactly.  It's been a very long,

14 but productive year.

15         I'd like to take a moment, if I could, to put in

16 perspective, briefly, what this Court's protection has meant

17 for creditors.

18         On the eve of our filing, if you go back in time to

19 November 10th, global creditors faced the possibility, the

20 real possibility of a near total loss.  This was not a simple

21 bank run.  Banks keep records and know where their assets

22 are.  This was different.  Regulators were seizing assets.

23 Insolvency filings had started in the Bahamas and Australia.

24 The founders of the company were facing criminal prosecution.

25 The general counsel couldn't be found.  Companies in the

1  group had no books and records of significance and many had

2  never had board meetings.  What digital assets remained had

3  been left with little protection against theft or hacks.

4       And what changed everything was the filing for

5  bankruptcy in this Court.  There was no other choice at the

6  time, there was nowhere else to go.  The automatic stay and

7  the U.S. bankruptcy system and its openness to foreign

8  debtors made this result possible.

9       We're asked constantly if we can project creditor

10  recoveries.  We cannot yet, not with certainty.  But I will

11  say this:  They could easily have been pennies had FTX been

12  subject to separate liquidations, fire sales, government

13  seizures, and hacks all over the world; there could have been

14  nothing left.

15       Now the central actor in this rescue is John Ray,

16  who made the call to file over a hundred companies for

17  bankruptcy after three hours on the job.  But he has not been

18  alone.  We have a very active board of directors with whom we

19  spend several hours a week on FTX matters for over a year.

20       And we have an extremely engaged official committee

21  of creditors, one of the most engaged I've experienced in my

22  career.  The individual members have devoted countless hours

23  to this case, countless personal time, many of them without

24  compensation.

25       And we have active and passive customer groups.

1   Your Honor may note that many of them sued us at the

2   beginning of the case, filed adversary proceedings on

3   customer property issues.  Well, our solution to that, our

4   invitation, which they accepted, was to come into the kitchen

5   of this case and help us formulate a plan, and the result has

6   been a better plan and a better process.

7          So, today, Your Honor, I'm very pleased to speak

8   for the debtors to say we appreciate all the work by so many

9   parties that have created this -- that have taken this very,

10  very complicated case and resulted in, although still

11  substantial time and demands from Your Honor, a relatively

12  small amount of court time compared to the amount of time

13  that has been spent by the professionals out of court.  And I

14  think that's a testament to everybody's attitude and all of

15  the meetings and negotiations that we've had over this year.

16         So where do we --

17         THE COURT:  I was surprised by that myself, how

18  much --

19         MR. DIETDERICH:  Well, it --

20         THE COURT:  -- how little there's been litigation

21  so far.  But I feel it might be coming down the road, we'll

22  see.

23         MR. DIETDERICH:  It -- I would -- I do not want to

24  jinx anything by saying it will continue, and we should

25  always be ready to -- what is it?  You know, prepare for the

1  worst, but hope for the best.  We've certainly prepared a lot

2  more litigation than Your Honor has seen.

3          So where do we stand?  Well, there's a couple of

4  things, I think, to bring to the Court's attention:

5          First, we have a proposed architecture now for a

6  plan of reorganization, and that architecture, I'm pleased to

7  say, is supported by every constituency with whom we've

8  consulted about the plan structure.

9          The plan is the result of public solicitation of

10  comments from stakeholders, an unusual step that we took,

11  given the complexity of the case and its public significance.

12  Your Honor will note that we circulated a draft plan -- filed

13  a draft plan publicly on July 31st and solicited public

14  comments on a number of study questions for the group.  Well,

15  we have answers and dialogue and conversations on each of

16  those questions and we think they've been fairly resolved.

17          We have a proposed settlement of customer property

18  issues in the case.  The settlement has two key components:

19  One is in the plan and the other is an offer to settle

20  preferences because the customer property issues, of course,

21  relate to both what we're doing in the plan of reorganization

22  and a defense customers might assert to preferences.  Neither

23  of those settlements is being proposed to the Court today.

24  But given their significance, I'll spend just a moment on

25  them.

1        The plan settlement follows the architecture in the

2   draft plan.  The plan creates three pools of value:  One for

3   the dot-com customers, one for the U.S. customers, and a

4   general pool.  And I'm excluding from this, Your Honor,

5   certain pools of value for separate subsidiaries that have

6   their own logic to them.  But in the main case, there's three

7   of these pools of value.

8        Each customer pool includes the assets that were

9   segregated and identifiably segregated for customers at the

10  commencement of the case.  But there's a shortfall in each

11  pool, the assets that are still there are less than the

12  customer entitlements against those assets.

13       So also in each customer's pool is what we call a

14  "shortfall claim."  And the shortfall claim is a claim

15  against the general pool for the return of the missing money.

16  That shortfall claim has been the crux of the negotiation

17  we've had with customers over the last months because there's

18  a question:  How should it rank?  Is it a general unsecured

19  claim, side by side with other customers, or is the nature of

20  the facts of our case such that the shortfall claim really

21  should be seen as a constructive trust claim or a floating

22  charge imposed for equitable reasons on the rest of the

23  estate?  And there's strong arguments on both sides.  There's

24  also tracing questions that are raised.

25       Well, the negotiated solution to this question is

1 to create in the plan of reorganization a modified priority

2 for the shortfall claims.  And the compromise we'll be

3 proposing in the plan, with the support of all the people

4 that were involved, is that 66 percent of those shortfall

5 claims have a priority, effectively like an equitable lien or

6 a floating charge on all the global value.  And the remaining

7 portion of the shortfall claim is a deficiency claim that

8 ranks equal with the general unsecured creditors.

9       The -- that negotiation was hard fought.  We think

10 we have a strong record for it.  Participating in it were not

11 just representatives of customers in both of the pools, but

12 also the debtors and the general -- the creditors' committee

13 on behalf of general unsecured creditors.

14       The preference settlement, Your Honor, is a general

15 offer that the debtors have agreed to make in the plan of

16 reorganization as part of the balloting process.  That offer

17 is an offer to customers that are defined as "eligible

18 customers," and we'll get to that in a moment.  Eligible

19 customers are given the opportunity to accept a preference

20 offer of settlement from the debtors, which is calculated in

21 a particular negotiated way.

22       And that calculation focuses on the change in

23 trading activity that happened nine days before the petition

24 date -- was filed, and identifies a nine-day period where

25 there's a preference -- kind of a modified preference look-

1  back period.  And the preference settlement is an offer for

2  15 percent of the net exposure entering that period of time.

3  And customers are permitted to settle that preference

4  exposure in their ballot, which will be identified.  It will

5  be identified, both the amount of their claim and the amount

6  of their preference exposure.

7           They're permitted to voluntarily elect to settle

8  that preference exposure, either by credit against their

9  claim or by payment of cash.  Customers don't have to take

10 that offer, Your Honor, they can say no, in which case it

11 will be resolved in the ordinary course.

12          Now there's a large number of customers that may

13 not be eligible for that settlement.  We've excluded from

14 that settlement, not just obvious categories of affiliates

15 and insiders, but in the public disclosure in the papers

16 we'll file, there's a categorization of other excluded

17 customers, which includes, importantly, customers against

18 whom the estate has some other cause of action unrelated to

19 preferences, or customers for whom the facts and circumstance

20 suggest to the debtors that the settlement would not be fair

21 to the estate.  So that process will unfold, we'll have

22 papers for it.

23          The other thing I would say, Your Honor, just to be

24 clear, to get the terms right, we have a *de minimis* concept

25 in the preference settlement, so that customers with less

1  than $250,000 of preference exposure are excluded.  The

2  customers are, you know, cautioned not to rely on my

3  statements today about this but to read the language that has

4  been now -- is now public in the termsheet that we circulated

5  with the plan support agreement.

6         The next item, Your Honor, is the plan support

7  agreement.  We have one.  This is also not something we'll be

8  seeking court approval of.  It -- the debtor is not bound by

9  it.  But it is an important step forward because we have plan

10 support commitments from the customers that had filed the

11 adversary proceedings, as well as support from the official

12 committee of creditors.  So that's a great milestone for us.

13        The plan support agreement does have some

14 milestones, but the milestones won't surprise Your Honor.

15 They're the same milestones we've been using in this case

16 from the beginning, in terms of our plan time table, which

17 involves, to simplify:

18        A plan and disclosure statement that we intend to

19 file by December 16th;

20        A disclosure statement hearing in March;

21        And confirmation of the plan really as soon as we

22 can, but probably in the middle or near the end of the second

23 quarter.

24        We also, Your Honor, have -- are trying and have --

25 I think are also making progress on some of the other items

1  that we've identified as matters that would otherwise result

2  in difficult or complicated plan litigation, and I want to

3  run through those briefly, as well.

4         The first is our dispute with the JPLs in the

5  Bahamas.  Well, I'm pleased to say we are also, under the

6  guidance of Judge Fitzgerald, having constructive dialogue

7  with the Bahamas, and we hope to have good news on that front

8  sometime later in November.

9         We're also building an approach to another issue

10  that has worried us from the beginning of the case and we

11  know is near and dear to many of our customers.  How do we

12  value digital assets for the purposes of plan?

13         In November, we'll be filing a motion to estimate

14  digital asset values for purposes of plan treatment.  The

15  motion is being prepared, like everything we're doing, in

16  consultation with the official committee and the ad hoc

17  customer committees, so that issues and disputes are avoided

18  wherever possible, before we get to court.

19         But that's an important milestone for us, as well,

20  Your Honor, because, although many digital assets are

21  relatively straightforward in value, other ones have

22  circumstances that will raise disputes if we don't call those

23  out and try to resolve those now.  So, rather than wait and

24  embed those issues in confirmation litigation next year,

25  we're going to try to bring those forward and resolve those

1  by omnibus estimation sooner.

2       We also, Your Honor, have broken a logjam with our

3  official committee on the monetization of our assets.  The

4  debtors generally have sought to monetize assets promptly.

5  Sometimes our official committee has been more inclined to

6  hold assets in the hopes of future appreciation.  This is a

7  legitimate business discussion.  And I'm pleased to say we

8  have consensus on what we will be selling immediately and

9  what we are holding for a little while longer, given market

10 dynamics.

11      Your Honor knows we have a merits settlement with

12 Genesis and we have procedural settlements with Voyager and

13 BlockFi.  The S&C team, at least, is very happy to see these

14 settlements because they avoid what are some of the most

15 difficult issues we've faced in the case that relate to the

16 venue questions when two debtors collide.  But I think we

17 have navigated all of that, so we know that, even though we

18 have disputes with some of these other debtors that remain to

19 be resolved, we have an understanding of where those disputes

20 will be resolved and in what kind of a process.

21      Finally, Your Honor, we've done this work while

22 assisting with regulatory and criminal investigations around

23 the world, including the prosecution of Sam Bankman-Fried,

24 whose trial continues in front of Judge Kaplan in New York.

25 We've done so, cooperating with the government authorities,

1  not just because it's the right thing to do; we've done so

2  because it's in the economic interest of our creditors.

3          Cooperation with the governments around the world

4  has implications for our plan.  Since customers and other

5  creditors, as well as the corporate entities, were, in our

6  view, defrauded, the plan subordinates government fines and

7  penalties around the world to creditor recoveries.  We are

8  asking government creditors to join this class voluntarily.

9          And as an example, the CFTC in the U.S. has already

10  acknowledged this in their 8.7-billion-dollar proof of claim,

11  which, as submitted, acknowledges the subordinated status of

12  our class of government restitution and fines.

13          So, Your Honor, we're going to continue at pace.

14  We intend to make progress prior to effectiveness and not to

15  wait for effectiveness on many of the things cases do after

16  effectiveness.

17          We will continue to resolve material claims, so

18  you'll see claim objections from us over the next months,

19  especially on our larger claims.

20          We will continue to sell material assets, and

21  you'll see asset disposition motions.

22          And we will continue to pursue material outbound

23  litigation.  This is not a case where we're going to wait for

24  the formation of a litigation trust someway -- someday and

25  see how it does, but the material pieces of litigation we

1    intend to commence during this case.

2           Our goal is not merely to confirm a plan and then

3    go home.  Our goal is to make distributions to customers as

4    promptly as we can.  And to do that, we know it takes a lot

5    of work now, so that, as we walk into confirmation and

6    effectiveness, we don't have the large reserves for disputed

7    items that have delayed distributions in other large cases,

8    sometimes for many, many years.

9           So that's our status and a little bit of our

10   philosophy on how to conduct this.  And I'm happy to take any

11   questions, Your Honor.

12          THE COURT:  Okay.  No, I don't have any questions

13   at this time.  Thank you.

14          MR. DIETDERICH:  Thank you.

15          THE COURT:  Anyone else wish to be heard on this

16   issue?

17          MR. PASQUALE:  Ken Pasquale from Paul Hastings for

18   the official committee.

19          Let me start, Your Honor.  I very much appreciate

20   Mr. Dietderich's acknowledgment of the committee's hard work

21   in getting us with the debtors, with the ad hoc group, and

22   the other stakeholders to where we are today.

23          As Mr. Dietderich said, our members have been very

24   actively involved.  As you know, they are residents all over

25   the globe, came to New York for a series of meetings.  And

1  those meetings and the negotiations that Your Honor knows we

2  were pushing to have as soon as possible resulted in the plan

3  support agreement and the structure that Mr. Dietderich

4  outlined.

5         There is a lot of work to do.  We're looking

6  forward to doing it with the other stakeholders, as we

7  proceed.

8         And I think I just -- the only other thing I'd like

9  to say is picking up on Mr. Dietderich's last comment.  The

10 milestones are what they are.  We would like to see and we

11 will be doing our best, as I know the debtors will and the

12 other stakeholders, to move as fast as we can and do better

13 than those milestones because the goal here is to get

14 recoveries to the creditors, to the customers at the earliest

15 possible date, and obviously maximize those recoveries.

16        Thank you, Your Honor.

17        THE COURT:  All right.  Thank you.

18        MR. HARVEY:  Good morning, Your Honor.  And may it

19 please the Court, Matthew Harvey from Morris, Nichols, Arsht

20 & Tunnell on behalf of the Ad Hoc Committee of Non-U.S.

21 FTX.com Customers.

22        Again, Your Honor, I want to echo Mr. Pasquale's

23 comments and Mr. Dietderich's comments and thank them for

24 acknowledging the hard work that the ad hoc committee put

25 into this.

1        Your Honor, it really took months of hard-fought

2   negotiations, but we were pleased that the settlement that

3   was ultimately reached of the customer property issues gave

4   appropriate account to the customer property arguments that

5   we have been advancing since the beginning of the case and

6   also resulted in what we believe is a favorable framework for

7   preference settlements.

8        And Mr. Dietderich mentioned -- excuse me -- while

9   customers are not required to take that settlement, we do

10  think it's a favorable framework for customers to settle

11  into, should they so desire.  And again, Your Honor, we're

12  pleased with the outcome here.

13       And it's not stated directly in the document filed

14  with the Court, but in the accompanying press release from

15  the debtors, the debtors noted correctly that they expect

16  that this will result in approximately 90 percent of

17  distributable value in the estates globally going to

18  customers.  So, again, the ad hoc committee was pleased with

19  the cooperation of the parties and the outcome here.

20       Thank you, Your Honor.

21       THE COURT:  Thank you.

22       Anyone else?

23     (No verbal response)

24       THE COURT:  No.  Okay.

25       MR. DIETDERICH:  Your Honor, Andy Dietderich.

1          Just one point and it's not at all a contradiction.

2 Thank you and thank you.

3          I just wanted to say one more time because there's

4 a been a little bit of confusion among some of the press on

5 the 90 percent number and I want to underscore what that is

6 and what that is not.  All right?

7          We do not know what the level of customer

8 recoveries in the case is going to be.  We're hoping it's a

9 nice recovery, but we don't know.

10          In the press release, there are some factors that

11 we listed for people to consider about what will drive actual

12 recoveries, including the size of the claims pool in this

13 case, which is -- which, you know, is also a -- kind of an

14 open question.

15          The 90 percent number is a number that we use

16 simply to demonstrate the following, which is:

17          Based upon our current assumptions about assets and

18 liabilities and the size of the claims pool, we estimate that

19 90 percent of global value, whatever global value there is,

20 will ultimately go to customers in the case.  It could be a

21 20 percent case or a twenty-cent case or a forty-cent case or

22 an eighty-cent case or a hundred-cent case, right?  We do not

23 know the answer to that yet.  What we are projecting at this

24 time is a -- the substantial majority, the lion's share of

25 value that we have to distribute is going to go to customers

1  internationally or customers in the United States.  I just

2  wanted to clarify that.

3            THE COURT:  Okay.

4            MR. DIETDERICH:  Thank you.

5            THE COURT:  I understood that, also.

6            MR. DIETDERICH:  Thank you.

7            THE COURT:  So I think, for the press, the idea is

8  the 90 percent is what's expected to be distributed based on

9  whatever the recovery ultimately turns out to be.  We don't

10  know what that recovery is at this point.  Okay.  All right.

11            MR. GLUECKSTEIN:  Good morning, Your Honor.  For

12  the record, Brian Glueckstein, Sullivan & Cromwell, for the

13  debtors.

14            The first item going forward on this morning's

15  agenda is Item 11, which is the second joint motion of the

16  debtors and the committee seeking an order pursuant to

17  Section 107(b) of the Bankruptcy Code to extend for another

18  90 days the period by which all customers' names and

19  addresses are redacted from the public record.

20            Your Honor, in support of that motion, we have in

21  the courtroom this morning Mr. Kevin Cofsky of Perella

22  Weinberg Partners, who is -- we'd like to call as a witness

23  to make the evidentiary record we need in support of this

24  motion.

25            THE COURT:  Okay.  Come forward.  Please take the

1  stand and remain standing for the oath.

2         THE ECRO:  Please raise your right hand.  Please

3  state your full name and spell your last name for the court

4  record, please.

5         THE WITNESS:  Kevin Michael Cofsky, C-o-f-s-k-y.

6      KEVIN M. COFSKY, WITNESS FOR THE DEBTORS, AFFIRMED

7         THE ECRO:  You may be seated.

8         Your Honor.

9         THE COURT:  Whenever you're ready, Mr. Glueckstein.

10        MR. GLUECKSTEIN:  Thank you, Your Honor.

11                      DIRECT EXAMINATION

12  BY MR. GLUECKSTEIN:

13  Q    Good morning, Mr. Cofsky.

14  A    Good morning.

15  Q    Mr. Cofsky, you have testified for the Court twice

16  previously in support of the debtors' motions to redact

17  customer names and address, correct?

18  A    Yes, that's correct.

19  Q    Can you briefly remind the Court of your background and

20  qualifications, please?

21  A    Yes.  I graduated from the Wharton School of Business

22  with a major in economics and a concentration in finance.

23        I started my career as an analyst in financial

24  restructuring at Houlihan Lokey.

25        I attended the University of Pennsylvania Law School and

1  the Fels Center of Government.

2       And then I was an attorney, clerking with Chief Justice

3  Poritz in the New Jersey Supreme Court and I practiced law at

4  Cravath, Swaine & Moore.

5       And then I joined Evercore Partners, ultimately as a

6  managing director.

7       And I left Evercore to join a predecessor firm to

8  Perella Weinberg Partners in 2006, and I've been with Perella

9  since that time, focusing most of my career in restructuring

10 and liability management.

11 Q    Mr. Cofsky, can you please remind the Court as to the

12 scope of work to which you and your colleagues at Perella

13 Weinberg Partners have been retained to assist the debtors

14 with in these cases?

15 A    Yes.  We've been retained as the investment banker for

16 the debtors.  And to that end, we have been asked to monetize

17 a number of assets to evaluate various ways in which to

18 maximize the value of the debtors' assets.

19 Q    And does that work include any work with respect to

20 monetization of the debtors' legacy exchanges?

21 A    Yes.  We've spent considerable time evaluating the

22 potential to either reorganize the legacy exchange assets or

23 to partner with others or to sell those assets.

24 Q    And you're personally involved in that work?

25 A    Yes, I am.

1  Q    Mr. Cofsky, have you become aware of information, since

2  your prior testimony in June of 2023, that changes any of

3  your prior opinions as to the need to keep the debtors'

4  customer information confidential?

5  A    No.  In fact, my experience since my last testimony only

6  serves to enhance my view that the value of those customer

7  identities to the estate is -- is high and very important.

8  Q    Mr. Cofsky, are the customer lists -- the names,

9  addresses, information of the customers -- a source of value,

10  in your opinion, to the debtors, if they were to sell the

11  exchange assets?

12  A    Yes.

13  Q    How about if the debtor were to reorganize the FTX

14  exchanges in some way, would they be a source of value to the

15  debtors?

16  A    Yes, they would.

17  Q    And how about the -- do you have an opinion as to

18  whether the debtors' customer information -- names and

19  addresses -- have value to the debtors on a standalone basis

20  if they were to be monetized simply as information?

21  A    Yes.

22  Q    And can you elaborate just a little bit as to your views

23  as to the potential sources of that value?

24  A    Sure.  As I testified previously, I -- actually, I don't

25  recall if it was in my declaration or in my prior testimony.

1  But we have been engaging in an outreach process with a

2  number of interested parties to either acquire the legacy

3  exchange assets and/or to partner with the debtors in

4  connection with a relaunch of the exchange.  We've been

5  evaluating that process relative to the potential to

6  reorganize the assets on a standalone basis.

7      As I testified previously, that process has been quite

8  robust.  And we -- on the basis of my discussions with those

9  counterparties, it has become very clear that they place

10 significant value on the identities of those customers and

11 the potential to have those customers continue to utilize the

12 new platform, whether that's a reorganized platform, a

13 partnered platform, or a sale to this potential investor.

14 And the exclusive access to those customer lists is very

15 important and has been a critical element of our

16 conversations.

17 Q    And where are you in that process today?  Take us from

18 June through today, as far as how far -- what you've been

19 doing in terms of the process to monetize these assets.

20 A    Sure.  We initially had a very broad outreach, a number

21 of inbounds, over 70 parties that were contacted or contacted

22 us.  We have narrowed that significantly, based on our

23 valuation of the indications of interest.

24     We are now engaging in robust discussions with a handful

25 of parties.  We are engaging in -- they are engaging in

1  diligence, we are engaging in diligence, and we are having

2  very detailed conversations on a regular basis regarding the

3  terms and the structure of a potential transaction.

4  Q    Mr. Cofsky, do you have a view as to timing for the

5  debtors to potentially conclude the process and enter into a

6  transaction?

7  A    I don't have a specific date.  These are very

8  complicated transactions, given the regulatory framework and

9  the complicated nature of these cases.

10      I am optimistic that we will be in a position to have

11 either a stalking horse bid or we'll have made a

12 determination with respect to a reorganized exchange on or

13 prior to the date that Mr. Dietderich referred to earlier,

14 which is the December 16th milestone.

15 Q    Mr. Cofsky, do you have a view, as the debtors'

16 investment banker, today, whether the immediate disclosure of

17 customer names and information -- names, addresses, and other

18 identifiable information would jeopardize the ability to

19 maximize that value?

20 A    I -- I do.  As I stated earlier, the exclusive access to

21 the identities of those customers and the potential to bring

22 those customers onto a reconstituted or new exchange is a

23 critical element of the discussions that we're having with

24 these counterparties.  So I think it's clear to me that

25 disclosure of those customer lists and those names would

1   significantly impact our ability to consummate a sale and

2   maximize value.

3   Q     Thank you.

4            MR. GLUECKSTEIN:  No further questions, Your Honor.

5            THE COURT:  Thank you.

6            Any cross?

7            MS. TOWNSEND:  Good morning, Your Honor.  Good

8   morning, Mr. Cofsky.

9            THE WITNESS:  Good morning.

10            MS. TOWNSEND:  Katie Townsend on behalf of the

11   Intervenors, The New York Times, Bloomberg, The Wall Street,

12   and The Financial Times.

13                        CROSS-EXAMINATION

14   BY MS. TOWNSEND:

15   Q     Mr. Cofsky, you recall we met each other back in June.

16   I believe your testimony was that, since that time in June,

17   your view of the potential value of the names of debtors'

18   creditors/customers has not changed in any way; is that

19   accurate?

20   A     I'm not sure that characterizes what I said.

21   Q     Okay.  Well, then let me ask it this way.

22   A     Sure.

23   Q     Since June, has your view of the potential value of the

24   names of debtors' customer creditors to the estate changed in

25   any way?

1   A      It has.  My view -- you know, I want to make sure I'm

2   clear -- when I was answering Mr. Glueckstein's question, my

3   view that the customers, the identities and the customer

4   lists have value hasn't changed, my view of the quantum of

5   value has changed.  As I've engaged in discussions with these

6   counterparties, the value is even greater than I had

7   previously expected.

8   Q      How many counterparties have you been in discussions

9   with that have changed your view as to the quantum of value?

10  A      I don't want to give a specific number because we have

11  -- as I indicated, we've narrowed the field from a large

12  number to a smaller number in what we're calling our second

13  round; it's a handful of parties.

14  Q      How many?

15          MR. GLUECKSTEIN:  I object, Your Honor.  We have

16  an ongoing sale process, I think Mr. Cofsky's testimony is

17  about his relative view that there is value, I'm not sure

18  getting into specific numbers and information about bidders

19  is appropriate or necessary.

20          MS. TOWNSEND:  If I may, Your Honor, Mr. Cofsky is

21  a fact witness.  He's provided, effectively, at this point,

22  hearsay testimony about discussions he's had with

23  counterparties.  He's not even going to tell us the number, I

24  assume, although I'll ask him, he's not going to tell us the

25  identities of those counterparties.  I think that's relevant

1  to his -- certainly his testimony, but our ability to cross

2  him.

3         THE COURT:  I think he can answer the number, but

4  not identify the individual parties.

5         THE WITNESS:  There are three.

6  BY MS. TOWNSEND:

7  Q    If I ask you -- and I don't want to confuse you, but in

8  light of the Court's instruction that you not name those

9  parties, could you, in your mind, assign each of them a

10  letter, so A, B, C.  Party number -- counterparty number one,

11  let's call it Counterparty A; the second one, Counterparty B;

12  the third one, Counterparty C.  Can you do that and keep them

13  kind of clear in your mind as A as one, B as one, and C as

14  one?  Does that make sense?

15  A    I'll try to do that.

16  Q    Okay.  How many conversations have you had with

17  representatives of Counterparty A where you've discussed the

18  potential value of the names, only the names, of FTX customer

19  creditors?

20  A    I can't say specifically, but certainly over ten.

21  Every conversa -- that we have with all these parties, we

22  have been negotiating term sheets and engaging in significant

23  diligence.  And so the question of the value of their

24  proposals is, obviously, relevant to all of our conversations

25  and a significant element of their term sheet revolves around

1  the extent to which they will have access to those customers.

2      So certainly over ten for each of those parties in

3  terms of conversations we've had regarding the value and the

4  value of the customers.

5  Q      During -- and let's take any of them, A, B, or C, any

6  of those three third parties, in any of those conversations

7  you've had, has there been a specific monetary amount

8  attached to the names, names alone of FTX customers?

9  A      There has been.  I want to be clear, the bids are

10 holistic, there's a specific quantum of consideration being

11 provided.  There isn't -- by the nature of these proposals,

12 there are not -- value is not allocated into one group versus

13 another group versus another group of the assets.  However,

14 it's clear from the structure of the proposals and the bids

15 and our negotiations that a significant portion of the value

16 is attributable to the identities of those customers.

17     And we're talking about -- to put this in context,

18 we're talking about a digital asset exchange.  And so the

19 revenue that is generated from an exchange is a function of

20 the customers on that exchange and the extent to which those

21 customers transact.  And so the customers, historically, of

22 FTX demonstrated by their historical participation on the

23 exchange that they transacted quite frequently, and so the

24 counterparties are very interested in having that level of

25 customer engagement and future transactions on a platform

1 where they can benefit economically from that.

2 Q    So when you say holistic, the bids are holistic, you

3 mean there for the exchanges as a whole, which would include

4 the customer base; is that fair to say?

5 A    Well, the proposals are -- each of the proposals is

6 different in structure and type, but each of the proposals is

7 for an entire transaction.  So there isn't a proposal for one

8 asset and another proposal for another asset and another

9 proposal for another asset.  So each -- while each proposal

10 is different in character, each of them includes the purchase

11 and exclusive use of the customers, the historical customers

12 of FTX, and has been clear as we've engaged in dialogue over

13 price and terms and structure that that element is a very

14 significant element of what the counterparties are seeking to

15 acquire.

16 Q    When you say it's clear, how is it clear?

17 A    It's clear based on my conversations and based on the

18 term sheets.

19 Q    What in any conversation that you've had with any of

20 these counterparties makes clear that -- strike that.

21      So, just to be clear, none of the bids or term sheets

22 that you've reviewed with respect to any of these

23 counterparties includes as an independent -- or values as an

24 independent asset the names of -- just the names of FTX

25 customers; is that accurate?

1  A     Actually, I don't think that is accurate.  Again, these

2  are complicated structures.  We're talking about the names,

3  identities, and the potential engagement of these customers

4  on a future exchange, and so the extent to which those

5  customers might engage on the future exchange is a critical

6  element of the value that would be provided to the estate.

7       So the parties have made it clear that, to the extent

8  that -- let me rephrase.  A critical element of the proposals

9  is ensuring that the identities of the customers does not

10 become available to other parties.  So, for example, the

11 diligence process has been very complicated because none of

12 the parties who we're engaging with want the other parties

13 who are engaging with the debtors to see the identities of

14 those customers.  They've made it very clear that they are

15 highly focused on ensuring that they have the exclusive

16 access to the lists and the identities so that they can

17 contact those parties and they can maximize the potential for

18 those customers to transact on an exchange going forward.

19      And so it's created some interesting logistical

20 obstacles for the debtor to overcome as we have been spending

21 a lot of time with these parties.  They've made it clear that

22 they are highly focused on being able to utilize those

23 customers going forward, but yet they obviously don't want

24 other parties who they're competing with to see those names.

25 So we're -- we've been managing through that.

1      So that -- to give you a sense of why I have confidence

2  that the counterparties place significant value on the

3  customers, they're telling me that they do.

4  Q    And has any counterparty told you that they assign a

5  specific monetary value, a specific monetary value to the

6  names alone of those customers, or is it as -- I think I

7  understand your testimony to say it's part of the whole

8  package; is that fair to say?

9  A    There's -- you've asked two questions.  One, no; no

10 party has told us that they are ascribing X value

11 specifically to the name.  Some of the proposals are -- have

12 various components to them and portions of the consideration

13 that would be provided to the estate are a function of the

14 extent to which existing customers transact on the future

15 exchange going forward.  And so, by virtue of that construct,

16 the conversation has been quite clear that the exclusive

17 access to these customers is of critical importance.

18      So we have had specific conversations about that and

19 about the extent to which the value that would be provided to

20 the estate would be conditioned on the extent to which

21 customers transact on a future exchange, or are accessible to

22 others and, therefore, are not available to that

23 counterparty.

24 Q    Since June, have you done any work to determine how

25 many of FTX's customer creditors are in fact exclusive or

1  exclusively traded on FTX exchanges?

2  A    We actually are in the process of undertaking that in

3  connection with the diligence process that I just alluded to.

4  There's a complicated undertaking by a third party that will

5  have access to the counterparties' lists on a confidential

6  basis and the debtors' lists, and I don't believe they

7  actually look at the list, but they're able to evaluate the

8  extent to which the customers are unique to FTX or the

9  counterparty, or there's overlap.

10 Q    When will that process be completed?

11 A    I actually don't know.  I was just reviewing emails on

12 this process this morning.  So it's currently ongoing.

13 Q    But as you sit here -- as you sit here today, you can't

14 say whether or not, let's take Counterparty A as an example,

15 there's a hundred percent overlap between FTX's current

16 customer list or names of customers and Counterparty A's; is

17 that accurate?

18 A    I would be shocked if all of our customers were on

19 another exchange, but I can't say for certain because I have

20 not reviewed their lists.

21 Q    And so when you say exclusive -- when you refer to

22 exclusive access to the names of FTX customers that the

23 counterparties are interested in, you mean exclusive in the

24 sense that other counterparties don't have access to that

25 during this bid process; is that accurate?

1  A     Can you restate that?  I want to make sure --

2  Q     Sure.

3  A     -- I answer the right question.

4  Q     You testified that the counterparties you've been

5  speaking to have an interest in exclusive access to the names

6  of FTX's creditor customers.  When you use the word exclusive

7  in that context, you mean vis-a-vis other counterparties

8  during the bid process, is that accurate, or do you mean

9  something else by exclusive?

10 A     No, no, that's not what I mean.  It's not a question --

11 there are two elements to that.  One, it's not versus only

12 the counterparties to the bid process, it's to the rest of

13 the world because, if other parties who would -- are

14 competitors of FTX historically and/or sought to compete in

15 this bid process, or for whatever reason didn't, had access

16 to these customer lists, the bidders in our process would be

17 -- a significant element of the value that they would be

18 providing would no longer be relevant if they viewed their

19 ability to access these customers somewhere else or if other

20 parties already had access to the identities of those

21 customers and could contact them and solicit them.

22       So it's not limited to these parties, it's just that

23 these are the parties who are left in the process because

24 they have provided the most compelling structure and terms to

25 the debtors for the acquisition of these assets or to partner

1  with the debtors.

2  Q    But you don't mean exclusivity in the sense that

3  they're exclusive, necessarily, customers of FTX, you're

4  talking about access to the list of names of FTX customers;

5  is that fair to say?

6  A    I want to make sure I'm answering clearly.  The

7  customers are free to transact on multiple exchanges, but the

8  fact that they are customers historically of FTX and that

9  they had been transacting on our exchange is unique to FTX.

10 And so the counterparties would not have exclusive rights to

11 contact these parties.  Anyone is free to take out an ad in a

12 newspaper and try to contact as many customers as they would

13 like, but that's different than the fact that this customer

14 list and these specific customers had transacted on FTX.

15      So I hope I'm answering your question.

16 Q    Since June, have you or anyone at Perella Weinberg

17 Partners taken any steps to determine how many FTX customer

18 creditors would be interested in continuing to trade on the

19 exchange following a sale or reorganization?

20 A    I don't know how we would do that without contacting

21 those customers.  We have evaluated the historical trading

22 volumes of those customers and we've provided that

23 information on a no-names basis with the counterparties,

24 which is why they're very interested in engaging in this

25 transaction.

1  Q      And whether or not those customers ultimately end up

2  continuing to trade on an FTX platform if it's reorganized or

3  sold remains to be seen because it's up to that customer,

4  right?

5  A      That's correct.

6  Q      And whether or not that customer's name becomes public

7  may have no impact at all on whether that customer decides to

8  continue to trade on an FTX platform, whether it's sold or

9  reorganized, correct?

10 A      I think that's a correct statement, but I don't think

11 that's the relevant question for whether the counterparties

12 see value in being able to contact that customer

13 specifically.

14 Q      Because there's the possibility that that customer will

15 continue to trade on the FTX platform if it's reorganized or

16 sold, right?

17 A      You lost me.

18 Q      Isn't the reason the counterparties see value in the

19 names of the customers because they anticipate that those

20 customers will continue to trade on FTX's platform if it's

21 sold or reorganized; is that accurate?

22 A      I think that's accurate, yes.

23 Q      Since June, has any third party offered to purchase a

24 list of the names, just the names, of FTX's customer

25 creditors on a stand-alone basis?

1  A     We did have a -- at least one proposal for that type of

2  structure, yes.

3  Q     How much did that party offer for just the list of

4  customer names -- no addresses, no anything else, just the

5  customer names?

6          MR. GLUECKSTEIN:  I object, Your Honor.  Again,

7  this is an ongoing sale process; the bidders are clearly

8  listening to this hearing.  The question here -- we'll get

9  into this in argument -- is about is there value, it's not

10 about the quantum of value.

11         THE COURT:  Sustained.

12 BY MS. TOWNSEND:

13 Q     Have you attached a monetary value to the names, the

14 list of customer names of FTX?

15 A     No.

16         MS. TOWNSEND:  I think no further questions, Your

17 Honor.

18         THE COURT:  Thank you.

19         Anyone else wish to cross?

20         MS. SARKESSIAN:  Thank you, Your Honor.  For the

21 record, Juliet Sarkessian on behalf of the U.S. Trustee.

22                     CROSS-EXAMINATION

23 BY MS. SARKESSIAN:

24 Q     Just a few questions, Mr. Cofsky.

25         So when do you anticipate the sale process that you're

1  currently conducting, when do you anticipate that that will

2  be at completion?

3  A    I don't have a definitive date for you, I wish I did.

4  As I said, they're very complicated transactions and we're

5  engaging in multiple conversations with parties every day on

6  the terms and the structure.  I am optimistic that we will

7  have either a plan for a reorganized exchange or a

8  partnership agreement or a stalking horse for a sale on or

9  prior to the December 16th milestone date.

10 Q    So I think you've talked about three possibilities.

11 One is an outright sale of the customer names as -- either as

12 stand-alone or perhaps as a wider deal, that's one;

13 reorganizing the exchanges with a partner or the debtors;

14 number three, the debtors just reorganizing the exchanges on

15 their own.  Is that relatively --

16 A    I think that's fair, sure.

17 Q    Okay.  Are there any of those scenarios in which -- let

18 me rephrase that.  Let's take it one piece at a time.

19      The outright sale, let's say a sale takes place and as

20 part of that sale the customer names are sold, would you

21 anticipate that the buyer would ask as part of that

22 transaction that the customer names remain sealed in the

23 bankruptcy case?

24 A    I would expect that they would, yes.

25 Q    So let's take the second scenario where it's not a

1  sale, but the -- but there is a reorganization where the

2  debtors pair with a partner to reorganize the platforms, in

3  that situation, would you anticipate that the debtor and the

4  partner would want the customer names to remain sealed in the

5  bankruptcy case?

6  A    I can't speak for them, but I would expect that they

7  would, yes.

8  Q    And then in a situation where there's no partner, it's

9  just the debtor, they're reorganizing, they're going to do a

10 second launch or whatever you wish to call it of a platform,

11 would you anticipate the debtor would again want to continue

12 to have the customer names sealed even after the effective

13 date of the plan?

14 A    I would think that the value of the customers to the

15 exchange would remain valuable even after the conclusion of

16 the case, yes.

17 Q    Do you see any situation in which the debtors would not

18 be seeking to permanently have the customer names redacted?

19 A    I can only speak from my perspective as the banker

20 trying to maximize the value of the debtors' assets, I can't

21 speak to the legal issues, from my perspective, the value of

22 the identities of the customers will remain and, regardless

23 of whether there's a reorganized exchange or a sale or a

24 partnership, the reorganized exchange, the new exchange in

25 any shape or form, would value -- would place significant

1  value on maintaining the confidential nature of their

2  customers.

3          MS. SARKESSIAN:  No further questions.

4          THE COURT:  Thank you.

5          Anyone else?

6      (No verbal response)

7          THE COURT:  Redirect?

8          MR. GLUECKSTEIN:  No redirect, Your Honor.  No

9  further questions.

10          THE COURT:  Thank you.

11          Thank you, Mr. Cofsky.  You may step down.

12          THE WITNESS:  Thank you.

13          MR. GLUECKSTEIN:  Your Honor, if it please the

14  Court, I think we're prepared to proceed to argument.

15          THE COURT:  Let me see if any of the other parties

16  have witnesses.  No witnesses?

17      (No verbal response)

18          THE COURT:  Okay.

19          MR. GLUECKSTEIN:  Thank you, Your Honor.  Again,

20  Brian Glueckstein, Sullivan & Cromwell, for the debtors.

21          By this motion, Your Honor, the debtors and the

22  committee are jointly seeking to further extend the period by

23  which customer names and addresses, including both individual

24  and institutional customer names and addresses, should be

25  redacted from public filings in these cases, unless

1 voluntarily disclosed by the customer, pursuant to Section

2 107(b)(1) of the Bankruptcy Code.

3       As the Court is aware, it is determined that --

4 Your Honor has determined at two prior hearings, based on

5 uncontroverted evidence from Mr. Cofsky, the debtors'

6 investment banker leading the effort to monetize the debtors'

7 exchange assets, that the debtors' customer lists have value

8 and are entitled to protection under Section 107(b)(1).  We

9 submit, Your Honor, that nothing has changed.  In fact, Mr.

10 Cofsky today again testified and reaffirmed his views that

11 the customer lists have value.  And he went further,

12 explaining that the debtors are now in a position to,

13 hopefully, actually realize that value, and detailed, in his

14 view, that very significant elements of the bids that the

15 debtors have in hand and have received rely on the fact that

16 they get exclusive access to the customer lists, names and

17 information, and that that is of critical importance to the

18 bidders.

19       Mr. Cofsky testified the debtors are in a very

20 advanced process whereby they're obtaining and evaluating

21 these proposals, each one that includes the potential

22 onboarding of the debtors' customers to another platform.

23 There is unquestionably, based on Mr. Cofsky's testimony,

24 value that would qualify these customer lists, names and

25 addresses, as confidentially sensitive information, pursuant

1  to Section 107.

2      The value of these proposals can only be realized

3  if the requested relief is granted and the debtors are

4  permitted to maintain the confidentiality of the entirety of

5  the debtors' customer lists.

6      As a practical matter, the names and addresses of

7  the debtors' individual customers are already permanently

8  sealed in accordance with the Court's order dated June 15th,

9  2023, pursuant to Section 107(c) of the Bankruptcy Code.

10 That order is being appealed.  The sealing of all names and

11 addresses, including those of institutional customers, is

12 necessary to facilitate the transactions currently under

13 discussion.  As Mr. Cofsky testified, the potential

14 purchasers will not pay the same value for customers who

15 could be acquired on their own because competitors or the

16 potential bidders could access the FTX customer lists

17 independent of this transaction process.

18     The conclusion of the testimony today, as before,

19 is that a critical component of the strategy to monetize the

20 debtors' assets is the continued confidentiality of the

21 debtors' customer lists.  This view is now bolstered by the

22 testimony that the debtors have live proposals that they are

23 pursuing to confirm this fact.

24     Your Honor in previous rulings has determined that

25 the FTX debtors' customer lists are protected by Section

1  107(b) as confidential commercial information and as a trade

2  secret.  Nothing has changed about the nature or

3  confidentiality of the debtors' customer lists since June

4  when we were last here on this issue and we submit they

5  remain so protected under the applicable legal standard.

6          The debtors are now finally in a position to

7  realize real value from the customer lists and exchange

8  assets in significant part because the customer names and

9  addresses have been kept confidential to date, and the

10  debtors should be permitted time to complete that process.

11          It is not clear at this point, as Mr. Cofsky

12  testified, when and whether the disposition of the customer

13  information will take place, before or in connection with the

14  plan process.  As Mr. Cofsky also testified, the debtors do

15  expect to have concluded at least the current sale process

16  prior to the filing of the amended plan and disclosure

17  statement in December.

18          Guided by the Court's prior rulings, the movants

19  have only requested at this time to formally extend the

20  protection of redacting all customer names for an additional

21  three months for entry of this order with all rights

22  reserved.  And Ms. Sarkessian, in her questioning this

23  morning, raised the possibility, Mr. Cofsky acknowledged,

24  that if we actually move forward with a transaction we are

25  likely to need to seek further relief from the Court, but at

1  this time we do not know whether a transaction will be

2  consummated or sought to be brought forward for approval.

3  There are scenarios such as a liquidation, a full liquidation

4  of the debtor, where there is no continuing exchange, where

5  this issue might resolve itself, but where we stand today is

6  in the middle of a sale process and what we are asking from

7  the Court is the continued protection to allow the debtor to

8  complete that process.

9          Neither the U.S. Trustee nor the media objectors

10 have offered anything new in opposition to the relief

11 requested under Section 107(b).  In their papers, both simply

12 incorporate prior recycled arguments, which have been

13 disproved by Mr. Cofsky's testimony.  The objectors continue

14 to rely on the general principles of the right of public

15 access to records and bankruptcy disclosure, but once again

16 do not provide any evidence of specific harm that is being

17 suffered that requires the disclosure of institutional names

18 and addresses immediately, nor do they recognize the Court's

19 role in modifying those requirements as appropriate for cause

20 shown.

21         As the Court and the parties in interest have been

22 able to observe, the debtors have been able to efficiently

23 and completely administer these Chapter 11 cases while

24 continuing to redact customer names and preserving the

25 integrity of the customer lists.  Notices have been sent,

1  pleadings served, and claims bar date procedures established,

2  claims have been filed, the bar date has now passed, all

3  within the parameters of the relief obtained in the Court's

4  prior orders and subject to the type of relief that we're

5  requesting be extended today.

6          As we addressed in our reply papers, any concerns

7  that was raised in this round of briefing by the U.S. Trustee

8  with respect to claims objection notices, we submit, are

9  unfounded since the debtors have proposed to provide

10  customized notices to any party who is the subject of a

11  claims objection, either through an omnibus motion or

12  otherwise.  All creditors will continue to receive

13  appropriate notices on all issues, including claims

14  objection, like all matters we have noticed to date in these

15  cases.

16          We submit, Your Honor, there's no basis for the

17  Court to carve out selected portions of the debtors'

18  customers from the redaction order, as suggested by certain

19  of the argument and objections.  As Mr. Cofsky's testimony

20  again was clear, it is the totality of the customer lists,

21  the names and the addresses, and the ability for a bidder and

22  a purchaser who is offering to provide value to the estate,

23  the value that they see is the ability to have exclusive

24  access to the customer list to be able to solicit those

25  customers without worrying whether competitors have access to

1  that list and are doing the exact same thing.  That is a

2  large portion, as Mr. Cofsky testified this morning, of the

3  value that's created here.

4         Finally, Your Honor, I note that with the debtors'

5  reply brief that we filed at Docket 3311 we filed a revised

6  form of order with respect to this motion, which addressed

7  comments received and the objections to the form of order

8  that had been interposed by the United States Trustee.  So we

9  understand, at least as to the form of order, those

10 objections are resolved.

11        We submit, Your Honor, that the objections to the

12 continued redaction of the customer names and addresses

13 pursuant to Section 107(b) should be overruled and the motion

14 granted.

15        I'm happy to answer any questions from Your Honor.

16        THE COURT:  No questions.  Thank you, Mr.

17 Glueckstein.

18        MR. GLUECKSTEIN:  Thank you.

19        THE COURT:  Ms. Townsend?

20        MS. TOWNSEND:  Thank you.

21        THE COURT:  Oh, I'm sorry.  Support, yeah.

22        MR. PASQUALE:  No, it's fine, Your Honor.  Ken

23 Pasquale from Paul Hastings for the committee, just one

24 minute.

25        As a co-movant with the debtors on this motion, we

1    obviously support all the arguments Mr. Glueckstein just

2    made, but I did want to just add, Your Honor, the committee

3    from the very start of these cases has been advocating for

4    the process that Mr. Cofsky described.  Mr. Cofsky made quite

5    clear the value inherent in the debtors' customer lists and

6    we believe, as the committee, that there is a significant

7    opportunity to maximize recoveries from the process that Mr.

8    Cofsky described.  The process should not be jeopardized at

9    this time, Your Honor.  We're at a critical juncture and

10   disclosure of the lists, as you heard, would, in our view,

11   jeopardize that process.  So we would ask that the motion be

12   granted.

13             Thank you.

14             THE COURT:  Thank you.

15             Now Ms. Townsend.

16             MS. TOWNSEND:  Thank you, Your Honor.  I'll be

17   brief.

18             We're here today on debtors' motion so that the

19   Court can determine whether debtors have demonstrated that

20   they're entitled to continue to redact the names of all of

21   FTX's customers/creditors that are -- from all filings in

22   this case for an additional 90 days, pursuant to Section

23   107(b).  I know there has been some discussion about

24   potential additional relief, but that's not an issue that's

25   before the Court today.

1          Before I address that issue, I should, I think,

2    note for the record, though it's already been alluded to,

3    that my clients media intervenors have objected and continue

4    to object to the Court's -- as this Court well knows, to the

5    redaction of the names of FTX's customer creditors under both

6    Section 107(b) and 107(c).  We have appealed the Court's June

7    15th order authorizing redaction under those provisions on

8    the showing that was made by the debtors and the Official

9    Committee back in June that is currently pending before the

10   District Court.  So we understand well that this Court

11   previously ruled under Section 107(b) that the customer

12   creditor names at issue constitute a trade secret and can

13   continue to be redacted while the debtors continue to seek

14   how they're going to come out of these bankruptcies.  We're

15   not attempting to re-litigate that issue or that conclusion

16   today, it's currently up on appeal, but we would be remiss if

17   we did not object to debtors' request for further -- and the

18   Official Committee's request for a further extension for

19   another 90 days of the redaction deadline, really, as Mr.

20   Glueckstein already referred to, for practical purposes for

21   the customer creditors that are entities only.

22          So, without waiving any of our objections or

23   arguments with respect to the Court's June 15th order, I will

24   just limit my argument to that narrow issue, which is the

25   only one currently before the Court today.

1          As the Court knows, debtors bear the burden of

2  demonstrating with admissible evidence that the names of all

3  of their customer creditors that are entities fall within the

4  scope of Section 107(b), which is a narrow statutory

5  exception to public disclosure in bankruptcy proceedings.

6  The debtors have offered the testimony of their fact witness,

7  Mr. Cofsky, again, as their sole evidentiary basis for

8  seeking to extend the redaction period for an additional 90

9  days.  As he did back in January and again in June, Mr.

10  Cofsky has testified in effect that the debtors are still

11  continuing to explore potential valuation of their assets and

12  that the names of FTX customers, in his view, are a source of

13  value or have value.

14          We've previously argued that -- I believe the term

15  was quantum -- the quantum of value is relevant, but to the

16  extent it isn't relevant, I think I would note a couple of

17  things.

18          Mr. Cofsky testified today that the names -- I

19  think it's fair to say the names of these entities are viewed

20  by purchasers, or potential purchasers or counterparties, as

21  having potential value because there is an existing customer

22  base.  So, if they're looking to purchase the company as a

23  whole, they're looking to potentially utilize that customer

24  base moving forward.

25          We don't know how many of these customers, and Mr.

1  Cofsky couldn't tell us how many of these -- it's nine

2  million total customers, some smaller subset of that that are

3  entities, how many of those are exclusive to FTX.  That's an

4  issue that came up back in June.  We don't know if some of

5  these customers are already parties of some of the -- or are

6  already customers, rather, of some of the counterparties that

7  Mr. Cofsky has engaged in discussions with.  We also don't

8  know what specific value is being attributed to the customer

9  names alone, as opposed to some larger part of -- as opposed

10 to the sort of exchanges as a whole.  Mr. Cofsky testified

11 that he hasn't taken any steps to determine or value the

12 customer list standing alone since June.

13         So we don't -- the media intervenors would take

14 the position, Your Honor, that the motion to extend the

15 redaction deadline should be denied.  To the extent the Court

16 seeks to extend the redaction deadline, we would urge the

17 Court to extend it, again, only for 90 days, that's the

18 relief that's been requested.  It appears, based on Mr.

19 Cofsky's testimony, that there may be less basis for

20 redaction of those names moving forward once -- possibly

21 after December, once a plan on how the debtors will come out

22 of these bankruptcies has been agreed to.

23         Thank you -- if there are no further questions --

24         THE COURT:  No questions.

25         MS. TOWNSEND:  -- thank you, Your Honor.

1          THE COURT:  Good morning, Your Honor.  For the

2    record, again, Juliet Sarkessian on behalf of the U.S.

3    Trustee.

4          Your Honor, I will be quite short.  I'm certainly

5    not going to repeat the arguments that we've made on this

6    issue at previous hearings.

7          The U.S. Trustee is not taking the position that

8    there is zero value for customer names, but that has to be

9    balanced against the right of the public under both

10   bankruptcy law and federal law generally to have -- for the

11   public to have access to Bankruptcy Court filings.  And here,

12   you know, there is no customer list that's on file.  There's

13   no document called a customer list that's been filed in these

14   cases.  I think when the debtors and others refer to customer

15   lists, what they mean is, well, we have the creditor matrix.

16   Well, the creditor matrix also has creditors on it that are

17   not customers and you can't tell in looking at it who's who

18   necessarily, but I believe the view of the debtors would be,

19   well, the over -- and I think they've said this -- well, the

20   vast majority of our creditors are customers so, effectively,

21   it's like a customer list.  And then, similarly, for the

22   schedules, the debtors' schedules, Schedule F includes

23   customers, it also includes non-customers who are general

24   unsecured creditors.

25          So that's what we're talking about and these are

1  documents that are effectively -- I mean, they're available

2  to the public, but in highly redacted form.

3          And, you know, we're talking again about extending

4  this another 90 days.  And, obviously, the United States

5  Trustee is not advocating for this to be a permanent sealing

6  -- far from the case, we think it should not be sealed at all

7  -- however, I think we shouldn't kid ourselves.  This -- you

8  know, based on Mr. Cofsky's testimony, he couldn't come up

9  with a scenario where it would not be ultimately the debtors'

10 request or the request of a purchaser to have the names

11 permanently sealed.  If these names are going to be sold, the

12 purchaser is going to ask for permanent sealing.  If the

13 debtor reorganizes and they're going to go ahead with the

14 platform, Mr. Cofsky testified -- you know, again, he says

15 I'm not the debtor, but he would anticipate that that would

16 be the request.

17         Mr. Glueckstein, I think the only scenario he came

18 up with was, well, if there was a total liquidation --

19 there's no sale, there's no reorganization, we're just

20 liquidating everything -- potentially, in that instance, they

21 would not ask for a permanent sealing, but that's the only

22 situation which, from everything I've heard, doesn't sound

23 like what's going to happen in this case and of course nobody

24 wants that to happen in this case.

25         So this is -- we're doing it in 90 days --

1          THE COURT:  Well, I think you could also have a

2     scenario where all this -- the sale falls through, none of

3     these three counterparties decide to buy it, and the debtors

4     decide not to restart the platform.

5          MS. SARKESSIAN:  That would be a -- and I assume

6     that would then --

7          THE COURT:  But that's not --

8          MS. SARKESSIAN:  -- be a liquidation.

9          THE COURT:  -- that's not necessarily a

10    liquidation.  They could reorganize without restarting the

11    platform.

12         MS. SARKESSIAN:  Okay, I see the point, Your

13    Honor.  Yes, if they were not going to restart the platform,

14    I'm not sure what the debtors' business would be otherwise,

15    but sure.  I guess there are some scenarios that, based on

16    what debtors' counsel has said they believe is going to

17    happen, it sounds likely that the scenarios will be one in

18    which somebody will be asking for this to be a permanent

19    sealing, but -- and I understand that that's not the issue

20    before Your Honor and Your Honor is not being asked to

21    permanently seal this, but our concern is, again, we are

22    coming up on the one-year anniversary.  So this information

23    has been sealed for a year or -- well, with respect to the

24    schedules, from the time they were filed in March.  So, you

25    know, I guess there's some slim possibility at some point

1  that the redactions will no longer be requested, but the U.S.

2  Trustee's concern is it's been a very long time since they've

3  been sealed and it looks likely that this is going to

4  continue and potentially be permanent.  So --

5          THE COURT:  But if a customer list has value, and

6  the debtors are trying to sell it and they do sell it, it

7  still has value to the purchaser.  So of course they're going

8  to ask for a permanent sealing of the customers because they

9  don't want to just buy it and then say, okay, here's

10 everybody who's on the customer list.  That doesn't do any

11 good for the purchaser.

12         MS. SARKESSIAN:  Right.  That's my understanding.

13 I was just trying to make the point, in cross-examining the

14 witness, that while this is being done in 90-day increments

15 there's a good likelihood that this is ultimately -- that

16 someone is ultimately going to ask that it be a permanent

17 sealing.

18         THE COURT:  And that may or may not be appropriate

19 when that comes up.

20         MS. SARKESSIAN:  Thank you, Your Honor.

21         The only other thing I have to say is with respect

22 to the form of order that Mr. Glueckstein is correct that the

23 changes that they made do resolve the U.S. Trustees issues

24 with the form of order.

25         THE COURT:  Okay.  Thank you.

1          MS. SARKESSIAN:  Thank you, Your Honor.

2          THE COURT:  Mr. Glueckstein.

3          MR. GLUECKSTEIN:  Just very briefly, Your Honor.

4  Again, Brian Glueckstein for the debtors.

5          Counsel for the media objectors went through a few

6  points about we don't know if these customers are exclusive

7  to FTX or we don't know if they're going to stay with the

8  exchange.  Of course, from the estate's perspective, and Mr.

9  Cofsky was clear on this, what matters to us is whether a

10  buyer is willing to ascribe value to the opportunity to have

11  exclusive access to that list such that they pay us for it.

12          If they are, from the estate's perspective, we

13  realize the value of that asset.  Whether those customers

14  ultimately do or don't stay on the reorganized exchange or on

15  the acquirer's exchange that is all presumed to being priced;

16  the risk of that is being priced into the purchase price that

17  Mr. Cofsky is negotiating with the potential bidders.

18          So, from the estate's perspective we submit, Your

19  Honor, the question for the Court is whether this is

20  confidentially sensitive information that there is value to

21  the estate, and the uncontroverted testimony is that there

22  is.  Mr. Cofsky was also clear that there is certainly more

23  value with these lists -- you know, these customer names and

24  addresses being available to the buyers then without - in

25  fact, I think his testimony was that it was a very

1  significant element of the consideration of the bids that we

2  received.

3        With respect to the potential permanent sealing, of

4  course, we have taken this in incremental steps with guidance

5  from Your Honor when we started this in the spring to be sure

6  that we were proceeding methodically.  We have been trying to

7  balance the need for public disclosure with the need to

8  maximize the value of assets for our estate.  As Ms.

9  Sarkessian acknowledges, we have filed non-customer

10 information publicly on the docket.  We have -- there has

11 been a lot of effort to reconcile those efforts, again, with

12 guidance from the Court.  And the debtor will continue to do

13 that.

14        If there is a transaction, yes, we are likely to be

15 before Your Honor needing further relief on this.  As I

16 acknowledged, nobody is hiding from that fact.  But we have

17 not come forward to ask for permanent sealing and, of course,

18 that is a different question.  As Your Honor says it may or

19 may not be appropriate when that is before you.

20        The question today is, is there sufficient value,

21 is this qualified for protection continued protection.  The

22 Court has twice found that this information qualifies for

23 protection.  Have we carried our burden that we should be

24 able to benefit from continued protection to allow the debtor

25 to complete the ongoing sale process and to see if there is a

1  transaction where value can be realized from this customer

2  information in a way that we believe delivers additional

3  value to our creditors, maximizing the value of the estate

4  which, of course, we are trying to do.

5        So, we would ask, Your Honor, that the motion be

6  granted and that the remaining objections be overruled.

7  Thank you.

8        THE COURT:  Thank you.  Well, I do recall at the

9  beginning, when this first came up, I suggested the 90 days

10  because we didn't know whether it had value or not at that

11  time.  But, once again, the uncontroverted evidence presented

12  today is that it does have some value.  The evidence today

13  was even stronger then it's been in the past two hearings.  I

14  now know that there are, at least, three parties who are

15  interested in purchasing the asset, platform.  Just as a

16  matter of common sense, a platform without customers is

17  nothing.  So, it has to have value.  The customer list has to

18  have value.

19        These customers have said we think there is value

20  to it.  We want to make sure that this remains sealed so that

21  when we buy it we have something to work with and that is

22  uncontroverted.  The objecting parties have still not brought

23  forward any witness who can dispute what Mr. Cofsky has

24  testified too.

25        So, I continue to find that 107(b) is appropriate.

1  That the customer list constitutes confidential commercial

2  information and trade secret; that it has value; that the

3  debtors have a right to try to sell it or to reorganize a

4  round of the platform, and continue to operate that platform;

5  it needs to have value if it does; and if the customer list

6  is disclosed it would lose a lot of value, obviously.

7        On the issue of the quantum of the value that

8  doesn't matter.  Nothing in 107(b) says it has to have a

9  certain level of value before you decide whether or not it

10 should be protected.  It just says if it's commercial

11 confidential information or a trade secret; and it is.  It

12 has value. It doesn't matter at this point what that value is

13 because it has value.

14       So, for those reasons I will overrule the

15 objections.  I will approve the order for an additional 90

16 days.  With that said, is there some way to avoid another one

17 of these hearings in 90 days where we don't have to go

18 through and hear the same testimony again.

19       Ms. Townsend, you did appeal the 107(b) issue,

20 correct?

21       MS. TOWNSEND:  Yes, Your Honor.

22       THE COURT:  Ms. Sarkessian, have you also appealed

23 that issue?

24       MS. SARKESSIAN:  Your Honor, our office did file a

25 notice of appeal, but we withdrew it.

1          THE COURT:  Okay.  Well, that complicates it.  I

2   was hoping that it was on appeal and you could just reserve

3   your rights in the future if and unless some additional

4   information comes open or you find a witness who can come in

5   and testify to the contrary.  Let's see if you can -- I will

6   let the parties talk it out and see if there is some way to

7   resolve that issue.

8          Mr. Glueckstein.

9          MR. GLUECKSTEIN:  Yes, Your Honor.  We certainly

10  agree.  We tried to do that in advance of this hearing.  The

11  parties wanted the ability to cross -- the objectors wanted

12  the ability to cross-examine Mr. Cofsky, but we certainly

13  agree that we would welcome, you know, the opportunity to try

14  to have parties reserve rights, but without needing to

15  continue to have evidentiary hearings in front of Your Honor.

16  We will talk further with the objectors.

17          THE COURT:  Okay.  Thank you.

18          Want to move to the next issue?

19          MR. GLUECKSTEIN:  Yeah, I think for the last matter

20  going forward today, the next item on the agenda, I will turn

21  it over to Ms. Brown.

22          MS. BROWN:  Good morning, Your Honor, may I please

23  the Court, Kim Brown.

24          THE COURT:  Still morning.

25          MS. BROWN:  It is still morning. I had to

1  doublecheck that with you there.  So, may I please the Court,

2  Kim Brown from Landis Rath & Cobb appearing today on behalf

3  of the debtors.

4        Your Honor, this brings us to Item No. 12 on the

5  agenda which is the debtors' motion requesting relief from

6  certain of the default provisions contained in Bankruptcy

7  Rule 3007 and Local Rule 3001 to enable the debtors to

8  implement an efficient and expeditious claim objection

9  process in these unquestionably large, unique, and complex

10  Chapter 11 cases.

11        As Mr. Dietderich explained during his case update,

12  it is a primary goal that is shared, as you heard, from both

13  the committee and the ad hoc committee to return value to

14  creditors as soon as possible in these cases.  To that end,

15  the debtors filed this motion seeking relief from certain of

16  the default provisions to enable them to create a workable

17  solution that provides for an expeditious review and the

18  process to object to claims.

19        Given the sheer volume of claims that likely will

20  need to be reconciled and potentially objected to in these

21  cases, the debtors submit that there is cause and it is in

22  the interest of justice to provide relief that would

23  authorize the debtors to (I) file more then three omnibus

24  claim objections a month; (II) exceed the 100 claim limit per

25  omnibus objection; and (III) forego having to identify every

1  conceivable basis to object to a claim on substantive grounds

2  particularly when the debtors believe that many can be

3  disallowed on certain threshold substantive issues.

4  　　　　　The U.S. Trustee has argued that this Court lacks

5  authority to modify the default rules governing omnibus claim

6  objections; however, both the applicable bankruptcy rules and

7  the local rules provide this Court with clear discretion to

8  approve the debtors' request.  Specifically, Bankruptcy Rule

9  3007(c) states, and I will quote:

10  　　　　　"Unless otherwise ordered by the Court or permitted

11  by Subdivision (d), objections to more then one claim shall

12  not be joined in a single objection".

13  　　　　　Subdivision (d) provides that an omnibus claim

14  objection may include 100 claims.  The "Unless otherwise

15  ordered by the Court" proviso clarifies that this Court may

16  modify Bankruptcy Rule 3007, including Subpart (d) that sets

17  a 100-claim limit to objections.

18  　　　　　Even if for some reason the Court were inclined to

19  go with the U.S. Trustee's position that Bankruptcy Rule 3007

20  does not provide such discretion, Local Rule 3007-1 expressly

21  states that to the extent that there is any inconsistency

22  with Bankruptcy Rule 3007 on the one hand and Local Rule

23  3007-1 on the other hand, the local rules govern omnibus

24  claim objections.

25  　　　　　Local Rule 3001-(f)(2) expressly authorizes this

1  Court to provide relief from the default limit on the number

2  of claims that can be included in an omnibus substantive

3  claim objection for cause.  Over arching all of these rules,

4  as acknowledged by the Office of the United States Trustee in

5  its objection, is Local Rule 1001(c) which provides that the

6  Court has discretion to modify the local rules in the

7  interest of justice.  As such, the debtors submit that this

8  Court has ample authority to provide the relief requested by

9  the debtors.

10         Here, ample cause exists for the Court to exercise

11  its discretion to allow the debtors to implement a workable

12  claims objection process that will further the interest of

13  justice.  Absent the relief requested, it could take years if

14  not decades to file, let alone diligence and prosecute,

15  claims to conclusion if they have to do separate claims

16  objections to the tens of thousands of claims that are likely

17  to be in dispute in these cases.

18         If parties who are filing claim objections are

19  required to identify every conceivable substantive ground for

20  objection to claims it would take -- it would balloon the

21  time that it would take to diligence and ultimately file

22  those claims objections which in turn would create an

23  astronomical additional cost on top of the cost just to

24  reconcile the claims in the first instance.  This would be

25  obvious to the detriment of the creditors and the holders of

1  allowed claims who share, I'm sure, in the debtors, the

2  committees, and the ad hoc committee's goal of getting value

3  returned as soon as possible to these creditors.  This kind

4  of delay is too expensive, it's too untenable and it's

5  obviously detrimental to the debtors' estates and the goals

6  to achieve their paths forward.

7          By contrast, granting the relief requested will

8  further the interest of justice by providing for the

9  expeditious and efficient prosecution of claims and in turn

10  help achieve the goals shared by all parties in interest to

11  provide an expeditious distribution to holders of allowed

12  claims for their recoveries.

13          Now the U.S. Trustee has also raised additional

14  concerns that granting the relief requested will somehow sow

15  confusion among creditors or shift the evidentiary burden,

16  but those concerns are misguided.  First, as Mr. Glueckstein

17  explained in connection with the creditor sealing motion it

18  is the debtors' intent, as it happens in many large Chapter

19  11 cases, that when an omnibus claim objection is filed the

20  debtors will file a full copy of the objection on the docket

21  and they will serve each impacted creditor with an exhibit

22  that is customized that will identify just the claims that

23  relate to that creditor that are subject to that claim

24  objection.

25          So, there will be no confusion, the creditors will

1  not have to sift through multiple exhibits to determine if a

2  single objection applies to them; it will be clear from the

3  start.  Additionally, there is nothing in the procedures or

4  the relief that we requested that by any means shifts the

5  burden from any of the parties.  The debtors agree, a

6  properly filed and timely filed proof of claim is prima facie

7  evidence that the claim is valid.  It is the burden that

8  shifts to the objecting party to provide affirmative evidence

9  that the claims should be disallowed for the basis identified

10 in the objection.

11       As I just explained, the creditor is going to be

12 served with this objection. It is going to include an exhibit

13 that is customized to them and will explicitly outline what

14 the basis of the objection is.

15       THE COURT:  Explain how that is going to work, the

16 customization.

17       MS. BROWN:  Sure. So, think about it as to how we

18 did it with respect to the claims procedures.  So, A&M and

19 Kroll worked together so that when proofs of claims were sent

20 out to the creditors they were individualized where it

21 identified, you know, what the creditors claim was, what was

22 a scheduled claim amount.

23       So, in this situation it would be no different. It

24 would be A&M and Kroll working together.  They are going to

25 take, you know, the master exhibit list that would be in the

1  form that is prescribed by Local Rule 3007-1.  It outlines

2  exactly what the exhibits must look like.  We have not sought

3  any relief with respect to deviating from the requirements in

4  the rules as to what the exhibits must be.  And then they

5  will, effectively, create custom exhibits that will remove

6  all of the other claimants except for those who are being

7  served with the objection and are impacted by that specific

8  claim objection.

9        THE COURT:  So, is the customer or the claimant

10 going to get a 1,000 page spreadsheet with everything

11 redacted out except their name?

12       MS. BROWN:  No.

13       THE COURT:  Okay.

14       MS. BROWN:  That is certainly not what we were

15 intending to do, right.  The goal here for the debtors and as

16 -- you know, we worked hand and hand with the committees to

17 come up with a process that we thought would be efficient,

18 expeditious, and as easy as possible on the creditors.  So,

19 they will only have, you know, one, two, three roles

20 depending upon how many claims are subject to their objection

21 and that is all that they will see on the exhibit.

22       THE COURT:  Okay.

23       MS. BROWN:  Now should they be inclined to want to

24 see all of the claims that were also subject to that

25 objection they will have the ability to access that on the

1  bankruptcy docket and granted to, you know, customer
2  information consistent with Your Honor's ruling today that
3  will be redacted.  They would still see, you know, there were
4  X number of claims that were objected to on a late filed
5  basis similar to, you know, whatever their claim is. I am
6  just using late filed as an example.

7        THE COURT:  Okay.  So, what happens if you file an
8  objection with a threshold issue and your objection gets
9  overruled, what happens next?

10        MS. BROWN:  So, assuming that this is a -- well,
11  there will need to be further diligence on both of the --
12  well on the part of the debtors and their professionals.  To
13  the extent the committee is weighing in on certain claims,
14  you know, there will be a dialog there.  After further
15  diligence there would be a later filed objection that, again,
16  would be customized so the creditor can see, okay, this claim
17  objection applies to me, here is the basis for the objection,
18  and then we would try to, obviously, work with the parties.

19        It goes for the initial objections that are filed
20  too.  You know, the debtors are always trying to work with
21  the parties to try to resolve any issues on a consensual
22  basis to the extent that it can.

23        THE COURT:  What are we going to do with -- I want
24  to make sure that pro se customers know that if they get a
25  claim objection, and many of these people are overseas, that

1 they have the right to appear via Zoom, they don't have to be

2 here in-person, will that be in the notice as well?

3         MS. BROWN:  We can certainly add that into the

4 notice, Your Honor.

5         THE COURT:  Certainly, if you have a claimant whose

6 got a billion dollars of bitcoin on the platform, and he

7 hires an attorney, that is a different story.  But, you know,

8 people who are overseas and have a few hundred dollars, or a

9 few thousand dollars, or even, you know, even a couple

10 hundred thousand dollars that they have invested on the

11 platform and they are going to appear pro se I want them to

12 know clearly that they do not have to appear in Court to

13 object or respond to the objection.

14         MS. BROWN:  Certainly.  That is consistent with

15 what we generally have done with respect to the various

16 notices that we have sent.  So, with respect to the bar date

17 notice, you know, this is a unique case.  The bar date

18 notice, unlike any other bar date notice we have ever done,

19 included at the very top before you even got to the case

20 caption that you should read this, this may impact your

21 rights.

22         I would think and propose that where we have that

23 in the notice for the claim objection that we would also

24 provide clear guidance that, you know, its unnecessary for

25 you to appear if you are a pro se claimant in-person, in

1  court, and it can be handled by a virtual hearing.

2       THE COURT:  Okay.

3       MS. BROWN:  Then, Your Honor, with respect to --

4  sorry, I lost my train of thought for a moment.  Just give me

5  one moment.  So, that brings me to, you know, what the U.S.

6  Trustee seems to be proceeding with here is really a policy

7  position that their pressing regardless of the unique

8  circumstances of these cases and the need for a workable

9  solution to the claims procedures.

10      What we have tried to achieve here, and balanced,

11 and worked hard with both the committee and the ad hoc

12 committee is for this to be something that is efficient,

13 expeditious and it meets everyone's goals of returning value

14 to creditors.

15      The last point that I will make, which probably is

16 the most important, there has not been a single party with an

17 economic interest or who would be subject to the procedures

18 and the relief that we have requested that has objected or,

19 otherwise, responded to the motion.  The only person who has

20 raised a concern is the Office of the United States Trustee.

21 Both the committee and the ad hoc committee support the

22 relief that we have requested.

23      So, unless Your Honor has any other questions, I

24 will cede the podium to those who may also like to speak.

25      THE COURT:  Thank you.  No questions.

1          MS. BROWN:  You're welcome.

2          MR. POPPITI:  Good morning, Your Honor.  For the

3    record Robert Poppiti from Young Conaway Stargatt & Taylor.

4          As Ms. Brown said, the official committee of

5    unsecured creditors does support the relief requested.  We do

6    appreciate the United States Trustees concerns, Your Honor.

7    We did have a conversation with them a number of weeks ago

8    when the motion was filed about what the committee's position

9    as on the relief requested.  Much of that conversation

10   focused on noticing issues, making sure creditors were

11   getting appropriate notice.

12         Our conversations with the debtor were very much

13   consistent with the colloquy you just had with Ms. Brown in

14   terms of how the notices are going to work which, in my

15   experience, is exactly how they would work in a case of this

16   size where you are going to have a customized notice so

17   creditors don't have to scroll through dozens of pages, if

18   not hundreds of pages, to find their particular claim.  So,

19   we are very comfortable with all of that.

20         We are also very comfortable with, I think, the

21   point that Your Honor and Ms. Brown just demonstrated that if

22   there are things that need to be in the notice about Zoom

23   hearings and other things, we are comfortable that it can be

24   done that way.  Again, we appreciate where the United States

25   Trustee is coming from, but ultimately this is a large case.

1  There is thousands of claims and ultimately parties do have

2  to read the notices.

3        The key, from our experience, is being very clear

4  in those notices about what the expectations are: what are

5  the response deadlines, how is the hearing going to go,

6  making sure that notice is setup in a way that parties can

7  very easily find their claims and not have to sift through

8  dozens of pages.  So, we are very comfortable with that and

9  we think that is key here.

10        We also think we have to be flexible as the debtors

11  have said.  This is a very large case.  There are any number

12  of claims.  While our local rules do modify the bankruptcy

13  rules, which by the way we do think is appropriate.  I was

14  very clear that the local rules have made modifications to

15  the bankruptcy rules.  I would like to think that the reason

16  the local rules are drafted the way they are is through years

17  of experience of practitioners in this district trying to

18  make sure that the claims process works the way it should:

19  efficient, making sure that creditors are getting appropriate

20  notice.

21        At the same time, it is very clear that those local

22  rules can be modified in the interest of justice.  And as

23  Your Honor and, I think, most folks in the courtroom know

24  often times in these larger cases they are modified to allow

25  for more objections per month, more claims per objection, and

1  such.  So, we think we have to be flexible here.

2       Again, why we appreciate the United States Trustees

3  concerns, we are just not prepared to go to a place right now

4  where the parade of horribles that they have identified in

5  their papers is going to play out.  We, obviously, have the

6  opportunity to seek to modify those rules as do the debtors

7  if ultimately, we find out that their not working for this

8  case and, of course, Your Honor has the opportunity and every

9  ability to police his docket to the extent that it becomes

10  unwieldly or there is any abuse of the so-called one bite at

11  the apple rule if that is lifted in this particular case.

12       So, as Ms. Brown said, the committee does support

13  the relief requested, Your Honor.  And if you have any

14  questions, please let me know.

15       THE COURT:  Okay.  No questions. Thank you.

16       MR. POPPITI:  Thank you.

17       MR. HARVEY:  Good morning, Your Honor.  For the

18  record Matthew Harvey from Morris Nichols Arsht & Tunnell on

19  behalf of the ad hoc committee.

20       I would echo the comments of the official

21  committee.  We support the relief.  As previewed in the

22  comments about the plan support agreement up front and the

23  progress that was made, an issue in this case is going to be

24  claims administration and the efficient administration of

25  claims.  A focus of our committee, since day one, has been

1  returning property to customers for its value as soon as

2  possible and as the debtors eluded to in their presentation

3  chopping as much wood on claims administration in advance of

4  the effective date will enable that.

5      So, we are supportive of the process. Its efficient

6  particularly with the guardrails the debtors put up here and

7  the additional guardrail that Your Honor helpfully suggested

8  making it know to creditors their rights and their ability to

9  appear and advocate for their rights without having to appear

10  in Delaware in-person.  So, the ad hoc committee is

11  supportive.

12      THE COURT:  Thank you.

13      MR. HARVEY:  Thank you, Your Honor.

14      THE COURT:  Anyone else?  Ms. Sarkessian.

15      MR. LIPSHIE:  Good morning, Your Honor.  Jonathan

16  Lipshie on behalf of the U.S. Trustee.

17      The U.S. Trustee opposes the motion.  I heard a lot

18  about guardrails here.  The motion, as articulated, has no

19  cap whatsoever on the number of creditors.  The local rules

20  and the bankruptcy rules have it at 100. I don't think there

21  is any inconsistency between the two, you know, despite what

22  Ms. Brown said.  The local rules track the bankruptcy rules.

23  That is number one.

24      The stress here is -- and they have unfettered

25  rights to go after non-substantive claims.  This is only as

1   to the substantive claims.  Our opposition is two-prong.

2        First of all, there's the issue on unlimited

3   monthly (indiscernible) claims.  There is no limit

4   whatsoever.  They can file 10, 100, 1,000 a month.  And there

5   is no limit as to the number of creditors.  They could be

6   100, 1,000, 10,000.  That -- notwithstanding what Ms. Brown

7   said, and the Court's questions concerning how the notice is

8   going to be sent out, that is -- without a cap that is an

9   unwieldy docket situation for the Court and for all the

10  parties in interest.

11        Notwithstanding that, the real problem that the

12  U.S. Trustee has with the motion is on the substantive

13  issues.  And as we articulated in our opposition, the way the

14  motion is couched and the relief sought is they have multiple

15  bites at the apple.  They could take a first bite, lose, come

16  back another time, come back a third time, come back a fourth

17  time, ad infinitum, the way the relief, as articulated, is

18  right now.

19        That, in the context of this case, where creditors,

20  customers have been, by everybody's account, victimized by

21  the prepetition actions, the egregious fraud involved in this

22  case, to submit them, and -- as Your Honor pointed out we've

23  got pro se, worldwide customers, and creditors who would have

24  to come in multiple times, lawyer up multiple times to fight

25  different objections on different grounds.

1    That cuts against transparency, due process, and

2  the way the delicate balance of claims objection litigation

3  is articulated in the code and in the rules where you are the

4  creditor, you file your proof of claim, its prima facie

5  evidence as to amount, validity, and it becomes the objector,

6  in this case the debtors' burden to come forth with some kind

7  of evidence.  That means all the evidence, all of the

8  substantive grounds.  Under what the debtors propose they

9  don't have to do that.  They can keep coming back.

10    The argument that everybody wants this case to move

11  fast is actually contrary to what the debtor is asking for

12  because they can keep coming back.  The issue of finality is

13  not served by having these multiple bites.  Figure out what

14  the claim objection is, all the substantive grounds, give it

15  to the debtor -- I mean, give it to the claimant and let the

16  litigation process commence.  I mean once that happens it's a

17  contested matter.

18    You have all discovery is fair game under 9014.

19  You get to take depositions, you get to ask for documents,

20  you get to make requests for admissions and then you litigate

21  the case.  The way its set up right now -- and, yes, it's a

22  big complicated case, but the point is get to the finality

23  early.  Don't let it drag on, and on, and on.

24    So, I think based on the facts and circumstances of

25  this case, what happened prepetition, what the creditors and

1  customers have been through, the bottom line is make the

2  debtors follow the rules as written, they're setup for a

3  reason, and get the case moving as fast as possible and final

4  as fast as possible.

5          THE COURT:  We have nine and a half million

6  customers.  If even 10 percent of those filed claims that are

7  objectionable how long would that take if they were limited

8  to 300 claim objections per month?

9          MR. LIPSHIE:  That is a good point, Your Honor.  It

10  would take a long, long time.

11          THE COURT:  It would take a decade or more, maybe

12  two decades.  We can't do that.  We just can't do that.

13          MR. LIPSHIE:  That certainly goes to the docket

14  issue.  I understand that, Your Honor.  But on the

15  substantive issues there has got to be some cap.  There is

16  not at the moment.

17          THE COURT:  Well, on the substantive issues we have

18  a lot of -- there's a lot of times when litigation, parties

19  file a motion for summary judgment on a threshold issue that

20  they think might resolve the case and it doesn't, and it goes

21  to trial.  I can see in this scenario where they have

22  threshold issues, as Ms. Brown pointed out, a late filed

23  claim.  So, they file an objection to a late filed claim.

24          In the event I overrule that objection I would say

25  then the debtor has an obligation to come forward with all

1  substantive objections after that.  Then we will deal with

2  all of them at one time.  They can't come back, and back, and

3  back, and back.  You get one shot.  Get their initial

4  threshold objection, if it gets overruled, they get another

5  objection, and that is it, one more, and it has to include

6  all the substantive objections.  I think that deals with the

7  issue of the serial litigation down the road for these folks.

8         A lot of these nobody is going to object.  They are

9  going to be disposed of without objection.  There will be

10 some, there will be some, but we can deal with those.  If we

11 end up with 10,000 objections in a month then we will have to

12 spread them out over a period of time and we will deal with

13 them. You know, I can sit here all day and we can go through

14 them one at a time and get as many done as we can.

15        At this point I don't see how I can say to the

16 debtors you can only do 300 per month and you have to put

17 every single possible objection in which then requires these

18 claimants to come in and respond to that which is going to be

19 a burden on them.  There might be a simple way to dispose of

20 the issue upfront.

21        So, I didn't give Ms. Brown a chance to respond to

22 you, but for these reasons I think I am going to overrule the

23 objection, but I am going to put those limitations on it:

24 one, --

25        MS. BROWN:  Your Honor, can I just --

1          THE COURT:  Yes, go ahead.

2          MS. BROWN:  Kim Brown again, Your Honor.  So, I

3   would just like to clarify with respect to the multiple bites

4   at the apple.  I certainly appreciate where Your Honor is

5   coming from.  I just want to distinguish between non-

6   substantive claims objections which are not limited in having

7   to -- like you can file late filed duplicate, no supporting

8   documents.  Those objections are deemed non-substantive under

9   the rule and there is no limitation with respect to those.

10         Perhaps the example I was providing for you in

11  connection with, you know, knocking out one of the others was

12  not the best for this particular scenario.  What I think we

13  would -- and I understand Your Honor wanting to ensure we're

14  not taking multiple bites at the apple over substantive

15  objections, but if we can knock out a substantive -- I would

16  ask that if we could have at least two bites on a substantive

17  objection with one carve-out.

18         So, the substantive objection, so let's say our

19  initial threshold issue often times relates to we have no

20  evidence in our books and records.  So, that would be the

21  initial one.  We would try to, you know, knock off of the

22  first case.  And if we can get that summarily dismissed,

23  great. If we can't then on the second objection then we have

24  to come forward.  We will continue our diligence, everything

25  we need to do, and bring forth every single potential

1  substantive objection.  It would be exclusive of the non-

2  substantive objection world.

3          The only caveat I would ask that we can do a carve-

4  out for relates to know your customer guidelines.  So, as

5  Your Honor may recall in our bar date process not only do

6  customers need to file a valid bar date, a valid claim, but

7  they also need to provide valid know your customer

8  guidelines.

9          You know, the crypto industry is known for there

10  being some players, not all, that operate a little shady.

11  So, it was imperative to the debtors that there were folks

12  who were not utilizing the claims process either through

13  selling their claim or otherwise to launder money or,

14  otherwise, commit bad acts.  So, knowing your customer is

15  very important.

16          What I understand is that the plan is going to have

17  certain deadlines for the know your customer information to

18  be provided.  I think this know your customer issue its

19  novel.  This isn't something that has come up in a lot of the

20  bankruptcy cases.  You know, we had done some digging, but

21  did not find anything as to whether an objection related to

22  failure to meet know you customer guidelines would either be

23  a non-substantive objection. It's certainly not identified in

24  the local rules as what can be a non-substantive objection.

25          At the same time we would like to move forward with

1   the substantive pieces and getting the substantive claims

2   knocked out as soon as possible, but if we are only getting

3   two bites of the apple, and then we get to plan confirmation,

4   and a creditor fails to provide the requisite know your

5   customer information we would like to have the flexibility to

6   object later on to disallow the claim because, you know,

7   whether they're a shady actor or what it might be that now

8   that that has been vetted and they have failed to provide

9   that.

10          So, if Your Honor is amenable, we would ask that we

11  get two bites at the apple with respect to a substantive

12  objection exclusive of an objection related to know your

13  customer requirements.

14          THE COURT:  What are the two bites for the

15  substantive?  You lost me on that.

16          MS. BROWN:  No problem, sorry.  So, we would have

17  the opportunity to object to file an initial substantive

18  objection that would try to dismiss it on threshold

19  substantive issues like lack of books and records.  Then to

20  the --

21          THE COURT:  Those are non-substantive.

22          MS. BROWN:  Lack of books and records is actually a

23  substantive objection under the rules.

24          THE COURT:  Okay.

25          MS. BROWN:  So, it's usually one of the easiest

1   ones to knock out which is why we're like we believe we can

2   get summarily dismissed a number of these on substantive

3   grounds.  To the extent that that -- that we were not to

4   prevail on that issue that we could then come back and file a

5   second substantive objection and that substantive objection

6   would identify every substantive grounds in which the debtors

7   have a basis to seek disallowance of a specific claim.

8           THE COURT:  Okay.  On the issue of know your

9   customer issue I would suggest looking at -- Judge Shannon

10  has a crypto case.

11          MS. BROWN:  Bittrex.

12          THE COURT:  Bittrex, yes.  He -- in order to

13  receive -- in that case they were returning the crypto to the

14  parties.  In that case he said, well, you have to -- there is

15  a form you have to fill out, kind of a know your customer

16  kind of thing, if you don't fill it out you don't get your

17  crypto back.  That was a separate process from, kind of, the

18  claim objection process which might be something you could

19  use here, I don't know.  It might be worth taking a look at

20  to see if it is something that could be useful.

21          MS. BROWN:  We certainly will take a look at that,

22  but I know that in our bar date order we have included this

23  requirement related to know your customer issues.  I am

24  thinking that perhaps there is a way that we can, you know,

25  implement some provision in the plan that would address the

1  know you customer issue.

2        I just don't want there to be a scenario where we

3  launch our two substantive objections and then we get to a

4  point down the road where the creditor has failed to provide

5  the know your customer information.  We are then in a

6  position where we can no longer seek to disallow that claim.

7        THE COURT:  Okay.  Mr. Lipshie.

8        MR. LIPSHIE:  Your Honor, Jonathan Lipshie, Office

9  of the United States Trustee.

10       Just to clarify, I think the Court is correct

11  because Local Rule 3007-1, Subsection (d)(vi), it breaks out

12  what substantive and non-substantive is. It clearly says non-

13  substantive is -- (vi) is a claim that does not have a basis

14  in the debtors' books and records.  That is covered as non-

15  substantive in the local rules.

16       So, I think the point is they make that objection

17  because its non-substantive and then they go to substantive

18  and they lay it all out.  Just so it's clear I wanted to

19  point that out.

20       MS. BROWN:  So, pulling up the rule its not just

21  that it has no basis in the books and records, but a non-

22  substantive objection also has to have where they have failed

23  to attach.  If you read, a claim that does not have a basis

24  in the debtors' books and records and does not include or

25  attach sufficient information or documentation to constitute

1 prima facie evidence.

2          So, while I am referring to it as a books and

3 records, the substantive objection is really a no liability

4 based on the books and records which is separate and apart

5 from a non-substantive objection whereas in the books and

6 records we don't have everything and you didn't attach

7 everything.

8          MR. LIPSHIE:  The rule says what it says, Your

9 Honor.

10          THE COURT:  All right.  Well, as I said, I am going

11 to overrule the objection, but I do want to put guardrails on

12 this including that we notify the -- for the customization of

13 the notice we notify these folks that they don't have to

14 appear in Court if they are objecting or they are responding

15 on a pro se basis, that they can appear by Zoom.

16          I will give the debtors the opportunity for two

17 bites. If you have a substantive claim objection that you can

18 bring up front that you think is dispositive you can bring

19 it.  If you have a non-substantive claim you can bring that.

20 Then once either one of those gets overruled you get one more

21 shot and that is it, one more bite at the apple.

22          Does that make sense?  Do you understand what I am

23 saying?

24          MS. BROWN:  I just want to make sure that I

25 understand.  So, we can file a non-substantive objection

1  based on whatever the grounds are.  Typically, you know, you

2  batch them by non-substantive here is all the late filed,

3  here is all the duplicates.  Are you suggesting that with

4  respect to the non-substantive you want us to include every

5  basis with respect --

6          THE COURT:  No.  If you have a non-substantive that

7  you think is dispositive you can bring that.  If you have a

8  substantive claim that you think is dispositive you can bring

9  that.  If either one of those gets overruled you get one more

10 shot at a substantive objection.  That is it.

11         MS. BROWN:  Thank you.  That does not impair us in

12 the event that there is a know your customer issue.

13         THE COURT:  Yeah, the know your customer issue, I

14 think, is a separate issue that is something that we have to

15 do in this case given the nature of the business we're

16 involved with here.

17         MS. BROWN:  Certainly. I'm sure that is something

18 that we can clean up in the plan process.  Thank you, Your

19 Honor.  I appreciate the clarification.

20         THE COURT:  So, the parties should meet and confer

21 and come up with an appropriate form of order.

22         Mr. Lipshie, did you want to --

23         MR. LIPSHIE:  No.

24         THE COURT:  Okay.  We will get that entered as soon

25 as it gets uploaded.

1          I didn't ask about -- do we have a final version of

2    the order uploaded for the first issue that we talked about

3    this morning?  I did see the blackline for the change, but I

4    didn't know if there was a final one.

5          MS. BROWN:  If it has not already been uploaded it

6    will be as we speak.

7          THE COURT:  Thank you.  Anything else?

8          MR. LANDIS:  That's it, Your Honor.

9          MS. SARKESSIAN:  Your Honor, if I could find out if

10   counsel for the Emergent Debtor is present or on the phone.

11         MR. LANDIS:  The Emergent matter, Your Honor, has

12   been --

13         MS. SARKESSIAN:  No, I know.  I wanted to -- Your

14   Honor, we wanted to know -- for the record, Juliet Sarkessian

15   on behalf of the U.S. Trustee.  We had spoken to Emergent,

16   debtors' counsel about scheduling a status conference not on

17   the DIP financing motion, but on a different issue which is

18   currently the fee examiner order. It was entered prior to the

19   Emergent case being jointly administered with the rest of the

20   FTX debtors.

21         So, Morgan Lewis, who is Emergent's counsel,

22   currently is not covered by the fee examiner order.  We would

23   like to have a status conference to discuss that matter and

24   we wanted to know if we could just add that to the next

25   omnibus hearing date.

1        MR. ZIEGLER:  Your Honor, Matthew Ziegler of Morgan

2   Lewis for the Emergent debtor.  That is totally fine with us.

3   We are available, I believe it's, November 15th to have that

4   status conference.

5        MS. SARKESSIAN:  If that would be okay with Your

6   Honor.

7        THE COURT:  Yeah, unless we have -- do we have --

8   are you guys talking with the PLS folks about rescheduling

9   the oral argument on a motion to dismiss?  I want to try to

10  limit the number of hearings if we can.

11       MR. LANDIS:  Thank you, Your Honor.  Adam Landis,

12  Landis Rath & Cobb, for the debtors.  Yes, we have been in

13  contact with those parties.  They have agreed to the November

14  15th date, so that should be going forward at that time.

15       THE COURT:  Is that the next omnibus date?

16       MR. LANDIS:  That is the next omnibus hearing.

17       THE COURT:  Okay.  Then we can add this to the next

18  omnibus as well.

19       MS. SARKESSIAN:  Thank you, Your Honor.

20       MR. ZIEGLER:  Your Honor, while I'm up here could I

21  give you 30 seconds on the Emergent DIP motion that was

22  continued from today.

23       THE COURT:  Well, it's not on for today.  What do

24  you want to talk about.

25       MR. ZIEGLER:  I wanted to give you a status update.

1  We were unable to surmount the logistical hurdles of having

2  our declarant available today.  And as Your Honor will note,

3  the U.S. Trustee has posted some objections. We have resolved

4  objections from FTX and from BlockFi. So, we are in touch

5  with Chambers and we will find a replacement date when our

6  witness can be available.

7          THE COURT:  Okay.

8          MR. ZIEGLER:  We would ask Your Honor if it is all

9  possible that she be allowed to participate by Zoom just

10  because she is based in the Cayman Islands and there are very

11  few resources in the estate right now, but we will post that

12  request to Chambers at the appropriate time.

13          THE COURT:  Yeah, I did have -- this came up in one

14  of my other hearings in Mallinckrodt, we are post-COVID now

15  which means if you want a witness to appear remotely you have

16  to put it in writing and explain why pursuant to Rule 43.

17  Rule 43 says you only get it if it's for -- it has to be

18  under compelling circumstances, for good reason under

19  compelling circumstances, good cause, something like that.

20  So, you know, I have to make it on a case-by-case basis as to

21  whether or not it is or is not compelling circumstances.

22          MR. ZIEGLER:  Understood, Your Honor.  We will

23  review the order and make that submission if appropriate.

24          THE COURT:  Thank you.

25          MR. ZIEGLER:  Thank you.

1      MR. LANDIS:  Last for the record, Your Honor, Adam

2  Landis for the debtors again from Landis Rath & Cobb.  We

3  have been doing our best to let all parties know that we are

4  post-COVID to remind parties of Your Honor's Chambers rules

5  and procedures and to ensure that if people want to submit

6  declarations that they have the declarants in Court prepared

7  for cross-examination.

8      We will continue to do that, but I think it bears

9  repeating on the record for those who are listening and we

10  will keep doing our job to let people know that they have got

11  to be here.

12      THE COURT:  Thank you.  Anything else before we

13  adjourn.

14    (No verbal response)

15      THE COURT:  Thank you all very much.  We are

16  adjourned.

17    (Proceedings concluded at 12:02 p.m.)

18

19

20

21

22

23

24

25

1                          CERTIFICATION

2              We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ Tracey J. Williams                    October 25, 2023

8    Tracey J. Williams, CET-914

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Coleen Rand                           October 25, 2023

13   Coleen Rand, CET-341

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25