**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |

| | |
|---|---|
| ALAMEDA RESEARCH LTD. and FTX TRADING LTD., | |
| Plaintiffs, | |
| - against - | Adv. Pro. No. 23-50444 (JTD) |
| PLATFORM LIFE SCIENCES INC., LUMEN BIOSCIENCE, INC., GREENLIGHT BIOSCIENCES HOLDINGS, PBC, RIBOSCIENCE LLC, GENETIC NETWORKS LLC, 4J THERAPEUTICS INC., LATONA BIOSCIENCES GROUP, FTX FOUNDATION, SAMUEL BANKMAN-FRIED, ROSS RHEINGANS-YOO, and NICHOLAS BECKSTEAD, | |
| Defendants. | |

**AMENDED COMPLAINT FOR AVOIDANCE AND RECOVERY OF TRANSFERS**
**AND/OR OBLIGATIONS PURSUANT TO 11 U.S.C. §§ 105, 544, 548, AND 550**
**AND DEL. CODE ANN. TIT. 6, §§ 1304 AND 1305, FOR BREACH OF FIDUCIARY**
**DUTIES, FOR AIDING AND ABETTING BREACH OF FIDUCIARY DUTIES,**
**FOR KNOWING ASSISTANCE IN BREACH OF FIDUCIARY DUTIES,**
<u>**AND FOR DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502**</u>

Plaintiffs Alameda Research Ltd. ("<u>Alameda</u>") and FTX Trading Ltd. ("<u>FTX</u>")

(together, "<u>Plaintiffs</u>") through their undersigned counsel, for their Amended Complaint against

---

[1]    The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification numbers are 3288 and 4063, respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.  The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Platform Life Sciences Inc. ("PLS"), Lumen Bioscience, Inc. ("Lumen"), GreenLight

Biosciences Holdings, PBC ("GreenLight"), Riboscience LLC ("Riboscience"), Genetic

Networks LLC ("Genetic Networks"), 4J Therapeutics Inc. ("4J Therapeutics") (together, the

"Lifesciences Defendants"), Latona Biosciences Group ("Latona"), FTX Foundation, Samuel

Bankman-Fried ("Bankman-Fried"), Ross Rheingans-Yoo ("Rheingans-Yoo"), and Nicholas

Beckstead ("Beckstead") (and together with the Lifesciences Defendants, the "Defendants"),

allege the following based upon personal knowledge and upon their investigation to date as to

themselves and their own acts, and upon information and belief as to all other matters:

## NATURE OF THE CASE

1.      Plaintiffs bring this adversary proceeding pursuant to Sections 105, 544, 548, and

550 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and

Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2)

and 1305, to avoid and recover from the Lifesciences Defendants, or from any other person or

entity for whose benefit the transfers were made, including Latona and the FTX Foundation, all

transfers of property of Plaintiffs to the Lifesciences Defendants made between February 2022

and October 2022, prior to commencement of the above-captioned bankruptcy cases

(collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), by the above-captioned

debtors and debtors-in-possession (collectively, the "Debtors" and each a "Debtor").  Plaintiffs

further bring claims against Bankman-Fried for breach of fiduciary duties, against Rheingans-

Yoo and Beckstead for aiding and abetting and/or knowingly assisting in Bankman-Fried's

breach of fiduciary duties, and against Latona for unjust enrichment.

2.      Pursuant to Section 502(d) of the Bankruptcy Code, Plaintiffs also seek to

disallow any and all claims filed or held by Defendants in these Chapter 11 Cases unless and

until Defendants have relinquished to Plaintiffs all property that they received in transfers that are determined by the Court to be avoidable and/or recoverable.

3.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  No trustee has been appointed for Plaintiffs or any other Debtor in the Chapter 11 Cases, and the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.  Joint administration of the Chapter 11 Cases was authorized by the Court by an order entered on November 22, 2022 [D.I. 128]. Accordingly, Plaintiffs have the authority to file this Amended Complaint to commence, and thereafter to prosecute, this adversary proceeding.

4.      Prior to the filing of the Chapter 11 Cases, Alameda was a cryptocurrency trading firm owned by Bankman-Fried and Zixiao "Gary" Wang ("Wang").  FTX was a digital asset exchange founded by Bankman-Fried, Wang, and Nishad Singh ("Singh").

5.      The FTX Foundation was the philanthropic arm of the FTX Group[2] of companies; Latona was a sham non-profit company organized in the Bahamas.  Together, the FTX Foundation and Latona took over $71 million of commingled funds from Alameda and FTX accounts to make investments in and donations to life sciences companies for Bankman-Fried's personal aggrandizement.  No benefits received for these investments (*e.g.*, shares, equity, or

---

[2]   The "FTX Group" is comprised of four silos.  These silos include:  (a) a group composed of Debtors West Realm Shires, Inc., West Realm Shires Services, Inc., and their Debtor and non-Debtor subsidiaries; (b) a group composed of Plaintiff and Debtor Alameda Research Ltd., Debtor Alameda Research LLC, and their Debtor subsidiaries; (c) a group composed of Debtor Clifton Bay Investments LLC, Debtor Clifton Bay Investments Ltd., Debtor Island Bay Ventures Inc. and Debtor FTX Ventures Ltd.; and (d) a group composed of Plaintiff and Debtor FTX Trading Ltd. and its Debtor and non-Debtor subsidiaries.

right to future payments) went to either Alameda or FTX, even though Alameda and FTX

transferred the funds to the life sciences companies.  Upon information and belief, Bankman-

Fried and Rheingans-Yoo intended to benefit personally from any profits generated by any of

these companies if they turned out to be successful and/or developed a successful product.

6.      The Lifesciences Defendants are life sciences companies in which Latona made

investments and to which the FTX Foundation made a donation using funds provided by FTX

and Alameda.  Although FTX and Alameda provided the funds for the investments made in the

name of Latona and the donation made in the name of the FTX Foundation, neither FTX nor

Alameda received any value in exchange for the transfers; nor did these transfers do anything to

advance the business interests of either FTX or Alameda.

7.      In or around January 2022, Bankman-Fried conceived of Latona as an "FTX

Foundation Project" that would:

> build out operational capacity to support promising new drugs transition from ideas to
> reality.  We anticipate devoting substantial funding to support the necessary processes;
> building out an efficient, safe clinical trial process in The Bahamas; and developing
> robust supply chains, both for production and distribution of potentially life saving
> medication.  We are planning to build long-term infrastructure and devote hundreds of
> millions of dollars to it.

8.      What Bankman-Fried did not disclose is that he planned to fund Latona's

investments in life sciences companies with funds provided by Alameda, which included

commingled FTX customer and corporate funds.

9.      In January 2022, Bankman-Fried hired Rheingans-Yoo, with whom he had

previously worked at another firm, to work at the FTX Foundation, which was then run by

Beckstead.  Bankman-Fried entrusted Rheingans-Yoo to run Latona and to direct Latona's

investments in the Lifesciences Defendants.

10.     On February 4, 2022, shortly after the FTX Foundation was incorporated but months before Latona was incorporated, Rheingans-Yoo, acting in concert with Beckstead and Bankman-Fried, directed the FTX Foundation to transfer $3.25 million as a donation to PLS. The FTX Foundation had no bank account at this time.  Rheingans-Yoo and Beckstead arranged for FTX to wire the money to PLS, and in so doing, aided and abetted Bankman-Fried's breach of fiduciary duties that he owed to FTX.

11.     After Latona's formal registration in the Bahamas in May 2022, Rheingans-Yoo, with Bankman-Fried's approval, orchestrated a series of investments by Latona in the Lifesciences Defendants.  Between May 26, 2022 and October 6, 2022, Rheingans-Yoo caused Latona to enter into agreements with the Lifesciences Defendants to invest $68.3 million in the Lifesciences Defendants.  Because Latona did not have a bank account of its own or any way of generating revenue of its own, Rheingans-Yoo arranged for Alameda to transfer the $68.3 million to the Lifesciences Defendants from an Alameda bank account.  The Debtors' investigation to date has shown that the Alameda bank account that funded Latona's investments in each of the Lifesciences Defendants contained commingled funds, *i.e.*, funds that had been deposited by customers of the FTX.com exchange as well as corporate funds.  Rheingans-Yoo, in arranging these transfers, knowingly assisted and/or failed to prevent Bankman-Fried's breach of fiduciary duties that he owed to Alameda.

12.     Plaintiffs have determined, based on their analysis and investigation to date, that the following transfers are avoidable under the Bankruptcy Code and Title 6 of the Delaware Code:

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|---|---|---|---|---|
| February 4, 2022 | Platform Life Sciences Inc. | Purported "Philanthropic Gift" | $3,250,000 | FTX |

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|---|---|---|---|---|
| May 26, 2022 | Platform Life Sciences Inc. | SAFE | $35,000,000 | Alameda |
| June 21, 2022 | Platform Life Sciences Inc. | Services | $15,000,000 | Alameda |
| August 9, 2022 | Lumen Bioscience, Inc. | Future Royalties | $3,000,000 | Alameda |
| August 11, 2022 | GreenLight Biosciences Holdings, PBC | Shares | $5,500,000 | Alameda |
| August 15, 2022 | Rand Bioscience LLC | Shares | $4,000,000 | Alameda |
| August 26, 2022 | Genetic Networks LLC | Convertible Promissory Note | $3,000,000 | Alameda |
| October 6, 2022 | 4J Therapeutics Inc. | Convertible Promissory Note | $2,800,000 | Alameda |
| **Total Transferred to Lifesciences Defendants** | | | **$71,550,000** | |

13.     During the course of this adversary proceeding, Plaintiffs may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiffs intend to avoid and recover all such transfers made, or obligations incurred, to or for the benefit of Defendants or any other transferee and accordingly reserve the right to amend this Amended Complaint.  In particular, and without intending to create any limitation, Plaintiffs reserve the right to amend this Amended Complaint to include:  (i) further information regarding relevant transfers or obligations, (ii) information regarding additional transfers made or obligations incurred, (iii) additional plaintiffs, (iv) modifications of and/or revisions to the Defendants' names, (v) additional defendants, and (vi) additional causes of action that may become known at any time during this adversary proceeding, through formal discovery or otherwise.

## THE PARTIES

14.     Alameda is a British Virgin Islands company limited by shares.  It is a wholly-owned subsidiary of Debtor Alameda Research LLC, a Delaware limited liability company that is 90% owned by Bankman-Fried and 10% owned by Wang.

15.     FTX is a corporation registered in Antigua and Barbuda.  Its principal place of business was in Nassau, Bahamas.  FTX and its subsidiaries and affiliate entities collectively did business as FTX.com and operated a digital asset trading exchange.  FTX is 80% owned by Paper Bird Inc., a Delaware corporation that is wholly-owned by Bankman-Fried.

16.     Latona purports to be a non-profit, limited liability company organized under the laws of the Bahamas.  It was incorporated in May 2022 for the purported purpose of investing in life sciences companies.  Latona held itself out as being part of the FTX Foundation.  Bankman-Fried and Rheingans-Yoo were both directors of Latona.

17.     The FTX Foundation is a non-profit, non-stock corporation incorporated in Delaware.  Its sole member was Bankman-Fried, and its directors included Bankman-Fried, Singh, Wang, Caroline Ellison (together, the "Insiders"), and Beckstead.

18.     Bankman-Fried was a co-founder of Alameda and was its chairman and sole director until September 6, 2022.  Bankman-Fried was also a co-founder of FTX.  At all relevant times, Bankman-Fried was the majority owner, and effectively controlled the operations, of Plaintiffs and their affiliated Debtors.  Bankman-Fried conceived of and served as a director of Latona, overseeing and approving the investments made by Latona that Rheingans-Yoo recommended.  Bankman-Fried was also the sole member and a director of the FTX Foundation, and oversaw and approved purported donations by the FTX Foundation that Rheingans-Yoo and Beckstead recommended.

19.     Rheingans-Yoo held himself out as the "Executive Director" of Latona.  In that role, Rheingans-Yoo reported directly to Bankman-Fried.  Rheingans-Yoo and Bankman-Fried had previously worked together at another firm and had lived together in Hong Kong and in the Bahamas.

20.     Beckstead was CEO of the FTX Foundation and, in that capacity, reported directly to Bankman-Fried.

21.     PLS is a company incorporated in British Columbia, Canada in February 2021 that supports clinical trials, including into therapeutics research.

22.     Lumen is a company incorporated in Delaware engaged in developing low-cost antibody treatments.

23.     GreenLight Biosciences is a publicly-traded company incorporated in Delaware engaged in low-cost RNA manufacturing.

24.     Riboscience is a limited liability company incorporated in Delaware that creates targeted DNA or RNA disruptor antivirals and other treatments.

25.     Genetic Networks is a limited liability company incorporated in Delaware engaged in data-driven drug discovery.

26.     4J Therapeutics is a company incorporated in Delaware that is working to develop a programmable antiviral using RNA technology.

## JURISDICTION AND VENUE

27.     This is an adversary proceeding commenced pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure because, at a minimum, it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates.  Fed. R. Bankr. P. 7001(1).

28.     This adversary proceeding relates to the Chapter 11 Cases filed with this Court on the Petition Date.

29.     The Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

30.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b), and the Court may enter final orders herein.

31.     Venue of this adversary proceeding in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

32.     The statutory predicates for the relief requested herein are Sections 105(a), 502(d), 544, 548, and 550 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

33.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, Plaintiffs consent to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## FACTUAL ALLEGATIONS

**I.     The Insiders' Scheme to Defraud the FTX Group's Customers, Creditors, and Shareholders.**

34.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses.  As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022.  Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the *Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I.

24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

35.    The Insiders used their control over the FTX Group's systems to perpetrate a massive fraud—squandering the FTX Group's assets on, among other things, luxury homes, political and "charitable" contributions, and various investments that would inure to the benefit of the Insiders rather than the corporate entities that had paid for them.

36.    The Insiders funded much of this spending through Alameda, which, at the Insiders' direction, unlawfully diverted assets belonging to FTX.com, the principal international cryptocurrency exchange operated by the FTX Group, to the Insiders' pet projects.  In doing so, the Insiders defrauded FTX.com's customers, creditors, and shareholders, and violated their fiduciary duties and numerous laws.

37.    Prior to their resignations or terminations amidst FTX's collapse, the Insiders held virtually all of the top executive positions at the FTX Group.  Bankman-Fried was the CEO of FTX until the Petition Date, was the sole director of Alameda until September 6, 2022, and was previously the CEO and sole director of West Realm Shires, Inc. ("WRS").  Wang served as the Chief Technology Officer at both FTX and WRS.  Singh served as the Director of Engineering at both FTX and WRS as well as serving as Chief Security Officer at WRS.  Ellison was the co-CEO of Alameda LLC from August 2021 until September 2022, when she was named the sole CEO.  Ellison was also a director of Alameda from September 6, 2022 until the Petition Date.

38.    The Insiders' conduct is currently the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission, the

Commodity Futures Trading Commission, and a host of state and international regulators. All of

the Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the

very practices that underlie this action. On December 19, 2022, Wang and Ellison pleaded guilty

to multiple felonies, including wire fraud, conspiracy to commit wire fraud, conspiracy to

commit commodities fraud, and conspiracy to commit securities fraud; Ellison also pleaded

guilty to conspiracy to commit money laundering. *See* Min. Entry, Dec. 19, 2022, *United States*

v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). On February 28, 2023, Singh pleaded guilty

to the same felonies as Ellison as well as conspiracy to make unlawful political contributions and

defraud the Federal Election Commission. *See* Min. Entry, Feb. 28, 2023, *United States* v.

*Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022). At all times prior to the Petition Date, the

Insiders collectively held majority stakes in FTX, Alameda, and WRS and exercised control over

the actions of those entities.

39.     In connection with his plea, Wang admitted that in 2019 he made "certain changes

to the [FTX.com] code" to give Alameda "special privileges on the FTX platform," including to

allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda

maintained negative balances in its own holdings of fiat (*i.e.*, government-issued) currencies and

cryptocurrencies. Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF

No. 21. Using these "special privileges," the Insiders frequently caused Alameda to spend large

amounts of Debtors' funds for their own personal benefit.

40.     Bankman-Fried has repeatedly, and publicly, stated that Alameda operated as "a

wholly separate entity" from FTX.com. *Annie Massa et al., Sam Bankman-Fried and Alameda*

*CEO Caroline Ellison Spoke About Red Flags at FTX 3 Months Before It Collapsed. Here's*

*What They Said – and How They Lied*, Fortune (Nov. 18, 2022, 5:58 AM),

https://fortune.com/2022/11/18/sam-bankman-fried-alameda-ceo-caroline-ellison-spoke-red-flags-ftx-3-months-before-it-collapsed-what-said-how-lied/.  Ellison was quoted as saying that "[w]e keep them [FTX and Alameda] quite separate in terms of day-to-day operations." *Id*.  In reality, however, the Insiders routinely, and secretly, used Alameda to loot "several billion dollars" from FTX.com using the "special privileges," thereby defrauding FTX.com's creditors.  Plea Tr. 28:23-29:1, *United States* v. *Singh*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 102; Plea Tr. 24:6-10, *United States* v. *Wang*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 21.

41.     Bankman-Fried also conspired with Ellison and others to divert funds to Alameda that were intended to be deposited at FTX.com before they reached the exchange, so that the Insiders could use those funds to benefit themselves.  Beginning in 2019 and continuing through 2022, Bankman-Fried caused FTX.com customers to deposit funds into bank accounts controlled by Alameda and then North Dimension Inc. ("North Dimension"), a wholly-owned subsidiary of Alameda LLC, without disclosing to the banks that held those accounts or to FTX.com customers the nature of the arrangement between FTX.com, Alameda, and North Dimension. *See* Superseding Indictment ¶ 18, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.

42.     In April 2021, Bankman-Fried ink-signed a sham "Payment Agent Agreement," that was falsely backdated by nearly two years.  An outside law firm was asked to prepare the intercompany agreement for the sole purpose of providing it to an external auditor that had been retained to prepare an audited financial statement of FTX in connection with a contemplated initial public offering ("IPO") of the company.  A senior FTX attorney directed that the agreement state that "FTX gets first dibs on Alameda's cash," an apparent attempt to paper over the fact that there were no existing limitations on Alameda's ability to spend FTX exchange

customers' cash for its own purposes.  The draft agreement the law firm subsequently provided

stated that Alameda provided "cash management" services for FTX, and that assets of FTX held

by Alameda pursuant to the agreement would be deemed a loan to Alameda.  Beginning in

March 2021, the same FTX attorney prepared another version of the sham agreement that did not

reflect any loan to Alameda, which stated that Alameda provided mere "payment services"

pursuant to which it would "complete payments . . . as directed by FTX from time to time," and

receive assets from FTX "to be held and/or transferred . . . as quickly as commercially possible."

In reality, Alameda never transferred and had no intention of transferring customer deposits to

FTX at all.

43.     In the days leading up to the Petition Date, Bankman-Fried supplied potential

investors with a purported Alameda balance sheet that included a liability of $8 billion in a

"Hidden, poorly internally labled [sic] 'fiat@' account."  *See* Superseding Indictment ¶ 56,

*United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 115.  However,

Bankman-Fried "well knew" that this liability reflected "FTX customer fiat deposits accepted

into Alameda's bank accounts that had not been maintained for the benefit of customers or

repaid to FTX[.]"  *Id.* ¶ 57.  The Insiders used these funds "to make investments in the name of

Bankman-Fried and his associates, rather than in the name of Alameda."  *Id.* ¶ 26.

44.     The Insiders were aware at all relevant times of the "special privileges on the FTX

platform" that allowed Alameda to "borrow" billions of dollars from FTX.com in order to, inter

alia, finance "loans" from Alameda to Defendants.  Ellison admitted that from 2019 through

2022 she was aware of this arrangement, which she described as "permitt[ing] Alameda access to

an unlimited line of credit without being required to post collateral, . . . pay interest[,] . . . [or]

being subject to margin calls or FTX.com's liquidation protocols."  Plea Tr. 27:11-15, United

States v. Ellison, 22-cr-00673 (S.D.N.Y. 2022), ECF No. 19.  Ellison also "understood that FTX

would need to use customer funds" to make many of its investments, *id.* at 28:2-4, 22-24, and

admitted that many investments "were done in the name of Alameda instead of FTX in order to

conceal the source and nature of those funds."  *Id.* at 28:24-29:1

45.    In the days leading up to the Petition Date, Ellison messaged Bankman-Fried that

she "had an increasing dread of this day that was weighing on me for a long time, and now that

it's actually happening it just feels great to get it over with[,] one way or another."  *See*

Superseding Indictment ¶ 53, *United States* v. *Bankman-Fried*, 22-cr-00673 (S.D.N.Y. 2022),

ECF No. 115.

## II.    Bankman-Fried, Rheingans-Yoo, and Beckstead Caused FTX and Alameda to Transfer Millions to the Lifesciences Defendants.

46.    Prior to the Debtors filing the Chapter 11 Cases, Alameda, FTX, the FTX

Foundation, and Latona were all controlled by Bankman-Fried.  As detailed below, Bankman-

Fried caused FTX and Alameda to transfer funds, including commingled customer and corporate

funds, to the Lifesciences Defendants.  These transfers were nominally made on behalf of the

FTX Foundation and Latona, but actually were made for the benefit of Bankman-Fried.  In

exchange for the transfers, neither FTX nor Alameda received any value.

47.    While purporting to make these investments for altruistic purposes (*i.e.*, pandemic

prevention and preparedness), Bankman-Fried in fact pursued these transactions because he

believed that doing so would generate goodwill and amass political capital and influence for

himself.  As an example, Bankman-Fried wrote, in an internal document:  "for PR and political

reasons it's really important to do bio things, and to do some public/networky bio things."

48.    Upon information and belief, although Latona purported to be a non-profit

corporation, Bankman-Fried, Rheingans-Yoo, and Beckstead wanted to participate in and profit

from any upside of these investments.  For that reason, Bankman-Fried, Rheingans-Yoo, and Beckstead intentionally obscured Latona's role in making these investments and avoided any discussion of the equity stakes that Latona had received in connection with these investments.

49.     For example, Rheingans-Yoo wrote to Ed Mills, the CEO of PLS:  "In general, our [Latona's] participation should be described as 'FTX Foundation' in all public-facing communication" and "we'd prefer not to mention the discussion terms of the equity stake at this point, to avoid pulling the public narrative to speculation about profit motive."

50.     Similarly, Beckstead wrote in an internal document in May 2022 concerning the PLS investment:  "Why did it need to be through Latona?  In case it makes a lot of money. Prefer not to be disclosed on Bahamian entity balance sheet.  Main thing:  if it makes a ton of money, how open do we need to be about that?"  Despite Latona's incorporation as a non-profit company, Rheingans-Yoo hoped that Latona would "make[ ] a ton of money."

51.     In pursuing these investments in the Lifesciences Defendants, Latona conducted minimal or no due diligence.  For most investments, Latona did not even receive access to a data room.  Latona also failed to conduct any valuation analysis of the Lifesciences Defendants, and in most cases, simply accepted the pre-money valuations put forth by the Lifesciences Defendants.  As Beckstead candidly conceded:  most of the life sciences investments were "ill-advised and not well-evaluated."

52.     In addition to failing to conduct due diligence or valuation analysis on its investments, Latona often paid far more than fair or reasonably equivalent value for the investments in the Lifesciences Defendants.  Properly valuing these investments was not important to Latona because it was not funding the investments with its own money, but instead with commingled funds provided by Alameda.

53.     Indeed, even the FTX Foundation's purported donation to PLS was made in a similarly slapdash fashion: the FTX foundation agreed to make a $3.25 million purported donation to PLS without even knowing whether PLS was a non-profit corporation—a key fact to be considered before agreeing to make a multi-million dollar "grant" that might be a tax-deductible charitable donation. But again, as with Latona, the money for the transfer did not come from the FTX Foundation; instead, FTX, at the direction of Bankman-Fried, Rheingans-Yoo, and Beckstead, funded the $3.25 million purported donation with commingled funds.

54.     In total, Latona and the FTX Foundation funneled approximately $71.6 million to the Lifesciences Defendants. The entirety of this $71.6 million came directly, at Bankman-Fried's ultimate direction, from Alameda and FTX. However, Alameda and FTX received no value whatsoever in return for these transfers.

55.     Alameda and FTX were insolvent when, or became insolvent shortly after, the transfers to the Lifesciences Defendants were made.

### (i)     The FTX Foundation's Purported Donation to PLS

56.     On or around January 25, 2022, PLS presented an investment pitch to Rheingans-Yoo, Bankman-Fried, and Beckstead.

57.     PLS proposed a "two-stage process for an investment" by the FTX Foundation "of a total of $10 million."

58.     On January 25, 2022, Rheingans-Yoo emailed the Head of FTX Ventures: "FTXF[oundation] is looking to give a $3mln-$10mln grant to Platform Life Sci; I'm curious what [you] think[] a reasonable equity stake could look like here. Pretty important that we stay friendly here, so I'd want to err on the friendly side with terms."

59.     On January 26, 2022, the Head of FTX Ventures replied to Rheingans-Yoo: "My first reaction is something like $15-30M post for a 'seed round' if this was structured as an

equity round is more than fair, so getting between 20-30% for $3-10M would not raise any eyebrows.  If we're doing $3M may lean toward 20%?  Something over 30% ownership starts to look weird on a cap table for their next round, and something that implies too high a valuation (eg we only get 10% for $10M) may also set themselves up for a tough future raise."

60.     Rheingans-Yoo proposed sending PLS "$3mln philanthropic grant now," in part based on PLS CEO Mills' proposal that the Foundation invest "the first $3mln as a grant and the other $7mln as an investment."  Rheingans-Yoo noted that "Nick [Beckstead] had a different idea," which was to invest $4 million to "support short-run operations," and "in April, we get together around a table and co-found a company . . . this is a bit awkward because maybe there already is a company?  idk to what extent there is.  I think it basically only makes sense if we think it will be a commercial success (will have to figure out what we think about this).  But if we did think we had a multi-$bln opportunity on our hands, we might want to see if we can go from investor to more meaningfully 'partner'?"  Bankman-Fried replied that he would "love that."

61.     On January 27, 2022, Rheingans-Yoo submitted an FTX Foundation Internal Funding Recommendation Form, recommending a $3,250,000 "philanthropic grant" to PLS, which Beckstead approved.

62.     On January 29, 2022, Rheingans-Yoo wrote to Mills that the FTX Foundation had approved a "philanthropic gift for $3,250,000" to PLS.  "The increase from the $3mln budget you submitted is intended to support the onboarding of 1-2 trial sites in the Bahamas." Rheingans-Yoo added that when the FTX Foundation hosts Mills and his team in the Bahamas in March, "it will make sense to discuss how to structure this venture together, so it's set up with the ongoing flow of funding (and all the other support)."

63.     The Head of Operations for FTX Ventures emailed Mills the next day, requesting that the invoice with the wire details for the funding be addressed to FTX.

64.     On February 4, 2022, Rheingans-Yoo and Beckstead, at Bankman-Fried's direction, caused FTX to wire $3,250,000 to PLS.

### (ii)    Latona's Investment in PLS

65.     Despite PLS's initial request for an investment "total[ing] [ ] $10 million," and the concern expressed by the Head of FTX Ventures that a 30% ownership stake in exchange for a $10 million investment would "look weird," on or around March 28, 2022, PLS and Latona (which had then not yet been incorporated) began preparing one term sheet for a $35 million investment in exchange for a 35% stake in PLS, and a second term sheet for a $15 million convertible loan.

66.     Latona and PLS executed a Simple Agreement for Future Equity ("SAFE") dated May 2, 2022, pursuant to which Latona invested $35 million in PLS at a $65 million pre-money valuation.  Latona did not conduct any due diligence before making the investment.  Under the SAFE Agreement, Latona received the right to certain of PLS's capital shares in the event of certain "triggering" events, namely, (1) an equity financing, (2) a liquidity event, or (3) a dissolution event.  Latona additionally received a right to appoint a member of the PLS Board of Directors.

67.     On May 20, 2022, Rheingans-Yoo emailed Michael Zimmerman, Chief Technology Officer of PLS, and Mills, stating that he had signed the $35 million SAFE on behalf of Latona, which he characterized as "a member of the FTX Foundation Group of Companies." Rheingans-Yoo informed Zimmerman and Mills that Latona would be appointing him to PLS's Board, a fact that was purposefully not disclosed publicly; Rheingans-Yoo joined Zimmerman and Mills as PLS's only directors.  In that May 20, 2022 email, Rheingans-Yoo also confirmed a

$15 million commitment by Latona to purchase clinical services from PLS "at our later direction and discretion." Rheingans-Yoo noted that "[t]he payments relating to the SAFE and the purchase commitment will [be] made in a single payment from an entity in the FTX group of companies as Latona's designated affiliate. These funds will be delivered on Latona's behalf, and in satisfaction of our payment obligations for these two agreements."

68. On May 23, 2022, Rheingans-Yoo sent a Slack message to the Head of Operations for FTX Ventures, asking her to wire $50 million to PLS on behalf of Latona, because "Latona doesn't have a bank account yet, and we'd like to move these funds as soon as possible." After the Head of Operations inquired why they were wiring $50 million when the SAFE agreement was only for $35 million, Rheingans-Yoo said there was a "separate purchase agreement [that] had a $15mln cash advance." When the Head of Operations asked for the purchase agreement for $15 million, Rheingans-Yoo replied, "I have an email, no formal agreement," but "if that's not sufficient, we can send the 35 first and get the purchase more formally papered."

69. On May 26, 2022, Rheingans-Yoo, with Bankman-Fried's approval, caused Alameda to wire $35 million to PLS on behalf of Latona.

70. On June 6, 2022, to "formally paper[]" the $15 million "cash advance," Latona and PLS signed a purported Services Agreement, pursuant to which Latona agreed to pay PLS $15 million as an advance payment on unspecified services to be rendered by PLS in the future to certain "Latona Third Party Designees," a term that was not defined in the agreement. Although the Services Agreement provided that PLS would provide these designees with services that would be more fully described in Statements of Work, no Statement of Work was ever executed.

71.     On June 21, 2022, Rheingans-Yoo, with Bankman-Fried's approval, caused Alameda to wire another $15 million to PLS on behalf of Latona.

72.     Although Alameda transferred a total of $50 million to PLS to fund Latona's investment, Alameda did not receive any value in exchange for these transfers.

                    **(iii)    Latona's Investment in Lumen**

73.     On May 14, 2022, as Latona was finalizing its $35 million investment in PLS, Mills sent an email introducing Rheingans-Yoo to Brian Finrow, the CEO of Lumen, a company Mills said had "been at the forefront on new strategies for COVID therapeutics."  Mills stated that he could "vouch for [Lumen's] integrity."

74.     On May 25, 2022, less than two weeks after their initial introduction, Finrow and Rheingans-Yoo began discussing the FTX Foundation making an investment in Lumen to help fund a new drug.  Rheingans-Yoo emailed Finrow that, "the idea is for Foundation funding to bear the downside risk to let the work go forward, while generating some alignment on the upside."

75.     On June 4, 2022, without any basis for selecting the amount, Rheingans-Yoo suggested that Lumen's project should be valued at a $62 million pre-money valuation.  He also offered to send funds to Lumen before the FTX Foundation had even signed an agreement.  He emailed Finrow, "[i]f we can work this out to a term sheet summary by early in the week, we'd be willing to send a first tranche of $3mln on a handshake basis to fund the trial to go forward on a good-faith basis, while we hammer out the full details."

76.     On June 22, 2022, Lumen's outside counsel sent an initial draft of a document referred to as a Charitable Research Funding Agreement.  The draft agreement contemplated that the FTX Foundation would make two $4 million payments to Lumen:  one upon signing of the agreement and the second upon "written confirmation from Lumen that one or more clinical

development candidate Products have been advanced to regulatory submission enabling studies by March 31, 2023." The draft agreement provided that if the FDA granted "emergency use or full approval of a Product" before June 30, 2027, the FTX Foundation would share in the upside, with Lumen paying the FTX Foundation "the Program Share Percentage of its Net Sales and Licensing Revenues resulting from such Products."

77.     Rheingans-Yoo sent Lumen a revised version of the agreement that substituted Latona for the FTX Foundation as the investing entity. In a subsequent email, Rheingans-Yoo informed Lumen that he was changing the investing entity to Latona and was reducing the funding amounts from two payments of $4 million each to an initial payment of $3 million and a second payment of $2.5 million.

78.     On August 5, 2022, Lumen and Latona executed the Charitable Research Funding Agreement. The agreement provided that Latona would transfer $3 million to Lumen within 15 days of the execution of the agreement and $2.5 million within 15 days of Latona receiving confirmation that a product has "advanced to regulatory submission enabling studies by March 31, 2023." The agreement also provided that, if Lumen received either emergency use authorization or full regulatory approval, Lumen would pay Latona the "Program Share Amount of the *sum* (without duplication) of (i) the Profit, and (ii) the Licensing Revenue." While characterized as a "Contingent Repayment of Charitable Funding," the Program Share Amount would potentially allow Latona to receive any upside on the drug, including profits and licensing revenue.

79.     On August 6, 2022, Rheingans-Yoo requested that an FTX Group employee wire Lumen the first payment of $3 million that Latona owed under the Charitable Research Funding Agreement. On August 9, 2022, Rheingans-Yoo, with the approval of Bankman-Fried, caused

Alameda to wire $3 million to Lumen's bank account to fund Latona's first payment under the agreement.

80.     Although Alameda wired $3 million to Lumen to fund Latona's investment, Alameda did not receive any value in exchange for this transfer.

**(iv)    Latona's Investment in GreenLight**

81.     On or around May 1, 2022, Rheingans-Yoo met Andrew J. Zarur, the CEO of GreenLight, at a conference.  On July 19, 2022, following a conversation between them, Zarur sent Rheingans-Yoo a nondisclosure agreement ("NDA") to govern discussions between GreenLight and the FTX Foundation, and requested a list of names of people who would need to access GreenLight's data room.  It appears that neither the FTX Foundation nor Latona ever signed the NDA, and therefore never received access to GreenLight's data room.

82.     On August 9, 2022, in an internal document, Beckstead wrote that the proposed GreenLight investment seemed "unattractive," in part because (i) it originated from a "random CEO pitching this to Ross [Rheingans-Yoo] at a conference," (ii) there was a "tenuous connection" between GreenLight and "bio x-risk (RNA-based agricultural product is not that close to covid/HIV vaccines, which is not that close to bio x-risk)," and (iii) no one at the FTX Foundation had a "deep understanding about" GreenLight's purported area of expertise.

83.     Despite these concerns, on August 11, 2022, Rheingans-Yoo, with Bankman-Fried's blessing, signed a subscription agreement pursuant to which Latona agreed to invest $5.5 million in GreenLight in exchange for 1,403,061 shares in the NASDAQ-traded public company.

84.     On August 11, 2022, Rheingans-Yoo, with Bankman-Fried's approval, caused Alameda to wire $5.5 million to GreenLight to fund Latona's investment.

85.     Although Alameda wired $5.5 million to GreenLight to fund Latona's investment, Alameda did not receive any value in exchange for this transfer.

### (v)   Latona's Investment in Riboscience

86.     Mills of PLS introduced Bankman-Fried to Jeff Glenn, a Professor at the Stanford Medical School who runs the Glenn Lab, and, as discussed below, was also a founder of Riboscience and 4J Therapeutics, in which Latona ultimately invested.  In January 2022, shortly after Bankman-Fried was introduced to Glenn, the FTX Foundation approved a purported "gift" of $807,000 to the Glenn Lab and in February 2022, the Foundation approved a second purported "gift" of $3,193,000 to the Glenn Lab, for a total of $4 million.  These two purported "gifts" were paid in May 2022 by Alameda.

87.     In addition to his affiliation with the Glenn Lab, which received $4 million in purported "gifts" from the FTX Foundation, Glenn was also a founder of Riboscience and 4J Therapeutics and pitched the FTX Foundation to make investments in both of his companies, which, as discussed below, Latona ultimately did.  In a document that Rheingans-Yoo wrote to Bankman-Fried, Rheingans-Yoo acknowledged that the fact that numerous investment opportunities "have come from Ed Mill's [sic] network . . . substantially increase[s] the chance that they all suck."

88.     On January 28, 2022, Glenn sent Beckstead a brief overview deck about Riboscience, and a confidentiality agreement that had to be signed to give the FTX Foundation access to Riboscience's data room.  Beckstead forwarded this message to Bankman-Fried and Rheingans-Yoo.

89.     On February 23, 2022, Rheingans-Yoo sent Glenn a signed confidentiality agreement and wrote that "we're tentatively interested in taking a non-lead stake in Riboscience's current round" of financing.

90.     On February 28, 2022, Rheingans-Yoo was granted access to Riboscience's data room.

91.    On March 3, 2022, Rheingans-Yoo emailed Glenn that he was considering "going forward with an investment in Ribocience in the $2-5mln check size." Rheingans-Yoo requested more details from Glenn on the financing round, including valuation and expected uses for the funding Ribocience received from Latona. Glenn replied the next day that the pre-money valuation was $100 million, and that the total $45 million raise was designed to fund three years of Ribocience's operating expenses. Glenn then wrote that he was "very much looking forward" to seeing Rheingans-Yoo in the Bahamas later that month. On March 4, 2022, Rheingans-Yoo committed that "[w]e're in for a $4 mln investment" and requested documents to sign. Bankman-Fried wrote to Glenn: "really excited to be working together!"

92.    On June 1, 2022, Glenn emailed Rheingans-Yoo and Bankman-Fried notifying them that the FTX Foundation's prior "donation" of $3,193,000 to the Glenn Lab had been finalized that day, and expressing his "deepest appreciation and thanks for [their] amazing generosity and support." Bankman-Fried responded, "[w]e're really excited too."

93.    On June 29, 2022, Glenn emailed Rheingans-Yoo that "sufficient time ha[d] passed since the (most generous) donation to the Glenn Labs, that we can now proceed with your desired investment in Ribocience." Glenn attached the investment documents, and requested the name of the entity that would be making the investment.

94.    On July 23, 2022, Rheingans-Yoo informed Glenn that "[w]e'll use the Bahamas nonprofit entity for life sciences investments"—Latona—to make the investment.

95.    On August 14, 2022, Latona and Ribocience executed an Amended and Restated Limited Liability Company Agreement, a Series A Preferred Units Purchase Agreement, an Investors' Rights Agreement, a Voting Agreement, and a Right of First Refusal and Co-Sale Agreement. Latona invested $4 million in Ribocience and in return received 224,467 preferred

A-2 units at a price of $17.82/unit.  The price per unit assumed that Rioboscience would raise $45 million in the Series A financing; Latona appears to have made no inquiry into whether Rioboscience reasonably could raise $45 million, and, as of the date of Latona's investment (which was months after Glenn had solicited such an investment from Latona), Rioboscience had raised only $11.16 million of its $45 million Series A fundraising goal.

96.     On August 15, 2022, Rheingans-Yoo, with the approval of Bankman-Fried, caused Alameda to wire $4 million to Rioboscience to fund Latona's investment.

97.     Although Alameda wired $4 million to Rioboscience to fund Latona's investment, Alameda did not receive any value in exchange for this transfer.

**(vi)     Latona's Investment in Genetic Networks**

98.     On July 15, 2022, the office manager at FTX in Miami sent an email to introduce Joe Bankman (Bankman-Fried's father), Rheingans-Yoo and Beckstead to Gennaro D'Urso and Leland Hartwell, the founders of Genetic Networks.

99.     Rheingans-Yoo and D'Urso met on July 21, 2022; following the meeting, D'Urso sent Rheingans-Yoo a convertible note and other materials relating to Genetic Networks. D'Urso continued to follow up with Rheingans-Yoo concerning a potential investment.

100.     On August 8, 2022, Rheingans-Yoo and D'Urso met in person in the Bahamas.

101.     The following day, Rheingans-Yoo decided to commit $3 million to Genetic Networks, based on his assumption—made without having conducted any due diligence or valuation process whatsoever—of a "$40mln pre-money [valuation] for now."

102.     On August 23, 2022, Genetic Networks and Latona executed a Convertible Promissory Note, pursuant to which Latona agreed to loan $3 million to Genetic Networks; the promissory note would convert to equity securities upon the occurrence of certain events.

103.    On August 26, 2022, Rheingans-Yoo, with Bankman-Fried's approval, caused Alameda Research to wire $3 million to Genetic Networks in connection with Latona's investment.

104.    Although Alameda wired $3 million to Genetic Networks to fund Latona's investment, Alameda did not receive any value in exchange for this transfer.

**(vii)    Latona's Investment in 4J Therapeutics**

105.    As discussed above, Glenn, a founder of 4J Therapeutics, had previously received $4 million in purported "gifts" from the FTX Foundation for his Glenn Lab and had also received a $3 million investment by Latona in his company Rioscience.

106.    Less than three weeks after Latona invested $3 million in Rioscience, on or around September 14, 2022, Glenn, this time wearing his 4J Therapeutics hat, emailed Rheingans-Yoo to inform him that 4J Therapeutics had officially incorporated and could now issue convertible notes.

107.    In his September 14, 2022 email, Glenn attached draft documents for the convertible note, and an Accredited Investor Questionnaire for Latona to complete.  Glenn stated that the "initial target raise is $5 to $10 million."

108.    On September 25, 2022, counsel to 4J Therapeutics emailed Rheingans-Yoo a Note Purchase Agreement and a Convertible Promissory Note for a $2.8 million loan by Latona to 4J Therapeutics.  Rheingans-Yoo had proposed the loan of $2.8 million.  There are no records that Rheingans-Yoo or anyone else affiliated with Latona performed any due diligence on or conducted any valuation analysis of 4J Therapeutics before agreeing to make the loan.

109.    On September 30, 2022, Rheingans-Yoo signed the Note Purchase Agreement and Convertible Promissory Note on behalf of Latona, pursuant to which Latona loaned 4J

Therapeutics $2.8 million; the promissory note would convert to equity securities upon the occurrence of certain events.

110.   On October 6, 2022, Rheingans-Yoo, with the approval of Bankman-Fried, caused Alameda to wire $2.8 million to 4J Therapeutics to fund Latona's loan.

111.   Although Alameda wired $2.8 million to 4J Therapeutics to fund Latona's loan, Alameda did not receive any value in exchange for this transfer.

112.   On October 8, 2022, 4J Therapeutics transmitted to Rheingans-Yoo the fully executed Convertible Promissory Note and the Note Purchase Agreement, both of which were dated October 7, 2022.

### III.   The Transfers to the Lifesciences Defendants Involved Multiple Badges of Fraud Evincing Actual Intent to Hinder, Delay, or Defraud Creditors.

113.   As set forth above, multiple badges of fraud recognized by bankruptcy law and Del. Code Ann. tit. 6, § 1304(b) permeate the transfers to the Lifesciences Defendants, including that:

i.     The transfers to the Lifesciences Defendants were part of a scheme to enrich and otherwise benefit Bankman-Fried, an insider;

ii.    Numerous material facts relating to those transfers were concealed;

iii.   Bankman-Fried removed or concealed Plaintiffs' assets;

iv.    The value of the consideration received by Plaintiffs was not reasonably equivalent to the value of the assets transferred or the amount of the obligations incurred;

v.     Plaintiffs were insolvent when, or became insolvent shortly after, the transfers were made; and

vi.    The transfers occurred shortly before or shortly after Plaintiffs incurred substantial debts.

**CAUSES OF ACTION**

**COUNT ONE**
**FRAUDULENT TRANSFERS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(A)**
**(AGAINST LIFESCIENCES DEFENDANTS AND DEFENDANTS FTX FOUNDATION**
**AND LATONA)**

114. Plaintiffs repeat and reallege the allegations in paragraphs 1 through 113 as if fully set forth here.

115. FTX and Alameda made the following transfers:

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|---|---|---|---|---|
| February 4, 2022 | Platform Life Sciences Inc. | Purported "Philanthropic Gift" | $3,250,000 | FTX |
| May 26, 2022 | Platform Life Sciences Inc. | SAFE | $35,000,000 | Alameda |
| June 21, 2022 | Platform Life Sciences Inc. | Services | $15,000,000 | Alameda |
| August 9, 2022 | Lumen Bioscience, Inc. | Future Royalties | $3,000,000 | Alameda |
| August 11, 2022 | GreenLight Biosciences Holdings, PBC | Shares | $5,500,000 | Alameda |
| August 15, 2022 | Riboscience LLC | Shares | $4,000,000 | Alameda |
| August 26, 2022 | Genetic Networks LLC | Convertible Promissory Note | $3,000,000 | Alameda |
| October 6, 2022 | 4J Therapeutics Inc. | Convertible Promissory Note | $2,800,000 | Alameda |
| **Total Transferred to Lifesciences Defendants** | | | **$71,550,000** | |

116. Each of the transfers to the Lifesciences Defendants was a transfer of property of Plaintiffs.

117. Each of these transfers was made with the intent to hinder, delay, or defraud present or future creditors, a fact known by the FTX Foundation, Latona, and Bankman-Fried during the Avoidance Period.

118.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(A) of the Bankruptcy Code, and Plaintiffs may recover from the Lifesciences Defendants, the FTX Foundation, and/or Latona the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**FRAUDULENT TRANSFERS PURSUANT TO**
**11 U.S.C. § 548(a)(1)(B)**
**(AGAINST LIFESCIENCES DEFENDANTS AND DEFENDANTS FTX FOUNDATION AND LATONA)**

119.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 118 as if fully set forth here.

120.     FTX and Alameda made the following transfers:

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|---|---|---|---|---|
| February 4, 2022 | Platform Life Sciences Inc. | Purported "Philanthropic Gift" | $3,250,000 | FTX |
| May 26, 2022 | Platform Life Sciences Inc. | SAFE | $35,000,000 | Alameda |
| June 21, 2022 | Platform Life Sciences Inc. | Services | $15,000,000 | Alameda |
| August 9, 2022 | Lumen Bioscience, Inc. | Future Royalties | $3,000,000 | Alameda |
| August 11, 2022 | GreenLight Biosciences Holdings, PBC | Shares | $5,500,000 | Alameda |
| August 15, 2022 | Riboscience LLC | Shares | $4,000,000 | Alameda |
| August 26, 2022 | Genetic Networks LLC | Convertible Promissory Note | $3,000,000 | Alameda |
| October 6, 2022 | 4J Therapeutics Inc. | Convertible Promissory Note | $2,800,000 | Alameda |
| **Total Transferred to Lifesciences Defendants** | | | | **$71,550,000** |

121.     Each of the transfers to the Lifesciences Defendants was a transfer of property of Plaintiffs.

-29-

122.    Plaintiffs did not receive reasonably equivalent value in exchange for any of the transfers.

123.    Each of the Plaintiffs:  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiffs was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiffs' ability to repay as such debts matured; the FTX Foundation and Latona had knowledge of the abovementioned facts.

124.    Accordingly, each of these transfers incurred by Plaintiffs to the Lifesciences Defendants should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiffs may recover from the Lifesciences Defendants, the FTX Foundation, and/or Latona the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT THREE**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, § 1304(a)(1) AND 11 U.S.C. § 544(b)**
**(AGAINST LIFESCIENCES DEFENDANTS AND DEFENDANTS FTX FOUNDATION**
**AND LATONA)**

125.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 124 as if fully set forth here.

126.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq.*

127.    FTX and Alameda made the following transfers:

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|------|----------------------|------------------|--------------------|------------|
| February 4, 2022 | Platform Life Sciences Inc. | Purported "Philanthropic Gift" | $3,250,000 | FTX |
| May 26, 2022 | Platform Life Sciences Inc. | SAFE | $35,000,000 | Alameda |
| June 21, 2022 | Platform Life Sciences Inc. | Services | $15,000,000 | Alameda |
| August 9, 2022 | Lumen Bioscience, Inc. | Future Royalties | $3,000,000 | Alameda |
| August 11, 2022 | GreenLight Biosciences Holdings, PBC | Shares | $5,500,000 | Alameda |
| August 15, 2022 | Riboscience LLC | Shares | $4,000,000 | Alameda |
| August 26, 2022 | Genetic Networks LLC | Convertible Promissory Note | $3,000,000 | Alameda |
| October 6, 2022 | 4J Therapeutics Inc. | Convertible Promissory Note | $2,800,000 | Alameda |
| **Total Transferred to Lifesciences Defendants** | | | | **$71,550,000** |

128.    Each of the transfers to the Lifesciences Defendants was a transfer of property of Plaintiffs.

129.    Each of these transfers to the Lifesciences Defendants was made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims; the FTX Foundation, Latona, and Bankman-Fried knew that the transfers to the Lifesciences Defendants were made with the intent to hinder, delay, or defraud Plaintiffs' present or future creditors, including creditors who hold allowable unsecured claims. Each of the transfers is avoidable by creditors who hold allowable unsecured claims.

130.    Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, § 1304(a)(1) and 11 U.S.C. § 544(b), and Plaintiffs may recover from the Lifesciences Defendants, the FTX Foundation, and/or Latona the full amount of such transfers,

plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FOUR**
**FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)**
**(AGAINST THE LIFESCIENCES DEFENDANTS AND DEFENDANTS FTX**
**FOUNDATION AND LATONA)**

131.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 130 as if fully set forth here.

132.    Section 544(b) of the Bankruptcy Code authorizes Plaintiffs to avoid any transfer of an interest in their property or any obligation incurred by them that is voidable under applicable law by a creditor holding an allowable unsecured claim.  Accordingly, fraudulent transfers and obligations are avoidable pursuant to Bankruptcy Code Section 544(b) and other applicable law, including the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

133.    FTX and Alameda made the following transfers:

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|------|----------------------|------------------|--------------------|------------|
| February 4, 2022 | Platform Life Sciences Inc. | Purported "Philanthropic Gift" | $3,250,000 | FTX |
| May 26, 2022 | Platform Life Sciences Inc. | SAFE | $35,000,000 | Alameda |
| June 21, 2022 | Platform Life Sciences Inc. | Services | $15,000,000 | Alameda |
| August 9, 2022 | Lumen Bioscience, Inc. | Future Royalties | $3,000,000 | Alameda |
| August 11, 2022 | GreenLight Biosciences Holdings, PBC | Shares | $5,500,000 | Alameda |
| August 15, 2022 | Riboscience LLC | Shares | $4,000,000 | Alameda |
| August 26, 2022 | Genetic Networks LLC | Convertible Promissory Note | $3,000,000 | Alameda |
| October 6, 2022 | 4J Therapeutics Inc. | Convertible Promissory Note | $2,800,000 | Alameda |

-32-

| Date | Defendant/Transferee | Type of Interest | Amount of Transfer | Transferor |
|---|---|---|---|---|
| **Total Transferred to Lifesciences Defendants** | | | **$71,550,000** | |

134.     Each of the transfers to Lifesciences Defendants was a transfer of property of Plaintiffs.

135.     Plaintiffs did not receive reasonably equivalent value in exchange for any of these transfers.

136.     Each of the Plaintiffs:  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiffs were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiffs' ability to repay as such debts became due; the FTX Foundation and Latona had knowledge of the abovementioned facts.

137.     Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

138.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiffs may recover from Lifesciences Defendants, the FTX Foundation and Latona the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT FIVE**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST THE LIFESCIENCES DEFENDANTS)**

139.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 138 as if fully set forth here.

140.    As alleged above, Plaintiffs are entitled to avoid each of the transfers to the Lifesciences Defendants addressed herein under Sections 544 and 548 of the Bankruptcy Code.

141.    Because the Lifesciences Defendants are the initial transferees or the entities for whose benefit such transfers were made, Plaintiffs may recover from the Lifesciences Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT SIX**
**PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)**
**(AGAINST DEFENDANT LATONA)**

142.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 141 as if fully set forth here.

143.    As alleged herein, the Lifesciences Defendants provided to Latona substantial interests in each of the transactions in exchange for the investments made by Alameda.

144.    As alleged above, Plaintiff Alameda is entitled to avoid each of the transfers to the Lifesciences Defendants addressed herein under Sections 544 and 548 of the Bankruptcy Code.

145.    As Latona is the entity for whose benefit the transfers made by Alameda to the Lifesciences Defendants were made, Plaintiff Alameda is entitled to receive from Defendant Latona pursuant to 11 U.S.C. § 550(a)(1) the value of the transfers from Alameda to the

Lifesciences Defendants, plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of Plaintiff Alameda's bankruptcy estate.

**COUNT SEVEN**
**UNJUST ENRICHMENT**
**(AGAINST DEFENDANT LATONA)**

146.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 145 as if fully set forth here.

147.    As a result of the transfers to the Lifesciences Defendants, Latona was unjustly enriched by the receipt of the following:

a.  an entitlement to $15 million of unspecified "services" from PLS and, under the SAFE between Latona and PLS, rights to future equity and board participation rights in PLS;

b.  Future payments in connection with Lumen products that achieve FDA emergency use authorization or full approval (in which case, Latona would be entitled to future profits and licensing revenues) before a specified target approval date;

c.  1,403,061 shares in GreenLight;

d.  224,467 preferred A-2 shares in Riboscience;

e.  A $3 million promissory note from Genetic Networks convertible to equity in Genetic Networks upon the occurrence of certain triggering events; and

f.  A $2.8 million promissory note in 4J Therapeutics convertible to equity in 4J Therapeutics upon the occurrence of certain triggering events.

148.    Any and all benefits obtained by Latona as a consequence of the abovementioned transfers to the Lifesciences Defendants were funded by Alameda.  However, Alameda received no benefit in exchange for the transfers.

149.    Alameda lacks an adequate remedy at law against Latona for Latona's unjust
enrichment at Alameda's expense.

150.    Alameda seeks to recover from Latona all entitlement to services, shares, future
payments and promissory notes Latona received in exchange for the $68.3 million in investments
that Latona made using money from Alameda.

## COUNT EIGHT
## DISALLOWANCE OF CLAIMS PURSUANT TO 11 U.S.C. § 502(d) (AGAINST ALL DEFENDANTS)

151.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 150 as if
fully set forth here.

152.    As alleged above, Defendants are transferees or beneficiaries of transfers
avoidable under Sections 544 and 548 of the Bankruptcy Code and entities from which property
is recoverable under Section 550 of the Bankruptcy Code.

153.    By reason of the foregoing facts and pursuant to Section 502(d) of the Bankruptcy
Code, any claims of Defendants that have been or will in the future be asserted in these
Chapter 11 Cases should be disallowed unless and until Defendants have relinquished to
Plaintiffs the property transferred, or have paid Plaintiffs the value of such transferred property,
for which and to the extent that the Court has determined Defendants are liable pursuant to
Section 550 of the Bankruptcy Code.

## COUNT NINE
## BREACH OF FIDUCIARY DUTIES PURSUANT TO BRITISH VIRGIN ISLANDS LAW (AGAINST DEFENDANT BANKMAN-FRIED)

154.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 153 as if
fully set forth here.

155.    At all relevant times, Bankman-Fried owed fiduciary duties—including duties of
care, loyalty, good faith, fair dealing, and oversight—to Alameda under the law of the British

Virgin Islands.  Bankman-Fried was required to act in Alameda's best interests, and not for his

personal benefit.

156.    By causing Alameda to make the transfers to the Lifesciences Defendants, in

exchange for which Alameda did not receive, and had virtually no prospect of receiving,

reasonably equivalent value, and from which Bankman-Fried personally benefited, Bankman-

Fried breached his fiduciary duties to Alameda.

157.    Bankman-Fried breached his fiduciary duties by, among other things:

    a.  Failing to implement or cause to be implemented internal controls that
would have prevented the wrongdoing alleged herein;

    b.  Actively contributing to a lack of internal controls that would have
prevented the wrongdoing alleged herein;

    c.  Participating in and enabling a fraudulent scheme to commingle customer
and corporate funds for misuse by Bankman-Fried for his personal benefit;

    d.  Authorizing and engaging in extensive self-dealing;

    e.  Approving and facilitating purported investments funded by Alameda
without due diligence as to their actual value and merit and with no upside
for Alameda;

    f.  Failing to exercise any meaningful oversight of the affairs of Alameda;

    g.  Abusing or allowing abuse of positions of authority in Alameda for the
personal gain of Bankman-Fried and to the detriment of Alameda; and

    h.  Investing tens of millions of dollars of commingled customer and
corporate funds in companies wholly unrelated to Alameda's business.

158.    Bankman-Fried, in breaching his fiduciary duties of care, loyalty, and good faith

(among others), showed a conscious disregard for the best interests of Alameda.

159.    As a direct and proximate result of Bankman-Fried's breaches of duty, Alameda

suffered damages in the amount of $68.3 million.

**COUNT TEN**
**BREACH OF FIDUCIARY DUTIES PURSUANT TO ANTIGUA AND BARBUDA LAW**
**(AGAINST DEFENDANT BANKMAN-FRIED)**

160.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 159 as if fully set forth here.

161.    At all relevant times, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing, and oversight—to FTX under the law of Antigua and Barbuda.  Bankman-Fried was required to act in FTX's best interests, and not for his personal benefit.

162.    By causing FTX to make the transfer to PLS, in exchange for which FTX did not receive, and had virtually no prospect of receiving, reasonably equivalent value, and from which Bankman-Fried personally benefited, Bankman-Fried breached his fiduciary duties to FTX.

163.    Bankman-Fried breached his fiduciary duties by, among other things:

   a.  Failing to implement or cause to be implemented internal controls that would have prevented the wrongdoing alleged herein;

   b.  Actively contributing to a lack of internal controls that would have prevented the wrongdoing alleged herein;

   c.  Participating in and enabling a fraudulent scheme to commingle customer and corporate funds for misuse by Bankman-Fried for his personal benefit;

   d.  Authorizing and engaging in extensive self-dealing;

   e.  Approving and facilitating purported donations funded by FTX without due diligence as to their merit and with no value for FTX;

   f.  Failing to exercise any meaningful oversight over the affairs of FTX;

   g.  Abusing or allowing abuse of positions of authority in FTX for the personal gain of Bankman-Fried and to the detriment of FTX; and

   h.  Investing millions of dollars of commingled customer and corporate funds in companies wholly unrelated to FTX's business.

164.     Bankman-Fried, in breaching his fiduciary duties of care, loyalty, and good faith (among others), showed a conscious disregard for the best interests of FTX.

165.     As a direct and proximate result of Bankman-Fried's breaches of duty, FTX suffered damages in the amount of $3.25 million.

**COUNT ELEVEN**
**KNOWING ASSISTANCE IN BANKMAN-FRIED'S BREACH OF FIDUCIARY**
**DUTIES UNDER BRITISH VIRGIN ISLANDS LAW**
**(AGAINST DEFENDANT RHEINGANS-YOO)**

166.     Plaintiffs repeat and reallege the allegations in paragraphs 1 through 165 as if fully set forth here.

167.     At all relevant times, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing, and oversight—to Alameda under the law of the British Virgin Islands.  Bankman-Fried was required to act in Alameda's best interests, and not for his personal benefit.

168.     By causing Alameda to make the transfers to the Lifesciences Defendants, in exchange for which Alameda did not receive, and had virtually no prospect of receiving, reasonably equivalent value, and from which Bankman-Fried personally benefited, Bankman-Fried breached his fiduciary duties to Alameda.

169.     Rheingans-Yoo knew that the transactions with the Lifesciences Defendants did not provide and had virtually no prospect of providing Alameda with reasonably equivalent value, and that Bankman-Fried personally benefited from the transactions.  Rheingans-Yoo thus knowingly assisted in and/or failed to prevent Bankman-Fried's breaches of fiduciary duty to Alameda.

170.    As a result of Bankman-Fried's breaches of fiduciary duty in connection with the transfers made to the Lifesciences Defendants, and Rheingans-Yoo's knowing assistance in those breaches, Alameda suffered damages in the amount of $68.3 million.

**COUNT TWELVE**
**AIDING AND ABETTING BANKMAN-FRIED'S BREACH OF FIDUCIARY DUTIES**
**UNDER ANTIGUA AND BARBUDA LAW**
**(AGAINST DEFENDANTS BECKSTEAD AND RHEINGANS-YOO)**

171.    Plaintiffs repeat and reallege the allegations in paragraphs 1 through 170 as if fully set forth here.

172.    At all relevant times, Bankman-Fried owed fiduciary duties—including duties of care, loyalty, good faith, fair dealing, and oversight—to FTX under the law of Antigua and Barbuda.  Bankman-Fried was required to act in FTX's best interests, and not for his personal benefit.

173.    By causing FTX to make the transfer to PLS, in exchange for which FTX did not receive, and had virtually no prospect of receiving, reasonably equivalent value, and from which Bankman-Fried personally benefited, Bankman-Fried breached his fiduciary duties to FTX.

174.    Beckstead and Rheingans-Yoo knew that the transfer to PLS funded by FTX did not provide and had virtually no prospect of providing FTX with reasonably equivalent value, and that Bankman-Fried personally benefited from the transaction.  Beckstead and Rheingans-Yoo thus aided and abetted Bankman-Fried's breaches of fiduciary duty to FTX.

175.    As a result of Bankman-Fried's breaches of fiduciary duty in connection with the transfer made to the PLS, and Beckstead and Rheingans-Yoo aiding and abetting those breaches, FTX suffered damages in the amount of $3.25 million.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully pray that this Court:

176.   Enter an order that the transfers addressed herein are avoidable fraudulent transfers under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

177.   Enter an order that Rheingans-Yoo and Beckstead aided and abetted and/or knowingly assisted in Bankman-Fried's breach of his fiduciary duties to Alameda and FTX, and ordering damages to be paid in an amount to be determined by this Court;

178.   Enter an order requiring Latona to provide restitution to Plaintiffs for its unjust enrichment;

179.   Award Plaintiffs under 11 U.S.C. § 550 no less than $71,550,000 (plus the value of any additional avoidable transfers that Plaintiffs learn, through formal discovery or otherwise, were made to Defendants during the Avoidance Period);

180.   Enter an order under 11 U.S.C. § 502(d) disallowing any and all claims filed or held by the Lifesciences Defendants, the FTX Foundation and Latona in these Chapter 11 Cases unless and until such Defendants relinquish to Plaintiffs the amount ordered as an award for avoidable transfers;

181.   Award Plaintiffs their attorneys' fees, pre- and post-judgment interests, and costs of suit; and

182.   Award Plaintiffs all other relief, at law or equity, to which they may be entitled.

Dated:  December 22, 2023
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Matthew B. McGuire (No. 4366)
Kimberly A. Brown (No. 5138)
Matthew R. Pierce (No. 5946)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
      mcguire@lrclaw.com
      brown@lrclaw.com
      pierce@lrclaw.com

-and-

**SULLIVAN & CROMWELL LLP**
Steven L. Holley (admitted *pro hac vice*)
Stephanie G. Wheeler (admitted *pro hac vice*)
Brian D. Glueckstein (admitted *pro hac vice*)
Christopher J. Dunne (admitted *pro hac vice*)
Jacob M. Croke (admitted *pro hac vice*)
125 Broad Street
New York, NY 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
E-mail:  holleys@sullcrom.com
      wheelers@sullcrom.com
      gluecksteinb@sullcrom.com
      dunnec@sullcrom.com
      crokej@sullcrom.com
*Counsel for the Debtors*
*and Debtors-in-Possession*